ORIGINAL

1   JOSEPH J. TABACCO, JR.  #75484
    Email:  jtabacco@bermanesq.com
2   NICOLE LAVALLEE #165755
    Email:  nlavallee@bermanesq.com
3   LESLEY HALE #237726
    Email:  lhale@bermanesq.com
4   BERMAN DeVALERIO PEASE TABACCO
    BURT & PUCILLO
5   425 California Street, Suite 2100
    San Francisco, CA 94104
6   Telephone:  (415) 433-3200
    Facsimile:   (415) 433-6382
7
8   *Liaison Counsel for Lead Plaintiff and the Class*

9   THOMAS A. DUBBS (admitted *pro hac vice*)
    Email:  tdubbs@labaton.com
10  JOSEPH A. FONTI (admitted *pro hac vice*)
    Email:  jfonti@labaton.com
11  STEPHEN W. TOUNTAS (admitted *pro hac vice*)
    Email:  stountas@labaton.com
12  MICHAEL H. ROGERS (admitted *pro hac vice*)
    Email:  mrogers@labaton.com
13  LABATON SUCHAROW LLP
    140 Broadway
14  New York, New York  10005
    Telephone:  (212) 907-0700
15  Facsimile:  (212) 818-0477

16  *Lead Counsel for Lead Plaintiff New Mexico State
    Investment Council and the Class*

17
18                  **UNITED STATES DISTRICT COURT**
                    **CENTRAL DISTRICT OF CALIFORNIA**
                           **WESTERN DIVISION**

19
20  SONAM BAKSHI, On Behalf of          )   Civ. Action No.: 2:06-CV-05036-R-CW
    Himself and All Others Similarly    )
    Situated,                           )   **CONSOLIDATED CLASS ACTION**
21                                      )   **COMPLAINT**
                        Plaintiff,      )
22                                      )   **CLASS ACTION**
            vs.                         )
23                                      )   Honorable Manuel L. Real
    HENRY SAMUELI, et al.               )
24                                      )
                        Defendants.     )
25                                      )
26
27
28

RECEIVED
BUT NOT FILED

APR 21 2008

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

APR 2 1 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                       DEPUTY

BY FAX

1    Lead Plaintiff New Mexico State Investment Council ("Lead Plaintiff"),

2    individually and on behalf of all other persons and entities who purchased or

3    otherwise acquired the Class A common stock of Broadcom Corp. ("Broadcom" or

4    the "Company") during the period between July 21, 2005 and July 13, 2006, inclusive,

5    (the "Class Period"), hereby alleges the following based upon personal knowledge as

6    to itself and its own acts, and upon information and belief as to all other matters.

7    Lead Plaintiff's allegations are based on Lead Counsel's investigation, which

8    included, among other things: (i) a review and analysis of Broadcom's public filings

9    with the U.S. Securities and Exchange Commission ("SEC"); (ii) a review and

10   analysis of other publicly available information concerning Broadcom and its

11   historical stock option practices; and (iii) interviews with former Broadcom

12   employees, each of whom have specific, personal knowledge of facts alleged herein.

13   Lead Plaintiff believes that substantial additional evidentiary support will exist for its

14   allegations after a reasonable opportunity for discovery.

15   **I.     NATURE OF THE ACTION**

16          **Overview of Defendants' Fraud**

17          1.     From Broadcom's inception as a public company in 1998 through the end

18   of the Class Period (the "Relevant Period"), certain of Broadcom's senior officers and

19   directors—including its co-founders, Henry Samueli ("Samueli") and Henry T.

20   Nicholas III ("Nicholas")—orchestrated a fraudulent scheme to inflate Broadcom's

21   stock price by backdating, and failing to properly account for, "most" of the

22   Company's stock option grants between April 1998 and May 2003.

23          2.     As alleged herein, the admitted backdating at Broadcom was

24   unprecedented in magnitude, involving options to purchase over ***239 million shares***

25   and resulting in a ***$2.2 billion*** restatement—the largest restatement ever due to options

26   backdating. Indeed, when Broadcom restated its historic financial statements for 1998

27   through 2005 (the "Restatement"), the Company, as well as its independent auditor

28

1

1   Ernst & Young LLP ("E&Y"), admitted that every financial statement and quarterly
2   and annual report that Broadcom had ever issued as a public company was materially
3   false and misleading.  The amount of the Restatement is only matched by the amount
4   of the individual defendants' profit from the scheme.

5       3.      On the heels of Broadcom's admissions, the Securities and Exchange
6   Commission (the "SEC") launched a formal investigation into Broadcom's stock
7   option practices, and the U.S. Attorney's Office for the Central District of California
8   (the "USAO") initiated a grand jury investigation.  Both investigations are still
9   ongoing, and have already resulted in at least one guilty plea.

10      4.      At the center of the fraud were Broadcom's co-founders, defendants
11  Samueli and Nicholas, who, sitting as the Company's two-person Options Committee,
12  determined the terms, including the grant date and strike price, of the Company's
13  backdated option grants.  Documents uncovered by the SEC and USAO confirm that,
14  at all relevant times, Nicholas and Samueli were active participants in the backdating
15  scheme.

16  **Fraudulently Backdated Options Were Central to Broadcom's Success**

17      5.      Broadcom's issuance of backdated stock options was central to its
18  perceived success.  Stock options were Broadcom's principal tool to recruit, retain,
19  and motivate employees, including highly sought-after technical personnel and
20  engineers needed to implement Broadcom's business plan.

21      6.      Among its peers, Broadcom was well known for paying below-market
22  salaries.  To attract and maintain employees, the Company depended upon stock
23  options to entice prospective employees, and offer competitive compensation.  To
24  minimize the costs of using options, defendants fraudulently selected the lowest
25  available historic stock price for option grants, thus ensuring that such options were
26  "in-the-money" at the time of grant.  Notwithstanding its clear requirement under
27  Generally Accepted Accounting Principles ("GAAP") and its own public disclosures,
28

2

1  Broadcom repeatedly failed to record a compensation expense for its issuance of in-
2  the-money options.  As a result, throughout the Relevant Period, the Company
3  materially overstated its reported net income and materially understated its reported
4  compensation expense.

5  <u>**The Scheme Artificially Inflated Broadcom's Stock Price**</u>

6       7.  Defendants' scheme did not end with their backdating of stock options.
7  Once the opportunity to profit from backdating was mitigated as a result of reforms
8  imposed under the Sarbanes-Oxley Act of 2002 ("SOX"), defendants continued to
9  falsify Broadcom's financial statements, fraudulently inflating Broadcom's reported
10 earnings through the end of the Class Period.

11      8.  Chief among defendants' concerns was Broadcom's inability to meet
12 Wall Street's and investors' expectations and retain key personnel if forced to
13 recognize the true cost of the backdated options.  At all relevant times, defendants
14 expressly recognized that if they disclosed the truth about their stock option practices
15 and Broadcom's actual financial performance the Company's share price would be
16 pummeled.

17      9.  Indeed, this is exactly what happened when the truth about the
18 Company's historical stock option practices was revealed to the market.  For example,
19 on May 22, 2006, investors learned that, between 1997 and 2002, Broadcom's stock
20 price consistently generated "excess" returns (*i.e.* increased relative to the stock
21 index), within 20 days after its issuance of incentive stock option grants.  That same
22 day, Broadcom's stock price dropped almost 8% from $37.20 per share to $34.34 per
23 share, wiping out more than $1.34 billion in market capitalization.

24      10.  As Broadcom admitted in the Restatement, but for the fraudulent
25 conduct, the Company's true earnings were far below the market's expectations
26 throughout its history as a public company.  Moreover, as illustrated in the chart
27 below, instead of consistently meeting or beating analysts' expectations from 1998
28

3

through the end of the Class Period, the Company would have missed its earnings targets each and every year since 1998.

| Fiscal Year or Quarter | Reported EPS (split adjusted) | Restated EPS |
|---|---|---|
| 1998 | $0.07 | $0.04 |
| 1999 | $0.21 | $0.07 |
| 2000 | $(2.08) | $(2.91) |
| 2001 | $(7.02) | $(9.60) |
| 2002 | $(5.56) | $(6.93) |
| 2003 | $(2.19) | $(2.95) |
| 2004 | $0.42 | $0.33 |
| 2005 | $0.73 | $0.66 |

**Defendants Executed The Scheme With Scienter**

11.     As detailed herein, Defendants acted with fraudulent scienter in selecting, approving, and failing to disclose the Company's issuance of backdated options. Indeed, faced with the findings of its internal investigation, the Company admitted the fraudulent role of its chief executives.   Notably, in the Restatement Broadcom admitted that "*[t]here is substantial evidence Dr. Nicholas was at times involved with the selection of grant dates after the fact* and with subsequent allocations of grants." (emphasis added).   Moreover, with respect to its former CFO, William J. Ruehle ("Ruehle"), the Company admitted that "*[t]here is substantial evidence [Ruehle] engaged in the selection of grant dates after the fact*."   (emphasis added).

12.     Defendants' scienter is also demonstrated by a statistical analysis of the Company's option grants, which routinely occurred at or near the lowest closing price in the calendar month.  As detailed below, the odds of defendants randomly picking the lowest monthly stock prices to grant options to themselves and Broadcom's key employees are worse than *1 in 32,000*.

1       13.    On a personal level, defendants reaped an extraordinary financial benefit

2  from their fraudulent scheme, not only from their receipt of backdated options, but

3  from their sales of Broadcom's stock at artificially inflated prices.  During the Class

4  Period, alone, defendants' insider trading proceeds exceeded *$134 million*, and during

5  the Relevant Period exceeded *$2 billion*.

6       **Ernst & Young Had Knowledge of the Fraud**

7       14.    The fraud was perpetrated with the knowing participation of the

8  Company's independent auditor, E&Y.  By no later than July 2000, E&Y knew that

9  Broadcom's publicly reported financial statements were materially false and

10  misleading, yet nonetheless signed an unqualified audit opinion for each fiscal year

11  during the Relevant Period.

12       15.    For example, on May 26, 2000, the Company purportedly issued a block

13  option grant, the single largest grant in Broadcom's history.  Tellingly, on that same

14  date, the Company's stock price closed at $118 per share, its lowest closing price in

15  nearly a *one year period*.  On or about July 2000, the Company's delay in allocating

16  these options caught the attention of E&Y, as Broadcom's stock price had increased

17  from $118 per share to well over $200 per share.

18       16.    E&Y confronted its client over the suspicious grant, and learned that the

19  options had been backdated in violation of GAAP.  Notwithstanding E&Y's actual

20  knowledge that the May 26, 2000 option grant was not allocated until *months after*

21  the purported grant date, and that such options were already in-the-money by more

22  than $82 per share, E&Y did not require the Company to record a compensation

23  expense (as required under GAAP), which would have exceeded *$700 million,*

24  amortized over the options' four-year vesting period.

25       17.    Moreover, once E&Y learned about Broadcom's improper stock option

26  practices in connection with the May 26, 2000 option grant, it compounded its

27  deliberate recklessness by failing to reevaluate whether the Company's stock option

28

1  practices complied with GAAP during subsequent audit years. Thus, during the Class
2  Period, E&Y fraudulently issued its unqualified audit report knowing full well that
3  Broadcom's financial statements were misstated in excess of $2 billion.

4        18.    E&Y was highly compensated for the accounting and auditing services
5  that it provided to Broadcom. In sum, between 2000 and 2006, the Company paid
6  E&Y more than *$19.6 million*, more than $17 million of which stemmed from audit
7  and audit-related services.

8        19.    In March 2008, the Company issued a press release announcing its
9  decision to replace E&Y as its longstanding auditor. Tellingly, the Company's press
10  release stated that it decided to replace E&Y "as part of [its] ongoing efforts to
11  enhance its corporate governance practices."

12        20.    As detailed herein, defendants' fraudulent scheme was carried out with
13  deliberation, injuring Lead Plaintiff and members of the Class who purchased
14  Broadcom's artificially inflated shares.

15  **II.    JURISDICTION AND VENUE**

16        21.    The claims asserted herein arise under and pursuant to Sections 10(b) and
17  20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b)
18  and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

19        22.    This Court has jurisdiction over the subject matter of this action pursuant
20  to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C § 78aa.

21        23.    Venue is proper in this District pursuant to Section 27 of the Exchange
22  Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the
23  preparation and dissemination of materially false and misleading information,
24  occurred in substantial part in this District and Broadcom conducts business in this
25  District.

26        24.    In connection with the acts alleged herein, defendants, directly or
27  indirectly, used the means and instrumentalities of interstate commerce, including, but
28

1  not limited to, the mails, interstate telephone communications and the facilities of the

2  national securities markets, including NASDAQ.

3  **III.    PARTIES**

4  **A.    Lead Plaintiff**

5       25.    Lead Plaintiff New Mexico State Investment Council is a non-cabinet

6  level agency reporting to the Governor of New Mexico, organized under the laws of

7  the State of New Mexico.  As set forth in the certification attached hereto as Exhibit

8  A, Lead Plaintiff purchased shares of Broadcom Class A common stock during the

9  Class Period at artificially inflated prices and suffered damages as a result of the

10 violations of the Exchange Act alleged herein.

11 **B.    Defendant Broadcom**

12      26.    Defendant Broadcom provides semiconductors for wired and wireless

13 communications products that enable the delivery of voice, video, data, and

14 multimedia to and throughout the home, the office, and the mobile environment.

15 Broadcom is incorporated in California and maintains its principal place of business

16 and chief executive offices at 16215 Alton Parkway, Irvine, CA 92618.   The

17 Company's Class A shares of common stock are publicly traded on NASDAQ.

18 **C.    The Individual Defendants**

19      27.    Defendant Samueli has served as Broadcom's Chief Technical Officer

20 since co-founding the Company in 1991.  From 1991 through 2003, Samueli served as

21 Co-Chairman of the Board, and has served as the sole Chairman since 2003.  As one

22 of two members of the Options Committee, Samueli granted and approved the

23 issuance of backdated options to the Company's non-Section 16 officers between

24 April 1998 and May 2003, when Broadcom admittedly issued backdated stock

25 options.  Samueli signed Broadcom's false and misleading Form 10-K for fiscal 2005.

26 As of March 2007, Samueli controlled 29.7% of the Company's voting stock.  At the

27 time Broadcom issued its annual report on Form 10-K during the Class Period,

28

7

1  Samueli fraudulently knew that it contained materially false and misleading financial
2  statements.  Samueli sold more than 1.8 million shares of Broadcom stock during the
3  Class Period, reaping gross proceeds in excess of $90 million.

4       28.     Defendant Nicholas co-founded Broadcom with Samueli, and served as
5  President, Chief Executive Officer ("CEO") and Co-Chairman from the Company's
6  inception until his resignation in January 2003.  As one of two members of the
7  Options Committee, Nicholas granted and approved the issuance of backdated options
8  to the Company's non-Section 16 officers between April 1998 and May 2003, when
9  Broadcom admittedly issued backdated stock options.  Since leaving Broadcom,
10 Nicholas has continued to own a significant percentage of Company's stock, and
11 through the Nicholas Family Trust controlled 29.3% of the Company's voting stock as
12 of March 2007.  At the time Broadcom issued its annual report on Form 10-K during
13 the Class Period, Nicholas fraudulently knew that it contained materially false and
14 misleading financial statements.  Nicholas, together with the Nicholas Family Trust,
15 sold more than 36.2 million shares of Broadcom stock during the Relevant Period,
16 reaping gross proceeds in excess of $875 million.

17      29.     Defendant Ruehle served as the Company's Chief Financial Officer
18 ("CFO") from 1997 until his "resignation" on September 19, 2006.  As Broadcom's
19 CFO, Ruehle signed and certified each of Broadcom's false and misleading financial
20 statements during the Class Period, including the Company's Form 10-K for fiscal
21 2005, and the Form 10-Qs for each fiscal quarter of 2005 and the first fiscal quarter of
22 2006.  Upon information and belief, and based upon Lead Plaintiff's investigation,
23 Ruehle hand-picked many of the grant dates for the backdated option grants.  At the
24 time Broadcom issued its annual report on Form 10-K during the Class Period, Ruehle
25 fraudulently knew that it contained materially false and misleading financial
26 statements.  Ruehle sold 210,000 shares of Broadcom stock during the Class Period,
27 reaping gross proceeds of more than $10.5 million.
28

30.     Defendant David A. Dull ("Dull") has served as Broadcom's General Counsel and Secretary since April 1998.  Until 1998, Dull was a partner in the law firm of Irell & Manella LLP, the Company's counsel in this Action.  Upon information and belief, and based upon Lead Plaintiff's investigation, Dull prepared unanimous written consents for Nicholas and Samueli between April 1998 and May 2003, which approved Broadcom's issuance of backdated options.  At the time Broadcom issued its annual report on Form 10-K during the Class Period, Dull fraudulently knew that it contained materially false and misleading financial statements.  Dull sold more than 197,000 shares of Broadcom stock during the Class Period, reaping gross proceeds in excess of $9.7 million.

31.     Defendant Alan E. Ross ("Ross") served as Broadcom's President and Chief Executive Officer from January 2003 through January 2005, and has served as a director since November 1995.  Between 1998 and November 2002, Ross served simultaneously on the Audit Committee and Compensation Committee.  Further, from March 2004 through March 2006, Ross served as Chairman of the Equity Award Committee.  Ross signed the Company's false and misleading Form 10-K for 2005 and, as a member of the Compensation Committee, determined and approved the terms of the Company's backdated option grants to Section 16 officers between April 1998 and May 2003.  In addition, as a member of the Compensation Committee and Audit Committee, Ross either knew or recklessly disregarded that Broadcom's historical stock option practices failed to comply with GAAP and the Company's stated accounting policies.  At the time Broadcom issued its annual report on Form 10-K during the Class Period, Ross fraudulently knew that it contained materially false and misleading financial statements.  Ross sold 333,432 shares of Broadcom stock during the Class Period, reaping gross proceeds in excess of $14.3 million.

32.     Defendant Werner F. Wolfen ("Wolfen") has served as a director of Broadcom and its predecessor since July 1994, and was elected "Lead Independent

9

1    Director" in May 2003.  Wolfen has served as a member of Broadcom's Audit
2    Committee since 1998, and has simultaneously served on the Compensation and Audit
3    Committees from November 2002 through present, including acting as Chairman of
4    the Compensation Committee from April 2003 through March 2006. Wolfen was also
5    a senior partner in the law firm of Irell & Manella LLP until 1998. Wolfen signed
6    Broadcom's false and misleading Form 10-K for 2005 and, as a member of the
7    Compensation Committee, determined and approved the terms of Broadcom's
8    backdated option grants to Section 16 officers between November 2002 and May
9    2003.    In addition, as a member of the Compensation Committee and Audit
10   Committee, Wolfen either knew or recklessly disregarded that Broadcom's historical
11   stock option practices failed to comply with GAAP and the Company's stated
12   accounting policies. At the time Broadcom issued its annual report on Form 10-K
13   during the Class Period, Wolfen fraudulently knew that it contained materially false
14   and misleading financial statements.  Wolfen sold more than 107,000 shares of
15   Broadcom stock during the Class Period, reaping gross proceeds in excess of $4.7
16   million.

17        33.    Defendant George L. Farinsky ("Farinsky") has served as a director of
18   Broadcom since February 2002. Farinsky has served on the Audit Committee since
19   November  2002,  and  served  simultaneously  on  the  Audit  Committee  and
20   Compensation Committee from April 2003 through March 2006. Farinsky signed
21   Broadcom's false and misleading Form 10-K for 2005 and, as a member of the
22   Compensation  Committee  and  Audit  Committee,  either  knew  or  recklessly
23   disregarded that Broadcom's historical stock option practices failed to comply with
24   GAAP and the Company's stated accounting policies. At the time Broadcom issued
25   its annual report on Form 10-K during the Class Period, Farinsky fraudulently knew
26   that it contained materially false and misleading financial statements.

27

28

34.    Samueli, Nicholas, Ruehle, Dull, Ross, Wolfen and Farinsky are collectively referred to herein as the "Individual Defendants." The Individual Defendants together with the Company are referred to herein as the "Broadcom Defendants."

35.    Samueli, Nicholas, Ruehle and Dull, by virtue of their positions as Broadcom's senior executive officers, directly participated in the management of Broadcom, and were directly involved in the day-to-day operations of Broadcom at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. In addition, Samueli, Nicholas, Ruehle and Dull were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, the fact that the false and misleading statements were being issued by the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.    As officers and controlling persons of a publicly-held company whose shares are registered with the SEC and traded on NASDAQ, Samueli, Nicholas, Ruehle and Dull had a duty to disseminate promptly, accurate and truthful information with respect to Broadcom, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded Class A common stock would be based upon truthful and accurate information. Samueli, Nicholas, Ruehle and Dull each violated these specific requirements and obligations during the Class Period.

37.    Ross, Wolfen and Farinsky participated in the drafting, preparation and/or approval of the Company's publicly filed financial statements, and were aware of, or recklessly disregarded, that those public filings were materially false and misleading. Because of their membership on the Board, the Compensation Committee

1  and the Audit Committee, each of these defendants were responsible for
2  "administering," reviewing and approving the terms of Broadcom's option grants to
3  Section 16 officers, as well as "reviewing" and "monitoring" the Company's corporate
4  financial reporting.  Ross, Wolfen and Farinsky each had access to non-public
5  information concerning the Company's historical stock option practices, and either
6  knew or recklessly disregarded the fact that Broadcom's issuance of backdated stock
7  options failed to comply with GAAP and the Company's stated accounting policies.

8      38.    The Individual Defendants are liable as participants in a fraudulent
9  scheme and course of business that operated as a fraud or deceit on purchasers of
10 Broadcom's Class A common stock by disseminating materially false and misleading
11 statements and/or concealing material adverse facts with respect to the statements
12 concerning Broadcom's stock option practices, as alleged herein.  The scheme:
13 (i) deceived the investing public regarding Broadcom's business, operations,
14 management and the intrinsic value of Broadcom's Class A common stock;
15 (ii) permitted certain of the Individual Defendants to receive substantial sums of
16 backdated stock options; (iii) caused Broadcom to materially understate its reported
17 compensation expense and materially overstate its reported net income; and
18 (iv) caused Lead Plaintiff and other members of the Class to purchase Broadcom
19 Class A common stock at artificially inflated prices.

20 **D.    Ernst & Young**

21     39.    Defendant Ernst & Young LLP ("E&Y") is a Delaware limited liability
22 partnership headquartered in New York, NY.  E&Y provided auditing services to
23 Broadcom at all relevant times, from its initial public offering in April 1998 through
24 the end of the Class Period, including, without limitation, conducting audits of the
25 Company's year-end financial statements.  E&Y played an integral part in the
26 conduct, acts and omissions alleged herein and, by no later than July 2000, either
27 knew or deliberately disregarded that Broadcom's option granting practices failed to
28

1  comply with GAAP and the Company's stated accounting policies.  Between 2000

2  and 2006, Broadcom paid E&Y $19.6 million in fees, more than $17.1 million of

3  which related to E&Y's auditing services.

4      40.    E&Y, together with the Broadcom Defendants, are collectively referred

5  to herein as "Defendants."

6  **IV.**    **CLASS ACTION ALLEGATIONS**

7      41.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule

8  of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and

9  entities who purchased or otherwise acquired Broadcom Class A common stock

10  between July 21, 2005 and July 13, 2006, inclusive, and who were damaged thereby

11  (the "Class").  Excluded from the Class are Defendants, the officers and directors of

12  the Company, members of their immediate families and their legal representatives,

13  heirs, successors or assigns, any entity in which the Broadcom Defendants have or had

14  a controlling interest, and any Broadcom employee who acquired Broadcom's Class A

15  common stock through their exercise of incentive stock options during the Relevant

16  Period.

17      42.    The members of the Class are so numerous that joinder of all members is

18  impracticable.  Throughout the Class Period, Broadcom stock was actively traded on

19  the NASDAQ.  While the exact number of Class members is unknown to Lead

20  Plaintiff at this time and can only be ascertained through appropriate discovery, Lead

21  Plaintiff believes that there are thousands of member in the proposed Class.  Record

22  owners and other members of the Class may be identified from records maintained by

23  Broadcom or its transfer agent and may be notified of the pendency of this action by

24  mail, using a form of notice similar to that customarily used in securities class actions.

25      43.    Lead Plaintiff's claims are typical of the claims of the members of the

26  Class as all members of the Class are similarly affected by Defendants' wrongful

27  conduct in violation of federal law complained of herein.

28

13

1    44.    Lead Plaintiff will fairly and adequately protect the interests of the

2    members of the Class and has retained counsel competent and experienced in class

3    and securities litigation.

4    45.    Common questions of law and fact exist as to all members of the Class

5    and predominate over any questions solely affecting individual members of the Class.

6    Among the questions of law and fact common to the Class are:

7        (a)    whether the federal securities laws were violated by Defendants' acts as

8            alleged herein;

9        (b)    whether statements made by Defendants to the investing public during

10           the Class Period misrepresented material facts about the business and

11           operations of Broadcom;

12       (c)    the extent to which the prices of Broadcom's publicly traded Class A

13           common stock was artificially inflated during the Class Period; and,

14       (d)    the extent to which members of the Class have sustained damages and

15           the proper measure of damages.

16   46.    A class action is superior to all other available methods for the fair and

17   efficient adjudication of this controversy since joinder of all members is

18   impracticable.  Furthermore, as the damages suffered by individual Class members

19   may be relatively small, the expense and burden of individual litigation make it

20   impossible for members of the Class to individually redress the wrongs done to them.

21   There will be no difficulty in the management of this case as a class action.

22   **V.    SUBSTANTIVE ALLEGATIONS**

23   **A.    Options Backdating – The "Ultimate Greed"**

24   47.    Options backdating is akin to betting on a horse race after the horse has

25   crossed the finish line.  With the benefit of hindsight, the executives or directors

26   tasked with administering their company's option grants can monitor the trends of

27

28

14

1   their company's stock price, and thus ensure that the options they award to themselves
2   and their colleagues are "in-the-money" at the time of the grant.

3        48.    As discussed below, companies that grant in-the-money options are
4   required to record a compensation expense, and to amortize that expense over the
5   vesting period of the option grant. Failing to record that compensation expense results
6   in an understatement of the company's reported compensation costs and an
7   overstatement of the company's reported net income, not only in the year of the option
8   grant, but in each subsequent year until the option fully vests.

9        49.    Commentators like former SEC Chairman Arthur Levitt have declared
10  that backdating "represents the ultimate in greed. It is stealing, in effect. It is ripping
11  off shareholders in an unconscionable way." Charles Forelle and James Bandler, *Five*
12  *More Companies Show Questionable Options Pattern*, The Wall Street Journal, May
13  22, 2006.

14       50.    Similarly, in testimony before the U.S. Committee on Banking, Housing,
15  and Urban Affairs on September 6, 2006, SEC Chairman Christopher Cox explained
16  why options backdating schemes, such as Broadcom's, cause "real harm" to
17  companies and their shareholders:

18            There are many variations on the backdating theme. But
19            here is a typical example...: They granted an "in-the-
20            money" option – that is, an option with an exercise price
21            lower than that day's market price. They did this by
22            misrepresenting the date of the option grant, to make it
23            appear that the grant was made on an earlier date when the
24            market value was lower. That, of course, is what is meant
25            by abusive "backdating" in today's parlance.

26
27            The purpose of disguising an in-the-money option through
              backdating is to allow the person who gets the option grant
28

1    to realize larger potential gains – without the company

2    having to show it as compensation on the financial

3    statements.

4

5    Rather obviously, this fact pattern results in a violation of

     the SEC's disclosure rules, a violation of accounting rules,

6    and also a violation of the tax laws.

7

8    (http://www.sec.gov/news/testimony/2006/ts090606cc.htm).

9        51.    Moreover, Harvey Pitt, former Chairman of the SEC, proclaimed that

10   "[t]hose who backdate options grants violate federal and state law.  And those on

11   whose watch this conduct occurs are also potentially liable:  *If they knew about the*

12   *backdating, they're participants in fraudulent and unlawful conduct.*  If they didn't

13   know about the backdating, the question will be:  Should they have done more to

14   discover it?" (emphasis added). Harvey Pitt, *The Next Big Scandal*, Forbes, May 26,

15   2006.

16       52.    As demonstrated below, the Individual Defendants engaged in a long-

17   term, fraudulent backdating scheme at Broadcom, which caused the Company to

18   overstate its reported net income by more than *$2.2 billion*, and ultimately required

19   the Company to restate its previously issued financial statements for every fiscal year

20   from 1998—its first year as a public company—through 2005.   Tellingly, the

21   Individual Defendants profited from their scheme, cashing out stocks and options for

22   over *$2 billion* during the Relevant Period.

23       **1.**    **How Stock Options Are Intended To Work**

24       53.    Stock options are agreements that allow an officer, employee or director

25   to purchase shares of a public company at a specific price—known as the "exercise

26   price" or "strike price"—on or after a predetermined date.  Employee stock options

27   serve a dual purpose: they yield a profit to employees when the market price of the

28

16

1  company's common stock exceeds the strike price, and they align the interests of the

2  company's employees with its shareholders.  As described below, a company incurs a

3  compensation expense for its issuance of incentive options when the exercise price of

4  those options is less than 100% of the fair market value of the company's common

5  stock on the date of the grant.

6       54.   An optionee reaps a profit from his or her receipt of incentive options

7  when the market price of the company's stock exceeds the exercise price of his or her

8  stock options.  For example, if a company grants an employee an option to purchase

9  100 shares with an exercise price of $10 per share, the employee can buy 100 shares

10  for $1,000 regardless of the actual market price of the stock on the date that the

11  employee exercises their stock options.  In this example, if the price of the stock rises

12  during the option term from $10 to $20 per share, the employee exercising the option

13  at $10 will pay a total of $1,000 for 100 shares of stock that are, at the time of

14  purchase, worth $20 per share or $2,000.  This employee will immediately realize a

15  "paper" profit of $1,000.

16       55.   When a company grants options to its employees or directors, it must do

17  so under the written procedures of a stock option plan that is publicly filed with the

18  SEC.  Given that stock option plans are publicly filed, the issuing company's officers

19  and directors, particularly those who sign the SEC filings attaching the plan, are

20  familiar with the terms of the plan and how it is designed to operate.

21       **2.**   **The Company's Stock Option Plan**

22       56.   At all relevant times, Broadcom's stock options were granted pursuant to

23  the 1998 Stock Incentive Plan (the "Stock Option Plan" or the "Plan").  The Plan was

24  designed and prepared by Broadcom's management, adopted by the Board, and voted-

25  on and approved by Broadcom's shareholders.  Although the Board amended and

26  restated the Plan over the subsequent eight years, the core provisions of the Plan

27  remained intact throughout the Relevant Period.

28

57.     The Stock Option Plan states that the Company uses stock options to "promote the interests of Broadcom Corporation, ... by providing eligible persons with the opportunity to acquire a proprietary interest, or otherwise increase their proprietary interest, in the Corporation as an incentive for them to remain in the service of the Corporation." *See* the Stock Option Plan, Article One, Section 1.

58.     Under the Plan, the Board is required to form a "Primary Committee," which has the "sole and exclusive authority" to "administer" the Plan with respect to the Company's Section 16 insiders, including, *inter alia*, the CEO, CFO, Controller and any vice president in charge of a principal business unit, division, or function (such as human resources).   Further, the Plan empowers the Board to form a "Secondary Committee," which, at the discretion of the Board, is responsible for "administering" the Plan with respect to the Company's non-Section 16 insiders.   At all relevant times, the Board appointed the Compensation Committee to serve as the "Primary Committee," and the Options Committee to serve as the "Secondary Committee." In mid-2004, the Company changed the name of the Options Committee to the Equity Award Committee.

59.     The Plan provides that the Compensation Committee and the Options Committee may issue "incentive" stock options, but specifically states that the per share exercise price of an incentive stock option granted under the Plan may not be less than 100% of the fair market value of the common stock of the Company on the date of the grant. The Plan defines "fair market value" as the closing selling price per share on the date of the grant, or if there is no closing selling price for the Common Stock on the date of the grant, then the closing selling price on the last preceding trading date.

60.     Throughout the Relevant Period, employees who received Broadcom stock options were required to enter into a written agreement with the Company with respect to each option grant, consisting of a Notice of Grant of Options ("Notice of

18

Grant"), a Stock Option Agreement, and a Plan Summary and Prospectus. Each Notice of Grant plainly states the terms of the option grant on the face of the document, so that the optionee can easily review the relevant terms of his or her option grant. These terms include: (i) date of the grant; (ii) exercise price per share; (iii) number of options granted; and (iv) expiration date. Before the option is legally granted, the optionee must sign the Notice of Grant, affirming their understanding of the terms and conditions set forth therein.

61.    Thus, each recipient of Broadcom stock options could ascertain, from the face of the Notice of Grant, the purported grant date and the designated strike price associated with each of their option grants. Based on this information, the Individual Defendants who received backdated options, including Nicholas, Samueli, Ruehle and Dull, either knew or recklessly disregarded that the grant date(s) and the exercise price(s) reflected on each of their Notice of Grants were not contemporaneous with the actual grant date(s), and either knew or recklessly disregarded that this "discrepancy" failed to comport with GAAP (given the Company's failure to record the options as a compensation expense) and the Stock Option Plan.

### 3.    APB 25: Accounting for Stock Options Issued Under the Plan

62.    Accounting for option grants is subject to GAAP, which are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate, irrespective of footnote or other disclosure. Regulation S-X requires that interim financial statements filed quarterly must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

19

63.     In effect through December 31, 2005, Accounting Principles Board Opinion No. 25 ("APB 25") was the relevant GAAP at issue with respect to option grants. This long-standing and well-settled GAAP provision clearly and simply mandates that a company must record a compensation expense if it issues an incentive stock option with an exercise price <u>lower than</u> the market price on the date of the grant (*i.e.,* an "in-the-money" option). The compensation cost is then amortized and recognized as an expense over the option's vesting period.

64.     Conversely, a company need not record a compensation expense when issuing an incentive stock option with an exercise price equal to the extant market price on the date of the grant (*i.e.,* an "at-the-money" option), or greater than the extant market price on the date of the grant (*i.e.,* an "out-of-the-money" or "underwater" option).

65.     Failure to properly account for "in-the-money" options results in an ***understatement*** of the issuing company's reported compensation costs and an ***overstatement*** of its reported net income in the year of the option grant, as well as each year thereafter, until the option fully vests. For example, if a company awards its employees with $24,000,000 in options during 2001, and such options carry a four year vesting period, the company would be required to record a $6 million compensation expense in 2001, 2002, 2003 and 2004.

66.     Throughout the Relevant Period, Broadcom assured investors that its incentive stock options were accounted for in accordance with APB 25. For example, each of the Company's publicly filed Form 10-Ks between 1998 and the end of the Class Period represented that "[t]he Company accounts for stock-based awards to employees in accordance with Accounting Principles Board ('APB') Opinion No. 25 . . . and has adopted disclosure-only alternative of SFAS No. 123."

67.     Moreover, Broadcom's publicly filed proxy statements, filed on Form 14As, plainly acknowledged the proper accounting treatment for granting in-the-

20

money options, stating that *"[o]ption grants . . . under the 1998 Plan with exercise or issue prices less than the fair market value of the shares on the grant or issue date will result in a compensation expense to the Company in an amount equal to the excess of such fair market value of the shares over the exercise or issue price. The expense must be amortized against the Company's earnings over the period that the option shares or issued shares are to vest."* *See, e.g.*, Broadcom's 2002 Proxy Statement at 19 (emphasis added).

### 4.    Certain of the Individual Defendants Served Concurrently on the Compensation Committee and the Audit Committee

68.    Remarkably, while the Company was admittedly issuing backdated options between April 1998 and May 2003, defendants Ross, Wolfen and Farinsky were serving *simultaneously* on both the Compensation Committee and the Audit Committee—the very committee charged with monitoring the integrity of the Company's financial reporting—during some or all of this timeframe.

69.    Thus, notwithstanding their specific responsibilities as members of the Compensation Committee, Ross, Wolfen and Farinsky, as members of the Audit Committee, were concurrently responsible for "review[ing] and monitor[ing] the corporate financial reporting and the internal and external audits of the Company, including, among other things, the Company's internal audit and control functions, the results and scope of the annual audit . . . and the Company's compliance with legal matters that have a significant impact on the Company's financial reports."

70.    To the extent that Ross, Wolfen and Farinsky were responsible for issuing, reviewing or approving "in-the-money" option grants through their service on the Compensation Committee, they either knew, or should have known, that the Company was therefore required to record a compensation expense in connection with those grants. In short, as demonstrated by the Restatement and the backdated option grants discussed below, Ross, Wolfen and Farinsky completely failed in fulfilling

1  their duties as members of the Audit Committee with respect to the Company's stock

2  option practices.

3  **B.    The Broadcom Defendants' Backdating Scheme**

4       71.    Stock options do not backdate themselves.   From inception, the

5  Individual Defendants' decision to backdate Broadcom's option grants was neither an

6  accident nor pure chance; rather, as demonstrated by the Company's own admissions

7  and evidence uncovered by the subsequent governmental investigations, it was an

8  intentional, long-term practice endorsed at the highest levels of the Company by

9  Broadcom's co-founders, Nicholas and Samueli.

10       72.    As set forth below, the Company has admitted that "most" of the options

11  that it issued between April 1998 and May 2003 were intentionally backdated.

12  Notwithstanding their direct and specific responsibilities to administer the Stock

13  Option Plan in accordance with APB 25, the Individual Defendants concealed their

14  fraudulent backdating practice by failing to properly account for in-the-money options

15  and by issuing a series of false and misleading statements concerning Broadcom's

16  option practices.

17       **1.    Broadcom Admittedly Issued Backdated Options**
18       **Between April 1998 and May 2003**

19       73.    Beginning as early as April 1998, the same month as Broadcom's initial

20  public offering, Samueli and Nicholas served as the only members of the Options

21  Committee, and were the primary arbiters of Broadcom's incentive option grants, the

22  terms of which were indisputably manipulated.

23       74.    Specifically, from April 1998 through May 2003, the Options Committee

24  (consisting of Samueli and Nicholas) awarded options to Broadcom's non-Section 16

25  officers. As Broadcom admitted in the Restatement, the Options Committee operated

26  at the whim of Samueli and Nicholas, and lacked any consistent process or

27  procedures:

28

22

1         The [Options Committee] did not conduct formal meetings
2         with respect to all option grants; rather, the committee
3         members often held informal discussions, either in person
4         or telephonically, to determine whether option grants
5         should be approved and priced as of that day. . . .No formal,
6         contemporaneous written records were kept. Instead, *the*
7         *[Options Committee] relied upon, and option grant*
8         *approvals were documented by, unanimous written*
9         *consents, which were dated "as of" a specified date but*
10        *were generally prepared after that date and signed at a*
11        *later time.* [Emphasis added].

12   Subsequent to the Company's admission, the SEC uncovered that, from June 1998
13   through May 2003, the Options Committee approved at least eighty-eight (88) option
14   grants, "most" of which, as the Company concedes, were backdated. Tellingly, when
15   the SEC scrutinized the purported grant dates associated with these option grants, it
16   determined that the Options Committee did not meet on those dates, nor did the
17   Options Committee decide to issue options on those dates.

18        75.    Absent formal meetings of the Options Committee, the SEC found that at
19   least certain of the grant dates were selected retroactively by Ruehle, who reviewed a
20   list of closing stock prices for prior Fridays (notably, the days on which the Options
21   Committee purportedly held its meetings) and then selected the Friday with the lowest
22   closing price. Evidence uncovered during the SEC's investigation further reflects
23   that, at the direction of Samueli and Nicholas, defendant Dull documented at least
24   certain of the phony grant dates using unanimous written consents ("UWC"). As the
25   Company admitted in the Restatement, however, these UWCs "were dated 'as of' a
26   specified date but were generally prepared after that date and signed at a later time."

27
28

23

76.     The Company also admits that Nicholas and Ruehle were "actively responsible for the lack of internal controls and the inappropriate grant practices." Specifically, after conducting an investigation into Broadcom's historical stock option practices, the Audit Committee (assisted by independent outside counsel) determined that:

- Defendant Nicholas "bears significant responsibility for the lack of adequate controls in the option granting process due to the tone and style of doing business he set. *There is substantial evidence that Dr. Nicholas was at times involved with the selection of grant dates after the fact and with subsequent allocation of grants.*" [emphasis added].

- Defendant Ruehle *"was at the center of the flawed option granting process. . . . Mr. Ruehle bears a substantial measure of responsibility for the lack of adequate controls and appropriate documentation of the options granting process.   There is substantial evidence he engaged in the selection of grant dates after the fact.*" There is also substantial evidence he engaged in subsequent allocations of grants. Mr. Ruehle failed to provide proper advice concerning proper accounting standards or to establish proper procedures.   *He was involved with grants for which the grant date was selected after the fact, and personally received options included in some of such grants."*  In addition, the Audit Committee determined that, with the assistance of the Company's former Treasurer, Ruehle selected certain grant dates after the fact in late 2002. [emphasis added].

77.     In addition, the Company admitted that its former Vice President of Human Resources, Nancy M. Tullos ("Tullos"), who at all times worked at the direction of Nicholas and Samueli, "bears significant responsibility for the lack of

24

1  controls and deficiencies in the options granting process.  She was heavily involved in
2  the flawed option granting process.  While there is a lack of evidence that Ms. Tullos
3  herself selected grant dates after the fact, there is substantial evidence she was heavily
4  involved in that process, and was fully aware of what was occurring, and encouraged,
5  assisted in, and enabled it.  There is also substantial evidence that Ms. Tullos was at
6  the center of the allocations of grants to individuals after the grants were made.  She
7  was also involved with grants for which the grant date was selected after the fact, and
8  personally received options included in some of such grants." [emphasis added].

9      78.    With respect to the Compensation Committee, the Company further
10  conceded that, between April 1998 and May 2003, the Compensation Committee
11  "relied upon, and option grant approvals were documented by, unanimous written
12  consents, which were dated 'as of' a specified date but generally were prepared after
13  that date and signed at a later time."  Defendants Ross, Wolfen and Farinsky each
14  served on the Compensation Committee during some or all of this timeframe, and thus
15  were responsible for selecting and approving the terms of the backdated options that
16  Broadcom fraudulently issued to its Section 16 officers.

17      **2.    The Significance of Stock Options To Defendants' Scheme**

18      (a)    **Defendants' Failure to Properly Account for Broadcom's
            Issuance of In-The-Money Options Caused the Company's
19          Stock to Trade at Artificially Inflated Prices**

20      79.    Defendants' failure to properly account for more than $2.2 billion in
21  compensation costs at the time that Broadcom issued in-the-money options enabled
22  the Company to materially overstate its reported net income and materially understate
23  its reported compensation expense during the Class Period.  At all relevant times, both
24  of these metrics were critical to Broadcom's stock price.

25      80.    For instance, between 2001 and 2003, Broadcom reported that its net
26  *revenue* increased from $962 million in 2001, to $1.08 billion in 2002, and onward
27  still to $1.61 billion in 2003.  During that same period, Broadcom reported that its

28

25

1  "stock-based compensation" purportedly decreased from $484 million in 2001, to

2  $360 million in 2002, before settling in at a relatively paltry $264 million in 2003.

3      81.    Over the same three years, Broadcom reported nothing but ever-

4  increasing revenues and profits.  Nevertheless, as this expansion and growth was

5  taking place, "stock-based compensation"—Broadcom's primary method for

6  attracting and retaining top-level talent—was supposedly declining. In reality, stock-

7  based compensation was by far Broadcom's largest expense in 2001 and 2003.  In

8  fact, from 2001 to 2003 alone, Broadcom underreported the cost of its stock option

9  grants by ***nearly $1.8 billion***, or ***nearly 220 percent***.

10      82.    Had Defendants correctly accounted for Broadcom's compensation

11  expense, the Company's true earnings would have been far below the market's

12  expectations.  More precisely, instead of consistently meeting or beating analyst

13  expectations from 1998 through the end of the Class Period, Broadcom would have

14  missed its earnings targets each and every year since 1998:

| Fiscal Year or Quarter | Reported EPS (split adjusted) | Restated EPS |
|---|---|---|
| 1998 | $0.07 | $0.04 |
| 1999 | $0.21 | $0.07 |
| 2000 | $(2.08) | $(2.91) |
| 2001 | $(7.02) | $(9.60) |
| 2002 | $(5.56) | $(6.93) |
| 2003 | $(2.19) | $(2.95) |
| 2004 | $0.42 | $0.33 |
| 2005 | $0.73 | $0.66 |

    **(b)**    **Options Were Integral to Attracting and Retaining Talent**

27      83.    Broadcom relied heavily upon stock options to attract and retain talent.

28  Indeed, Broadcom was quite clear about the significance of stock options to its overall

1   compensation program.   From 1998 through 2004, Broadcom's annual proxy

2   statements stated that "[t]he Company relies significantly on equity incentives in the

3   form of stock option grants in order to attract and retain key employees and other

4   personnel and believes that such equity incentives are necessary for the Company to

5   remain competitive in the marketplace for executive talent and other key employees."

6       84.    Failing to retain key personnel could be devastating to Broadcom's

7   success.  As the Company repeatedly warned investors, "Broadcom is engaged in a

8   very competitive industry, and its *success depends upon* the ability to attract and

9   retain qualified executives through competitive compensation packages."  March 27,

10  2006 DEF 14A Proxy Statement ("2006 Proxy Statement").   Indeed, as Ruehle

11  explained to analysts during an April 16, 2003 conference call, "Broadcom has always

12  paid below market cash compensation and in the case of senior contributors and

13  managers, we *paid very significantly below market.  We have offset this by paying*

14  *significantly above market in equity*." (emphasis added).

15      85.    These realities were not lost on Samueli or Nicholas, both of whom used

16  in-the-money options to entice potential recruits to work at Broadcom.  For example,

17  investigations conducted by the SEC and USAO identified at least one instance in

18  June 1999, whereby Nicholas and Samueli offered 120,000 backdated options to a

19  senior engineer (Mehrdad Nayebi) as part of his hiring package.

20      86.    Nicholas and Samueli—identified by the USAO as "Executive A" and

21  "Executive B," respectively—played an active role in Nayebi's hiring process, and

22  either knew or should have known that Broadcom was offering him stock options that

23  were purportedly "granted" prior to his actual hire date.  Indeed, although Nayebi was

24  not offered a position of employment until June 1999, and did not start at Broadcom

25  until June 28, 1999, his stock options were granted with an exercise price of

26  $88.375—the closing price on May 25, 1999—rather than $119, the closing price on

27

28

June 28. Thus, by the time Nayebi started his employment at Broadcom, his 120,000 options were in-the-money by more than $3.5 million.

87.    Tellingly, at the direction of Samueli and Nicholas, Tullos attempted to conceal the Options Committee's decision to grant backdated options to Nayebi. Specifically, Tullos prepared a backdated offer of employment, as well as a backdated personnel action notice, both of which reflected a phony hire date of May 25, 1999. Tullos also instructed one of her colleagues (Laura Turner) to delete an e-mail evidencing that Nayebi's options were backdated.

88.    At least in the case of Nayebi, his receipt of options dated prior to his actual hire date was a "key factor" in whether he decided to accept Broadcom's offer of employment. In fact, in an e-mail to Tullos dated July 15, 1999, Nayebi noted that his options were not backdated far enough, stating: "My hire date was 5/25 NOT 5/28. The option price is showing to be $95.75 instead of $88.375. I hope this is just a simple clerical error since that has been a major key deciding factor." Nayebi also stated in the same e-mail that he had a "clear agreement" with defendant Nicholas that his options would be "granted" by Broadcom on May 25, 1999 at $88.375.

89.    After inquiring into Nayebi's actual hire date, Tullos learned that the Options Committee purportedly granted Nayebi 120,000 options at $88.375 on May 25, 1999, *the day before* defendant Samueli stated in an e-mail that the Company "should make an offer" to Nayebi. In fact, as the USAO's investigation revealed, both Samueli and Nicholas knew that Nayebi was not actually hired on May 25, 1999, as Tullos sent an e-mail to Samueli on May 27, 1999, stating that she was going to "set up a telephone interview between" Nayebi and Nicholas.

90.    In November 2007, Tullos signed a plea agreement with the USAO, admitting that she attempted to destroy the e-mail noted in ¶87, above, because "she was concerned that, notwithstanding [Nicholas's] statements to the contrary, [Nayebi's] true hire date was later than May 25, 1999." Thus, as stated in the plea

agreement, Tullos, who at all times worked at the direction of Nicholas and Samueli, "knew that the electronic mail she requested [to] be deleted might damage Broadcom if the United States Department of Justice or other federal agencies were to obtain it as part of any official proceeding, and she was attempting to avoid that outcome."

### 3. The Broadcom Defendants' Scheme Continued Until the End of the Class Period

91. Broadcom claims that it ceased issuing backdated stock options in June 2003. This was hardly an altruistic measure on the part of the Broadcom Defendants. In reality, their ability to backdate was eviscerated by Congress's enactment of SOX, which requires insiders to report their receipt of incentive option grants to the SEC within two trading days of the grant date.

92. Nevertheless, even after the enactment of SOX, the Broadcom Defendants continued to engage in their scheme to defraud, thus maintaining Broadcom's artificially inflated stock price through the end of the Class Period. As discussed above, Broadcom issued tens of millions of dollars in backdated options between April 1998 and May 2003. The issuance of those in-the-money options, which were granted with vesting periods of up to four years, required the Company to record and amortize a compensation expense over the vesting period.

93. Simply put, the Broadcom Defendants' fraudulent conduct in 2002 and 2003—and their subsequent concealment of the fraud after SOX—caused the Company to materially overstate its reported net income and materially understate its compensation expense in 2005 and 2006. In fact, in 2005 alone, the Company understated its stock-based compensation by over $42 million, or *70 percent*. As a result, Broadcom's stock continued to trade at artificially inflated prices through the end of the Class Period.

## C. The Broadcom Defendants' Improper Pricing of Stock Option Grants

94. The Broadcom Defendants' fraudulent scheme was undertaken and perpetuated with culpable scienter. From inception, Broadcom's issuance of

29

backdated options did not occur by accident or by pure chance.  As detailed below, scrutiny of the grants that were reviewed and/or approved by each of the Individual Defendants reveals a deliberate, self-serving pattern whereby Broadcom's stock options were repeatedly issued using the lowest possible strike price.  Indeed, the probability that the Individual Defendants selected the grant dates by chance are worse than *1 in 32,000* odds.

### 1.   **Exchange of Options**

#### (a)   **The 2001 Options Exchange**

95.   By mid-2001 Broadcom's stock price withered as the tech bubble of the late-1990s imploded.  The vast number of options Broadcom employees held, and that were once the envy of Silicon Valley, were now underwater—worthless.  Thus, in its constant effort to retain employees, Broadcom initiated an exchange of employees' options to purchase nearly *19 million* shares.  By participating in the exchange, option holders received an equivalent number of options, except that the re-granted options were priced as of a new measurement date.

96.   In a press release dated April 26, 2001, defendant Nicholas touted the Company's decision to offer an options exchange to its employees, and specifically acknowledged that equity-based compensation has had a "very positive effect" on the Company's business and financial success, stating:

> This is a significant initiative by the company intended to address the recent decline in price of Broadcom's stock and the financial impact of that decline on our employees.

> *                *                *

> *We believe this has had a very positive effect on our business and financial success in the past and that it will have the same effect in the future.*  Broadcom's employees

30

1
2
3
4
5
6
7
8

are true owners in Broadcom, and they understand clearly that their work and their work ethic are directly tied to the success of the company and its shareholders. With the current economic slowdown and the recent drop in the market price of many technology stocks, including Broadcom's, we believe that this is the best way to continue to retain and motivate our most important asset, our employees. [emphasis added].

9
10
11
12
13
14
15

97.     Unknown to the market, however, the Broadcom Defendants, led by Ruehle and Nicholas, sought to capitalize on the options exchange by backdating the newly issued options to December 24, 2001, thus capturing the lowest possible strike price during the re-grant window. Given the magnitude of stock options implicated by the company-wide options exchange, this decision, alone, enabled the Company to avoid over *$569 million in compensation expenses*. Strikingly, had Defendants

16
17

properly accounted for this exchange, stock-based compensation for 2001 would have been Broadcom's *single largest expense*.

**Background of the 2001 Options Exchange**

18
19
20
21
22
23
24

98.     According to Broadcom, the Company initiated the 2001 exchange in response to the "intense and [] recent decline" of Broadcom's stock price, which made it "more difficult to attract and retain such key employees, all of whom have been granted stock options." As the Company admitted in its Form 10-K for fiscal 2001, Broadcom's "future success *depend[ed]*" on its "ability to continue to attract, retain and motivate qualified personnel."

25
26
27
28

99.     In an attempt to repair employee morale, Broadcom commenced a tender offer in May 2001. Specifically, the Company offered its employees the opportunity to voluntarily exchange their underwater options priced at or above $45.00 per share for new options to purchase the same number of shares. The new options, however,

1  would be priced six months and one day after June 23, 2001, on which the tender

2  period closed.

3      100.   When the six month and one day tender period ended, Broadcom had

4  from December 24, 2001 to January 31, 2002 to re-grant options to the employees

5  who participated in the tender offer.  In total, the Company's employees exchanged

6  options to purchase *18,716,811 shares* with a weighed-average price of $128.35, and

7  were promised that the exercise price of their re-granted options would be the closing

8  price of Broadcom's Class A common stock on the date of the grant.

9      **The Exchanged Options Were Improperly Backdated**

10      101.   The Broadcom Defendants represented to investors (and their employees)

11  that the re-granted options were granted on December 24, 2001.  As the Company

12  conceded in the Restatement, however, the Broadcom Defendants did not choose to

13  "grant" these options on December 24, 2001 until January 2002.

14      102.   Specifically, at the end of 2001, Broadcom's senior officers, including

15  Nicholas and Samueli, deliberated on when to grant the newly exchanged options, as

16  the SEC uncovered.  The choice became obvious.  Broadcom's closing price on

17  December 24, 2001 ($39.75 per share) marked the lowest possible price during the re-

18  grant window.  Indeed, in an e-mail dated January 4, 2002, defendant Ruehle urged

19  Nicholas, Samueli and Dull (among others) to use December 24, 2001 as the grant

20  date, and thus capitalize on a *23 percent* increase in Broadcom's stock price between

21  December 24, 2001 and January 4, 2002, stating:

22          I VERY strongly recommend that these options be priced

23          as of Dec 24 ($39 & change).  The absolute drop dead [sic]

24          for this decision is Friday Jan 4.  If there are no objections I

25          would like to go ahead and price as of that date.... Given

26          the recent market performance, I think that we should grab

27          the Dec 24 price.

28

103.  Further, the SEC's investigation revealed that, on the same day as Ruehle's e-mail, Tullos confirmed with Nicholas, Samueli, Ruehle and Dull that the Options Committee and the Compensation Committee had "approved" the re-grant on December 24, 2001, even though all of these senior officers knew, or should have known, that this grant date was selected retroactively.  In fact, the senior officers also knew that the Compensation Committee could not have granted options on December 24, 2001, as one of its two members had passed away in July 2001, and had not been replaced.

104.  Ruehle and Dull personally benefited from their decision to backdate these stock options to December 24, 2001.  Based on public filings with the SEC, defendants Ruehle and Dull received 250,000 options and 300,000, respectively, from the 2001 options exchange.

105.  Unbeknownst to class members, the 2001 options exchange caused Broadcom to incur extraordinary compensation expenses, which far surpassed the $8.9 million expense that Broadcom originally reported.  As Broadcom ultimately disclosed in the Restatement, the true expense totaled more than *$569 million*.

### (b)    The 2003 Exchange

106.  In 2003, the Broadcom Defendants orchestrated a second options exchange, covering options to purchase over 20 million shares of Broadcom stock. Broadcom stated in its Form 10-K for 2003 that the offering involved, among other options, "*unvested* eligible options that were previously assumed by the [Company] in connection with acquisitions that were accounted for using the purchase method of accounting." (emphasis in original).

107.  After it completed the 2003 options exchange, Broadcom reported that it recorded a non-cash charge of approximately $55.6 million in May 2003, which purportedly reflected the stock-based compensation expense associated with the exchange.  In reality, this charge was *understated by a multiple of five*.  As reflected

33

1  in the Restatement, Broadcom actually incurred, and should have reported, a

2  compensation charge of *$276.3 million*.

3      **2.    The May 26, 2000 Option Grant**

4      108.   May 26, 2000 is the purported date of the single-largest block grant in the

5  Company's history.  Not only was this the date of Broadcom's lowest stock price for

6  the month of May 2000, as illustrated below, it was also the lowest closing price

7  within nearly a *one year period*:



Grant of 350,000 Shares
May 26, 2000

18      109.   Like other backdated options grants, this grant enriched certain of the

19  Individual Defendants, as well as certain other senior officers.  In particular Ruehle

20  received 100,000 options and Dull received 150,000 options.

21      110.   As Broadcom has now admitted, the Options Committee and

22  Compensation Committee did not allocate these options to recipients until the summer

23  of 2000, when Broadcom stock was trading at an all time high, which exceeded over

24  128% of the Company's stock price on May 26, 2000.

25      111.   On or about July 2000, the Broadcom Defendants' delay in allocating the

26  May 26, 2000 option grant caught the attention of E&Y, as Broadcom's stock price

27  increased from $118 per share on May 26 to as high as $261 per share during the

34

1   month of July.   Indeed, the SEC's investigation revealed that, amidst "intense

2   discussions" with E&Y, "*[s]enior management at Broadcom . . . feared that the*

3   *Company would need to change the grant date or record a $700 million*

4   *compensation charge* to reflect the difference between the May and July stock price."

5   For example, on July 28, 2000, Tullos sent an e-mail to the then-director of

6   compensation, stating that "[c]hanging the strike price now or taking compensation

7   changes [sic] are both unacceptable to me," thus evidencing her understanding that

8   Broadcom's issuance of in-the-money options triggered an accounting consequence

9   under APB 25.

10       112.   Ultimately, E&Y signed-off on the May 26, 2000 option grant

11   fraudulently knowing that the grant violated GAAP.   Recognizing that E&Y either

12   knew, or should have known, that the May 26, 2000 grant was improperly backdated,

13   Broadcom's Director of Financial Reporting warned in a September 11, 2000 e-mail

14   to Tullos (and others) that "*[g]oing forward, we can expect much greater scrutiny by*

15   *[E&Y] on our option granting practices*.   I strongly recommend for next year's

16   [company-wide] grant that we have all the names and numbers ready before we select

17   a [strike] price [and grant] date.   *I do not believe that [E&Y] will grant us any*

18   *flexibility on this in the future.*"   (emphasis added).

19       **3.   Additional Backdated Option Grants**

20           **(a)   November 3, 1998**

21       113.   In addition to engaging in options backdating, the Broadcom Defendants

22   also capitalized on spring-loading, which occurs when options are granted just days

23   prior to a company's disclosure of positive news.

24       114.   On November 3, 1998, the Company purportedly made its first block

25   grant under the Stock Option Plan.   The grants to non-Section 16 officers were

26   approved by Samueli and Nicholas, and the grants to Section 16 officers were

27

28

1  approved by defendant Ross.  As illustrated in the chart below, the Company's stock
2  price closed at $81.81 on November 3, the lowest price for that month:



12  Significantly, after November 3, 1998, the Company's stock price would not trade as
13  low as $80 per share (on a split-adjusted basis) until nearly three years later, in the
14  post-9/11 days of late September 2001.

15      115.  Just four business days after Broadcom purportedly issued this block
16  grant on November 3, the Company announced blockbuster news concerning a key
17  product.  Specifically, on Monday, November 8, 1998, the *Wall Street Journal*
18  reported that Broadcom was expected to unveil a "*major step forward*" in its key
19  technology, a single computer chip that would meld Internet pages and television
20  pictures on TV screens.  The financial press confirmed the importance of the new chip
21  that same day.  For example, Lou Dobbs reported on CNN's Moneyline broadcast
22  noting that investors would find Broadcom's innovation "*irresistible*."

23      116.  The market reacted swiftly and forcefully, moving Broadcom's share
24  price up *seven percent* in a single day, reaching a *52-week high*.  The Company's
25  stock price surged even higher on Tuesday, November 10, 1998, to close at $96.50.  In
26  one week following the temporary low on November 3, 1998, Broadcom stock
27  increased in value by *nearly 20%*.

28

117.   As further evidence that these options were not only spring-loaded, but backdated, the Company did not disclose that it "granted" these options on November 3, 1998 until *70 days later* on February 16, 1999, which almost certainly is more representative of the actual grant date.

118.   Certain Defendants reaped a significant financial benefit from this option grant, including Ruehle (300,000 options) and Dull (100,000 options).

**(b)   October 19, 2001**

119.   As discussed in ¶¶95-105, above, the Company offered its employees the opportunity to participate in an options exchange in 2001.  For those employees who declined to participate in the options exchange, the Company awarded them options on June 24, 2001, priced at $33.68, the closing price on June 22, 2001.

120.   The SEC's investigation revealed that, at the time of the June 24, 2001 grant, Nicholas planned to award options to his "direct reports," including certain Section 16 officers, using a grant date of June 24, 2001.  Pursuant to the Stock Option Plan, all option grants to the Company's Section 16 officers required the approval of the Compensation Committee, which, at that time, included Ross.

121.   By September 2001, the Company had not yet issued the June 24 option grants to Nicholas's direct reports because Nicholas had not decided how such options should be allocated.  That month, Broadcom's stock price dropped below $33.68, the closing price on June 24, 2001.  In other words, the options that Nicholas intended to grant to his direct reports were underwater, or worthless.   Undeterred by the Company's slumping stock price, Nicholas, instead, hand-picked October 1, 2001 as the new grant date, thus capitalizing on Broadcom's lowest closing price in 2001.

122.   Once again, however, Nicholas did not timely decide how these options should be allocated.  Recognizing that Broadcom's stock price dropped significantly since June 24, 2001, Tullos alerted Nicholas of her concern that the rank and file employees who received a supplemental option grant from the Company on June 24,

37

1  2001 (with a strike price of $33.68) would resent the fact that Nicholas's direct reports
2  were now receiving a strike price of $18.77.

3      123.   On January 3, 2002, Tullos e-mailed certain senior officers, including
4  Ruehle, Dull and an unnamed member of the Options Committee (*i.e.*, Samueli or
5  Nicholas), stating that **Nicholas "would like to find another opportunistic date, say**
6  **$25.55 on 10/5 or 29.25 on 10/19."**   (emphasis added).   A cursory glance at
7  Broadcom's slumping stock price on October 19, 2001, and the price surge thereafter,
8  demonstrates precisely why Nicholas was focusing on these dates:



18  According to an article published on March 28, 2008 by the <u>Daily Journal</u>, entitled
19  "*Broadcom Faces New Backdating Allegations*," sources familiar with the SEC
20  investigation have identified Samueli as the unnamed Options Committee member
21  referred to in the e-mail, above.

22      124.   Upon receipt of Tullos's e-mail, the unnamed member of the Options
23  Committee, who sources have identified as Samueli, agreed to "grant" these stock
24  options to Nicholas's direct reports on October 19, 2001.   Thereafter, Tullos
25  confirmed with Dull, who was responsible for preparing the UWCs for the
26  Compensation Committee, that Nicholas's direct reports, including the Section 16
27  officers, had been granted options on October 19, 2001.

28

38

125.   Notwithstanding the fact that Tullos's e-mail stated that Nicholas was searching for an "opportunistic [grant] date," the Individual Defendants either knew, or should have known, that these options could not possibly have been "granted" to Broadcom's Section 16 officers on October 19, 2001, because one member of the two-member compensation committee had passed away in July 2001, and had not yet been replaced.

### (c)   March 1, 2002

126.   On March 1, 2002, Broadcom purportedly granted 1,000,000 options each to Nicholas and Samueli. Just a day earlier, on February 28, 2002, Broadcom granted 120,000 options to unnamed non-section 16 officers. Pursuant to the Stock Option Plan, the March 1, 2002 option grant was approved by the Compensation Committee, which included Ross, and the February 28, 2002 option grant was approved by the Options Committee, which consisted of Samueli and Nicholas. As illustrated below, on March 1, 2002, the Company's stock price fell to its lowest trading price for the month of March:



127.   Further adding to the egregious nature of this backdated option grant, on March 1, 2002, the Company announced its entrance into a burgeoning segment of the networking market, in Nicholas's words, *"a major element of our vision to enable*

1  *ubiquitous broadband connectivity.''* (emphasis added).  As would be expected, the

2  market reacted strongly, pushing Broadcom's share price up over *44.5%* since

3  February 28, 2002.

**(d)    July 3, 2002**

5      128.   Broadcom's July 3, 2002 option grant is yet another instance of options

6  backdating.   The SEC's investigation revealed that, on or about May 17, 2002,

7  Samueli and Nicholas approved a grant date of May 10, 2002 at an exercise price of

8  $24.54.  Nonetheless, the Broadcom Defendants decided to abandon that date when

9  the Company's stock price continued to decline.

10      129.   In mid-June 2002, one member of the Options Committee (Samueli or

11  Nicholas) suggested that Broadcom should take advantage of a "favorable strike

12  price," and grant its company-wide option grant for 2003 concurrent with its 2002

13  option grant.   The Company's stock price continued to plummet, however, further

14  complicating the timing of this option grant.

15      130.   In late June 2002, the Company's employees grew anxious to receive

16  their share of the company-wide option grant, and sent several e-mails to Tullos

17  demanding an explanation for the delay.  For example, on June 26, 2002, Tullos sent

18  the following response to one employee's inquiry:

19          I really do not understand why I keep getting these

20          questions, particularly from people that have been at

21          [Broadcom] a long time.  I cannot respond fully in writing,

22          but in case you haven't noticed, the stock continues to drop.

23  In a separate e-mail, Tullos informed another employee that "*[t]he problem is that I*

24  *cannot tell you what we are doing (post-Enron, now Worldcom).*" (emphasis added).

25      131.   Ultimately, the Company purportedly granted its company-wide option

26  grant for 2002 and 2003 on July 3, 2002 at an exercise price of $15.74.  The July 3,

27  2002 date marked Broadcom's second lowest stock price in 2002 until September 5,

28

40

2002.  The SEC's investigation confirmed that Ruehle selected this grant date in mid-July 2002, and that during the last week of July, Tullos was still assembling the individual allocation recommendations, and continued to make changes to those allocations through at least August 7, 2002.

132.    Once again, the fraudulent nature of this option grant did not go unnoticed by Ruehle, who, at that time, knew that he would be required to certify the Company's financial statements pursuant to SOX.   Indeed, the SEC uncovered evidence that Ruehle instructed Tullos to gather all information relating to the July 2, 2002 option grant through *in person* meetings with members of the business units, and to not request the information in writing.  In an e-mail dated July 19, 2002, Tullos noted that Ruehle did not want her to "communicate anything in writing since it would leave an e-mail trail of unfavorable dates."

133.    True to the rest of this narrative, the Company's July 2, 2002 option grant yielded immediate gains.  Broadcom's stock price climbed nearly 11% the very next day, rising nearly *42% in less than two weeks*:



    (e)    **August 5, 2002**

134.    On August 5, 2002, Broadcom's stock price closed at $15.74, the same closing price as July 3.  This presented an opportunity for Nicholas, who had failed to

1   allocate the options that he intended to grant to his direct reports, including certain

2   Section 16 officers, in time for the July 3, 2002 grant.  The options granted to the

3   Section 16 officers required the approval of the Compensation Committee, including

4   Ross, and the options granted to the non-Section 16 officers required the approval of

5   the Options Committee, including Samueli and Nicholas.

6       135.   As demonstrated by the chart below, the Broadcom Defendants carefully

7   selected a grant date of August 5, 2002 for these option grants.  By choosing this

8   price, the Broadcom Defendants capitalized on a 20% decline in the four trading days

9   leading up to August 5, 2002, as well as a 15% price surge in the following five days:



20       136.   The SEC's investigation confirmed that defendant Ruehle priced the

21   option grant for Nicholas's direct reports—including himself and other Section 16

22   officers—at $15.74, notwithstanding the fact that neither the Options Committee nor

23   the Compensation Committee had approved an option grant on August 5, 2002.

24       137.   Defendants Ruehle (200,000 options) and Dull (300,000 options) each

25   received backdated stock options in connection with the August 5, 2002 grant.

26       **4.**    **The Statistical Probability of these Grants Establishes Scienter**

27       138.   As part of its investigation, Lead Plaintiff retained an expert in finance

28   who has authored several articles on the subject of options manipulation and is a

42

1    recognized expert in the field to conduct an analysis of Broadcom's incentive stock

2    option grants between April 1998 and May 2003 to Section 16 officers, based on

3    information available to Lead Plaintiff. For the limited purpose of this analysis, Lead

4    Plaintiff instructed the expert to consider Broadcom's option grants through May 2003

5    because the Company claims to have stopped unlawfully backdating its options as of

6    that date.

7        139.   The expert's analysis reveals that the near-perfect timing of the

8    Company's option grants could not have resulted from chance. In fact, as set forth

9    below, the mathematical probability that Broadcom's option grants could achieve the

10   number of historical low points that they did without manipulation was at least 1 in

11   32,000 (or a probability of 0.00311%).

12       140.   Specifically, the expert identified 20 unique grant dates between

13   November 1998 and May 2003. Based on these 20 grants, the expert identified 14

14   grant dates that may have been susceptible to backdating, by excluding those grant

15   dates for which the required SEC forms were filed within 2 business days or for which

16   the Company's options were not granted at-the-money.

17       141.   The expert then identified 6 of the 14 grant dates that occurred on the

18   lowest closing price of the particular month. Once identified, the expert employed a

19   three step empirical simulation of the historical trading parameters to estimate the

20   probability that the Broadcom Defendants had chosen these 6 grant dates at random.

21   First, for each of the 6 grant dates, the expert identified all historical closing prices for

22   the same month. Second, the expert randomly drew a price in each of the months in

23   which one of the six grants was made. Third, after repeating the first two steps for

24   every one of the six grant dates, the expert counted the total number of times the

25   lowest price of the month was drawn. The expert then repeated these three steps five

26   million times.

27

28

1    142.   Based on this empirical simulation, the expert estimates that the

2    probability that the Broadcom Defendants selected six or more of the fourteen grant

3    dates occurring at monthly lows is 1 in 32,124.

4    143.   The expert also calculated the probability that these option grants

5    occurred at random using a binomial distribution, which is a probability function used

6    in problems, such as the one at hand, with a fixed number of tests or trials, when the

7    outcomes of any trial are only success or failure.  For this analysis, rather than using

8    the actual trading data used in the empirical analysis, the expert assumed that each of

9    the months in which the six grants occurred had 20 trading days, and therefore a 5%

10   chance that the lowest price could be selected at random, and that each month had one

11   unique low price.  Based on this analysis, the expert determined that there was a 1 in

12   30,220 chance that the grant dates associated with these six grants were chosen at

13   random.

14   144.   This analysis is quite revealing of the Broadcom Defendants' scienter, as

15   these six grant dates are but a small subset of the ninety-six grant dates at issue.  Lead

16   Plaintiff is confident that once discovery commences, and the specific dates for option

17   grant made exclusively to non-Section 16 officers are discoverable, this statistical

18   analysis will not only be confirmed, but strengthened.

19   **D.     Broadcom's Restatement**

20   145.   On January 23, 2007, Broadcom restated its financial statements

21   previously filed for fiscal years 1998 through 2005 and for interim quarterly periods

22   during fiscal years 2003 to 2005 and for the first quarter of 2006.  The Restatement is

23   Broadcom's, as well as E&Y's, *admission* that the Company's financial statements

24   for these periods were materially false and misleading and omitted necessary

25   information to render those statements truthful.  In sum, Broadcom admitted that its

26   earnings had been inflated in excess of *$2.22 billon* since its inception as a public

27

28

company in April 1998.  By this measure, Broadcom's backdating fraud is by far the most egregious of all other public companies implicated in such misconduct.

146.   The Restatement is Broadcom's and E&Y's admission of the material falsity of Broadcom's financial statements because, under GAAP, a restatement of previously filed financial statements is required, and indeed only permitted, to correct *material* accounting errors or irregularities "*that existed at the time the financial statements were prepared.*"  *See* Statement of Financial Accounting Standard No. 154, *Accounting Changes and Error Corrections* ("FAS 154"), ¶¶ 25-26.

147.   The Restatement radically altered the financial picture of Broadcom. Specifically, as summarized below, the Restatement erased more than $2.2 billion in net income that the Company had previously reported since 1998 and, instead, increased compensation expense by that amount:

| Stock- Based Compensation Expense | | |
|---|---|---|
| As Reported | Adjustments (In thousands) | As Restated |
| Year ended December 31, 2005          $ 60,004 | $ 42,011 | $102,015 |
| Year ended December 31, 2004             74,687 | 43,714 | 118,401 |
| Year ended December 31, 2003           577,487 | 333,609 | 911,096 |
| Year ended December 31, 2002           419,663 | 548,450 | 968,113 |
| Year ended December 31, 2001           511,010 | 916,879 | 1,427,889 |
| Year ended December 31, 2000           120,209 | 274,555 | 394,764 |
| Year ended December 31, 1999               4,713 | 48,241 | 52,954 |
| Year ended December 31, 1998               1,900 | 8,106 | 10,006 |
|                                                         $ 1,769,673 | $ 2,215,565 | $3,985,238 |

148.   In total, Broadcom attributes $904.5 million of the Restatement to 18 instances where "the grant date for some options was selected *after* the date indicating on the unanimous written consent documenting the approval of those options."  In other words, the Company admits that these 18 option grants were intentionally backdated.  The affected awards on these grants involved 6,205 options covering 90.3 million shares.

149.   In addition, Broadcom attributes $1.037 billion of the Restatement to 68 instances where the Company could not locate contemporaneous documentation

(beyond the "as of" UWCs) confirming that a committee meeting occurred on the indicated grant date. Accordingly, the Company "presumed" that each of these grant dates did not comply with APB 25. The affected awards on the grants involved 10,529 option grants covering 108.9 million shares. Among the option grants that fall into this category, three of the grants occurred when the closing price of Broadcom's Class A common stock was "near the lowest price experienced during the applicable quarter of year." These three grants involved 1,128 option grants covering 12.5 million shares.

150. Moreover, the Company attributes approximately $678 million of the Restatement to certain company-wide option grants to a substantial percentage (as high as 90%) of Broadcom's employees. With respect to two of these company-wide option grants, including the block option grant in May 2000 (discussed in ¶¶108-112, above), the Company failed to complete the allocation of its options to individual employees before the grant dates selected by the Options Committee or the Compensation Committee. The affected awards on these two grant dates involved 4,271 option grants covering 33.7 million shares.

**E. The Broadcom Defendants' Scheme Systematically Violated GAAP and SEC Regulations**

151. Broadcom admits that, from April 1998 through May 2003, "most" of its incentive stock option grants were intentionally backdated. This long-term practice systematically caused the Company to run afoul of GAAP and SEC regulations, both for the proper reporting of its financial condition generally, and the reporting of its compensation costs specifically.

152. According to SEC regulations, public companies, such as Broadcom, are required to prepare their financial statements in accordance with GAAP. By failing to comply with APB 25, Broadcom's financial statements are presumptively in violation of those regulations.

153.   GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.   They are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association.   Through three successor groups AICPA has also established:   the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB") with the permission of the SEC (Accounting Series Release 150).

154.   SEC Rule 4-01(a) of SEC Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote [or other disclosures], unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1).  Regulation S-X requires that interim financial statements must also comply with GAAP.  17 C.F.R. § 210.10-01(a).

155.   As noted in AICPA auditing standard ("AU"), § 110.02, a public company's management is responsible for preparing financial statements in conformity with GAAP:

> The financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, initiate, authorized, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.   The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management.… Thus, the fair presentation of financial

statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

156. As demonstrated by the long-term, pervasive nature of their backdating scheme, Defendants wholly failed to adopt sound accounting policies and to maintain internal controls designed to ensure that the Company's public filings were fairly presented.

157. The SEC also regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." Public Statements by Corporate Representatives, Exchange Act Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,096, 17 C.F.R. § 241.20560, 1984 WL 126134 (Jan. 20, 1984).

158. Under SEC regulations, the management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition." Timely Disclosure of Material Corporate Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) 23,120A, at 17,095, 17 C.F.R. § 241.8995, 1970 WL 10576 (Oct. 15, 1970). Defendants violated this regulation throughout the Class Period by deliberately and/or recklessly misrepresenting that Broadcom was complying with APB 25 and its own stated accounting policies.

159. In Securities Act Release No. 6349, 23 S.E.C. Docket 962 (Sept. 28, 1981), the SEC stated that:

It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

1    160.   The Broadcom Defendants repeatedly violated this basic precept by

2  concealing from the public a complete understanding of material facts relating to:

3  (i) Broadcom's historical stock option practices and compliance with GAAP and its

4  own stated accounting policies; (ii) the true compensation costs the Company would

5  have incurred had it properly accounted for its issuance of in-the-money stock options;

6  and (iii) material weaknesses in the Company's internal controls.

7    161.   In Accounting Series Release No. 173 (July 2, 1975), the SEC reiterated

8  the duty of management to present a true representation of a company's operations:

9            [I]t is important that the overall impression created by the

10           financial statements be consistent with the business realities

11           of the company's financial position and operations.

12   162.   For the reasons stated above, the Broadcom Defendants failed to present

13  a correct impression of Broadcom's business realities.

14   163.   Item 7 of the Company's Form 10-Ks and Item 2 of its Form 10-Qs,

15  Management's Discussion and Analysis of Financial Condition and Results of

16  Operations, requires the issuer to furnish information required by Item 303 of

17  Regulation S-K, 17 C.F.R. § 229.303.

18   164.   On May 18, 1989, the SEC issued an interpretive release (Securities Act

19  Release No. 6835, 54 Fed. Reg. 22427 (May 18, 1989)), which stated, in relevant part:

20           The MD&A requirements are intended to provide, in one

21           section of a filing, material historical and prospective

22           textual disclosure enabling investors and other users to

23           assess the financial condition and results of operations of

24           the registrant, with particular emphasis on the registrant's

25           prospects for the future. As the Concept Release states:

26

27           The Commission has long recognized the need for a

28           narrative explanation of the financial statements, because a

49