1   JOSEPH J. TABACCO, JR. #75484
    Email: jtabacco@bermanesq.com
2   NICOLE LAVALLEE #165755
    Email: nlavallee@bermanesq.com
3   LESLEY HALE #237726
    Email: lhale@bermanesq.com
4   **BERMAN DeVALERIO PEASE**
        **TABACCO BURT & PUCILLO**
5   425 California Street, Suite 2100
    San Francisco, CA 94104
6   Telephone:  (415) 433-3200
    Facsimile:  (415) 433-6382
7
    *Liaison Counsel for Lead Plaintiff*
8   *and the Class*

9   THOMAS A. DUBBS (admitted *pro hac vice*)
    Email: tdubbs@labaton.com
10  JOSEPH A. FONTI (admitted *pro hac vice*)
    Email: jfonti@labaton.com
11  STEPHEN W. TOUNTAS (admitted *pro hac vice*)
    Email: stountas@labaton.com
12  MICHAEL H. ROGERS (admitted *pro hac vice*)
    Email: mrogers@labaton.com
13  **LABATON SUCHAROW LLP**
    140 Broadway
14  New York, New York  10005
    Telephone: (212) 907-0700
15  Facsimile: (212) 818-0477

16  *Lead Counsel for Lead Plaintiff*
    *New Mexico State Investment Council*
17  *and the Class*

18
19              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
                       **WESTERN DIVISION**
20

21  In re BROADCOM CORPORATION          )   Lead Case No.:  CV-06-5036-R (CWx)
    CLASS ACTION LITIGATION             )
22                                      )   **CONSOLIDATED AMENDED**
                                        )   **CLASS ACTION COMPLAINT**
23                                      )
                                        )   **CLASS ACTION**
24                                      )
                                        )   Honorable Manuel L. Real
25                                      )

26                                                      BY FAX
27
28

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
LEAD CASE NO.: CV-06-5036-R (CWx)

# **TABLE OF CONTENTS**

I. NATURE OF THE ACTION ......................................................................... 1

II. JURISDICTION AND VENUE .................................................................. 10

III. PARTIES ..................................................................................................... 11

    A. Lead Plaintiff ....................................................................................... 11

    B. Defendant Broadcom ............................................................................ 11

    C. The Individual Defendants ................................................................. 11

    D. Ernst & Young ..................................................................................... 19

IV. CLASS ACTION ALLEGATIONS .......................................................... 20

V. SUBSTANTIVE ALLEGATIONS ............................................................ 22

    A. Options Backdating – The "Ultimate Greed" ................................... 22

        1. How Stock Options Are Intended To Work ............................... 24

        2. The Company's Stock Option Plan ............................................. 25

        3. APB 25: Accounting for Stock Options Issued Under the Plan ....................................................................................... 27

        4. Certain of the Individual Defendants Served Concurrently on the Compensation Committee and the Audit Committee ........................................................................ 30

    B. The Broadcom Defendants' Backdating Scheme ............................... 31

        1. Broadcom Admittedly Issued Backdated Options Between April 1998 and May 2003 ........................................... 32

        2. The Broadcom Defendants Falsified the Date of Wolfen's Appointment to the Compensation Committee to Ensure that Broadcom Could Issue Backdated Options on Dates When the Compensation Committee Was Not Constituted .................................................................................. 36

        3. The Board's Covert Reforms in June 2003 ................................ 39

        4. The Broadcom Defendants' Scheme Continued Until the End of the Class Period ............................................................. 41

    C. The Significance of Stock Options To Defendants' Scheme ............. 42

        1. Defendants' Failure to Properly Account for Broadcom's Issuance of Backdated Options Caused the Company's Stock to Trade at Artificially Inflated Prices ............................. 42

2.   Options Were Integral to Attracting and Retaining Talent ........ 43

    (a)   Broadcom "Granted" Backdated Stock Options to Key Recruits Prior to their Actual Start Dates .............. 44

    (b)   Broadcom Awarded In-the-Money Options to Key Recruits Through its Acquisition Targets ............. 47

    (c)   Broadcom Awarded "Top-Up" Option Grants to Executives at Certain Acquisition Targets .................... 49

D.   Selected Examples of Backdated Option Grants ............................... 50

  1.   Exchange of Options ................................................. 51

    (a)   The 2001 Options Exchange ......................................... 51

    (b)   The 2003 Exchange ................................................. 54

  2.   The May 26, 2000 Option Grant ................................. 55

  3.   Additional Backdated Option Grants ......................... 58

    (a)   November 3, 1998 ................................................. 58

    (b)   October 22, 1999 ................................................. 60

    (c)   March 1, 2000 ................................................... 60

    (d)   October 1, 2001 ................................................. 61

    (e)   October 19, 2001 ................................................. 63

    (f)   March 1, 2002 ................................................... 65

    (g)   July 3, 2002 ..................................................... 66

    (h)   August 5, 2002 ................................................... 68

    (i)   May 19, 2003 ..................................................... 69

E.   The Statistical Probability that Broadcom Randomly Granted Options on Opportunistic Grant Dates Establishes Scienter ............. 70

F.   Broadcom's Restatement ................................................. 71

G.   The Broadcom Defendants' Scheme Systematically Violated GAAP and SEC Regulations ................................................. 73

H.   Broadcom's Lack of Internal Controls ............................................. 80

VI.   SUMMARY OF THE BROADCOM DEFENDANTS' SCIENTER ......... 83

A.   Defendant Samueli .................................................................. 83

B.    Defendant Nicholas ............................................................. 88

C.    Defendant Ruehle ............................................................... 93

D.    Defendant Dull ................................................................... 98

E.    Defendants Ross, Wolfen and Farinsky ........................... 105

VII.    THE BROADCOM DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................................................... 111

VIII.    EY FRAUDULENTLY ISSUED THE 2005 OPINION ........................... 130

A.    Overview of EY's Relationship With Broadcom ............................ 130

B.    EY Knowingly Issued A Materially False And Misleading Audit Opinion In 2005 ................................................ 132

1.    EY Knew It Did Not Audit The May 26, 2000 Grant Pursuant to GAAS, And Instead Gave Broadcom "Flexibility" to Backdate The Largest Options Grant In The Company's History ....................................... 134

2.    EY Had Actual Knowledge Of Unauthorized Grants Following The Death of One of Two Members of the Compensation Committee ................................. 139

3.    Separately, EY Knew There Was Insufficient Evidential Matter For Nearly Half of the Backdated Grants .................. 141

4.    EY Presided Over Corrective Reforms, Confirming the Material Weakness ................................................ 144

5.    No Later Than July 2000, EY Knew That Broadcom's Internal Controls Suffered From A Material Weakness .......... 146

6.    False Management Representations Letters Are Basis of Government Charges ................................................ 150

7.    Additional Evidence of EY's Scienter ................................. 151

(a)    EY's Knowledge, or Reckless Disregard, Of Risk Factors Further Support Allegations of Scienter .......... 151

(b)    EY was Deliberately Reckless in Ignoring Numerous "Red Flags" ................................... 152

C.    EY's False and Misleading Statements ........................... 154

1.    Overview of False Statements ........................................ 154

2.    The 2005 Opinion .......................................................... 155

IX.    LOSS CAUSATION ........................................................... 159

A. Overview of Loss Causation ............................................................ 159

B. The Market's Understanding of the Accounting Implications of Backdating Options ...................................................... 160

C. Background Disclosures ........................................................ 161

    1. May 16, 2006—The CFRA Report .......................................... 161

    2. May 17, 2006—Broadcom's Patent Victory............................. 163

    3. May 18, 2006—*Wall Street Journal* Articles ......................... 164

D. Corrective Disclosures .......................................................... 165

    1. May 22, 2006—Merrill Lynch Report ..................................... 165

    2. May 23, 2006—Criminal Probes Expanded ............................ 167

    3. May 25, 2006—Internal Investigation .................................... 169

E. Additional Support For Lead Plaintiff's Allegations of Loss Causation ......................................................... 170

    1. The July 14, 2006 Announcement of the Restatement Was "Well Anticipated," So The Stock Did Not Decline........ 170

    2. Broadcom's Filing of The Restatement "Removes A Significant Overhang," So the Stock Increases Slightly.......... 171

    3. Statistical Economic Analysis Further Supports Lead Plaintiff's Loss Causation Allegations.................................... 172

X. LEAD PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE ............................................................. 174

XI. THE SAFE HARBOR PROVISION IS INAPPLICABLE ...................... 175

XII. CAUSES OF ACTION ............................................................ 176

XIII. PRAYER FOR RELIEF............................................................ 186

XIV. JURY TRIAL DEMAND........................................................... 188

1       Lead Plaintiff New Mexico State Investment Council ("Lead Plaintiff"),

2   individually and on behalf of all other persons and entities who purchased or

3   otherwise acquired the Class A common stock of Broadcom Corp. ("Broadcom"

4   or the "Company") during the period between July 21, 2005 and July 13, 2006,

5   inclusive, (the "Class Period"), hereby alleges the following based upon personal

6   knowledge as to itself and its own acts and upon information and belief as to all

7   other matters.

8       Lead Plaintiff's allegations are based on Lead Counsel's investigation,

9   which included, among other things: (i) a review and analysis of Broadcom's

10  public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) a

11  review and analysis of other publicly available information concerning Broadcom

12  and its historical stock option practices; (iii) interviews with former Broadcom

13  employees, each of whom have specific, personal knowledge of facts alleged

14  herein; and (iv) the results of investigations conducted by the U.S. Attorney's

15  Office for the Central District of California ("USAO") and the SEC, as reflected

16  in the criminal indictments of defendants Henry Nicholas and William Ruehle

17  and civil charges against these defendants together with Broadcom, Henry

18  Samueli and David Dull, as described below.   Lead Plaintiff believes that

19  substantial additional evidentiary support will exist for its allegations after a

20  reasonable opportunity for discovery.

21  **I.**       **NATURE OF THE ACTION**

22      **Overview of Defendants' Fraud**

23      1.       From Broadcom's inception as a public company in 1998 through

24  the end of the Class Period (the "Relevant Period"), certain of Broadcom's senior

25  officers and directors—including its co-founders, Henry Samueli ("Samueli") and

26  Henry T. Nicholas III ("Nicholas")—orchestrated a fraudulent scheme to inflate

27

28

Broadcom's stock price by backdating, and failing to properly account for, "most" of the Company's stock option grants between April 1998 and May 2003.

2. As alleged herein, the backdating scheme at Broadcom was unprecedented, involving options to purchase over **239 million shares** and resulting in a **$2.2 billion** restatement—the largest restatement ever due to options backdating. Indeed, when Broadcom restated its historic financial statements for 1998 through 2005 (the "Restatement"), the Company, as well as its independent auditor Ernst & Young LLP ("EY"), admitted that every financial statement and quarterly and annual report that Broadcom had ever issued as a public company was materially false and misleading. The amount of the Restatement is matched only by the magnitude of the individual defendants' insider trading proceeds, which exceeded **$2.03 billion** during the Relevant Period.

3. On the heels of Broadcom's admissions, the SEC launched a formal investigation into Broadcom's stock option practices, and the USAO initiated a grand jury investigation. To date, these investigations have resulted in numerous civil and criminal actions against Broadcom and certain of its senior executives based on the same fraudulent scheme alleged herein, including:

- **Defendant Broadcom**: In April 2008, the SEC charged Broadcom with civil securities fraud. The Company consented to entry of final judgment, agreeing, *inter alia*, to a civil penalty of **$12 million**;

- **Defendant Samueli**: In May 2008, the SEC charged Samueli with civil securities fraud. In June 2008, the USAO filed an Information against Samueli, charging him with lying under oath to the SEC about his role in Broadcom's options granting process. Several days later, the USAO filed a Plea Agreement, wherein Samueli *admitted that he deliberately lied under oath to the SEC* to "influence [its] decisions or actions in connection with its investigation." The district

court subsequently ***rejected*** the Plea Agreement for being "too lenient" in light of the "very serious allegations of securities fraud [that the SEC levied] against [Samueli] that, if true, warrant a significant prison sentence";

- **Defendants Nicholas and Ruehle**:  In May 2008, the SEC charged Nicholas and William J. Ruehle ("Ruehle"), Broadcom's former CFO, with civil securities fraud.  Then, in June 2008, the USAO unsealed an indictment against Nicholas and Ruehle, charging them with, *inter alia*, conspiracy and criminal securities fraud; and

- **Defendant Dull**:  In May 2008, the SEC charged David A. Dull ("Dull"), the Company's former General Counsel, Corporate Secretary and Senior Vice President, with civil securities fraud for his role in the fraudulent backdating scheme.

**Fraudulently Backdated Options Were Central to Broadcom's Success**

4.    At all relevant times, Broadcom's issuance of backdated stock options was central to its perceived success.  Stock options were Broadcom's principal tool to recruit, retain, and motivate employees, including highly sought-after technical personnel and engineers needed to implement Broadcom's business plan.

5.    Among its peers, Broadcom was well known for paying below-market salaries.  To attract and maintain employees, the Company depended upon stock options to entice prospective employees and offer competitive compensation.  To minimize the costs of using options and to award extraordinary compensation to Broadcom's employees and officers, defendants fraudulently selected the lowest available historic stock price for option grants, thus ensuring that such options were "in-the-money" at the time of grant.

6.     Throughout the Relevant Period, in clear violation of Generally Accepted Accounting Principles ("GAAP") and its own public disclosures, Broadcom failed to record a compensation expense for its issuance of backdated options.  As a result, the Company materially overstated its reported net income and materially understated its reported compensation expense from 1998 through the end of the Class Period.

## Defendants Executed The Scheme With Scienter

7.     As detailed herein, defendants acted with fraudulent scienter in selecting, approving, and accounting for the Company's issuance of backdated options.  Indeed, faced with the findings of its internal investigation, the Company admitted the fraudulent role of its chief executives.  With respect to Nicholas, Broadcom admitted that "*[t]here is substantial evidence Dr. Nicholas was at times involved with the selection of grant dates after the fact* and with subsequent allocations of grants."  (emphasis added).  Moreover, with respect to Ruehle, the Company admitted that "*[t]here is substantial evidence [Ruehle] engaged in the selection of grant dates after the fact*."  (emphasis added).

8.     Documents uncovered by the SEC and USAO also confirm that, at all relevant times, Nicholas, Samueli, Ruehle and Dull knowingly and actively engaged in the backdating scheme.  Indeed, as described herein, the governmental actions uncovered emails wherein these defendants discussed and approved the selection of numerous opportunistic grant dates.  And the evidence uncovered by the governmental actions also confirms that, by no later than September 2000, each of these defendants had actual knowledge that granting backdated options triggered accounting consequences under GAAP.

9.     Moreover, in one telling chain of events, the governmental investigations uncovered how defendants intentionally backdated a director's appointment to the Compensation Committee to ensure that it could issue options

on several advantageous grant dates when the Committee was not constituted, as one of its two members passed away months earlier and had not been replaced.

10.     On a personal level, defendants reaped an extraordinary financial benefit from their fraudulent scheme, not only from their receipt of backdated options, but from their sales of Broadcom's stock at artificially inflated prices. For example, during the Relevant Period, defendant Dull received backdated options that were in-the-money by at least ***$24 million*** and defendant Ruehle received backdated options that were in-the-money by at least ***$21 million***. Further, during the Relevant Period, defendants' insider trading proceeds exceeded ***$2 billion*** and, during the Class Period, exceeded ***$134 million***.

11.     Defendants' scienter is also demonstrated by a statistical analysis of the Company's option grants, which routinely occurred at or near the lowest closing price in the calendar month.  As detailed below, the odds of defendants randomly picking the lowest monthly stock prices to grant options to themselves and Broadcom's key employees are less than ***1 in 32,000***.

### Nicholas Paid Off a Whistleblower in November 2000

12.     Remarkably, in November 2000, a former Broadcom employee alleged in a draft complaint that Broadcom was artificially inflating its earnings by issuing backdated options without recording a compensation expense.  In order to keep the scheme from unraveling, and to ensure that Broadcom's fraudulent accounting for option grants did not come to light, Nicholas met with the whistleblower and agreed to pay him a settlement worth approximately ***$7 million***.    Upon information and belief, Broadcom's senior executives, including Nicholas, Samueli, Ruehle and Dull, authorized the Company to retain outside counsel and to finalize this settlement with the whistleblower.

**The Board's Covert Reforms in June 2003**

13. In January 2003, defendant Nicholas resigned as Broadcom's longstanding CEO, and did not seek re-election as a director when his term as Co-Chairman of the Board ended in May 2003.

14. In June 2003, immediately following Nicholas's departure, the Board, led by Samueli as its sole Chairman, "significantly strengthened [its] options granting practices and put into place *rigorous processes to prevent and detect any future instances of improper accounting for equity awards*." *See* Broadcom's January 23, 2007 Press Release (announcing the Restatement and quoting Scott McGregor, current CEO). Broadcom did not disclose this fact to investors until it completed the Restatement, approximately 3.5 years later.

15. That the Board recognized the need to implement "rigorous processes to prevent and detect future instances of *improper accounting* of equity awards" upon Nicholas's departure reflects defendants' implicit understanding that: (i) Broadcom's historical stock option grants had accounting consequences; (ii) the Company's previously reported financial results were, therefore, false and could not be relied upon; and (iii) that a restatement may be necessary.

16. Yet, rather than correct the Company's improper accounting for its historic option grants, defendants concealed the scheme and continued to fraudulently account for backdated options that were granted prior to May 2003, but that continued to vest thereafter. Tellingly, Broadcom correctly accounted for *all* of its newly issued option grants after May 2003, thus confirming that defendants understood the correct accounting treatment for backdated options during the same timeframe.

**The Scheme Continued Through the End of the Class Period**

17. Defendants recognized that, if they were required to recognize the true cost of Broadcom's backdated option grants, the Company would not be able

to meet Wall Street's and investors' expectations and retain key personnel. At all relevant times, defendants expressly recognized that if they disclosed the truth about their stock option practices and Broadcom's actual financial performance, the Company's share price would be pummeled.

18. Indeed, this is exactly what happened when the truth about the Company's historical accounting for backdated stock options was revealed to the market. For example, on May 22, 2006, investors learned that Broadcom was a *"standout"* company for options backdating. That day, Merrill Lynch issued the results of its proprietary analysis, which revealed that between 1997 and 2002, Broadcom's stock price consistently generated "excess" returns (*i.e.,* increased relative to the stock index), within 20 days after its issuance of incentive stock option grants. As a result of Broadcom's backdating, investors were warned to expect government investigations, a restatement of false historic financial statements, and employee terminations. In reaction to this news, Broadcom's stock price dropped almost 8 percent from $37.20 per share to $34.34 per share, on 26.8 million shares of volume—nearly double Broadcom's average volume during the Class Period—wiping out more than $1.76 billion in market capitalization.

19. As Broadcom admitted in the Restatement, but for the fraudulent conduct, the Company's true earnings were far below the market's expectations throughout its history as a public company. Moreover, as illustrated in the chart below, instead of consistently meeting or beating analysts' expectations from 1998 through the end of the Class Period, the Company would have missed its earnings targets each and every year since 1998.

| Fiscal Year or Quarter | Reported EPS (split adjusted) | Restated EPS |
|---|---|---|
| 1998 | $0.07 | $0.04 |
| 1999 | $0.21 | $0.07 |
| 2000 | $(2.08) | $(2.91) |
| 2001 | $(7.02) | $(9.60) |
| 2002 | $(5.56) | $(6.93) |
| 2003 | $(2.19) | $(2.95) |
| 2004 | $0.42 | $0.33 |
| 2005 | $0.73 | $0.66 |

**Ernst & Young Fraudulently Issued False Audit Opinions**

20.     The fraud was perpetrated with the knowing participation of the Company's independent auditor, EY.  By no later than July 2000, EY knew, or at least recklessly disregarded, that Broadcom's publicly reported financial statements were materially false and misleading, yet nonetheless signed an unqualified audit opinion for each fiscal year during the Relevant Period.

21.     For example, on May 26, 2000, the Company purportedly issued a block option grant, the single largest grant in Broadcom's history.  Tellingly, on that same date, the Company's stock price closed at $118 per share, its lowest closing price in nearly a **_one year period_**.  On or about July 2000, the Company's delay in allocating these options caught the attention of EY, as Broadcom's stock price had increased from $118 per share to well over $200 per share.

22.     EY confronted its client over the suspicious grant, engaging in "intense" discussions with Ruehle (and others) and seeking answers as to why the grant was not yet "complete" months after the purported measurement date. Notwithstanding EY's actual knowledge that these options were already in-the-money by more than $82 per share, EY granted its client "flexibility," not

1  requiring the Company to record a compensation expense (as required under
2  GAAP), which would have exceeded *$700 million*.

3       23.    EY's failure to audit Broadcom's grants in accordance with the
4  Generally Accepted Auditing Standards and later PCAOB Standards
5  (collectively, "GAAS") was not limited to the May 26, 2000 grant.  As both EY
6  and Broadcom admitted, nearly half of the Restatement's $2.2 billion reduction in
7  earnings is attributed to backdated options that *could not* have been audited, as
8  the only documentation that existed for these option grants was unanimous
9  written consents ("UWCs").  By their very nature, these UWCs were not
10  contemporaneous documentation—a fact exposed on the face of the documents.
11  Significantly, to the extent that EY ever looked at these UWCs, it knew that the
12  documents were executed weeks—or even months—after the "as of" date of the
13  purported option grant.

14       24.    Further, EY signed-off on option grants to Section 16 officers on at
15  least three dates when it knew the Compensation Committee was not constituted,
16  as one of its two members had passed away in July 2001 and had not been
17  replaced.  Beyond the fact that the Compensation Committee was not constituted
18  on any of these dates, the timing of one of these grants—which involved a
19  purported re-grant of options on December 24, 2001—was suspicious for several
20  additional reasons: (i) it occurred on the first day of a five-week re-grant window;
21  (ii) in retrospect, the purported grant date marked the lowest closing price during
22  the entire re-grant window; and (iii) it purportedly occurred on Christmas Eve.

23       25.    EY was highly compensated for the accounting and auditing services
24  that it provided to Broadcom.  In sum, between 2000 and 2006, the Company paid
25  EY more than *$19.6 million*, more than $17 million of which stemmed from audit
26  and audit-related services.

27

28

---

26.    In March 2008, the Company issued a press release announcing its decision to replace EY as its longstanding auditor.  Tellingly, the Company's press release stated that it decided to replace EY "as part of [its] ongoing efforts to enhance its corporate governance practices."

*                    *                    *

27.    As detailed herein, defendants' fraudulent scheme was carried out with deliberation, injuring Lead Plaintiff and members of the Class who purchased Broadcom's artificially inflated shares.

## II.    JURISDICTION AND VENUE

28.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

29.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Broadcom conducts business in this District.

31.    In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets, including NASDAQ.

## III.  **PARTIES**

### A.  **Lead Plaintiff**

32.   Lead Plaintiff New Mexico State Investment Council is a non-cabinet level agency reporting to the Governor of New Mexico, organized under the laws of the State of New Mexico.  As set forth in the certification attached hereto as Exhibit A, Lead Plaintiff purchased shares of Broadcom Class A common stock during the Class Period at artificially inflated prices and suffered damages as a result of the violations of the Exchange Act alleged herein.

### B.  **Defendant Broadcom**

33.   Defendant Broadcom provides semiconductors for wired and wireless communications products that enable the delivery of voice, video, data, and multimedia to and throughout the home, the office, and the mobile environment.  The Company was co-founded by Samueli and Nicholas in 1991 and went public in April 1998.  Broadcom is incorporated in California and maintains its principal place of business and chief executive offices at 16215 Alton Parkway, Irvine, CA 92618.  The Company's Class A shares of common stock are publicly traded on NASDAQ.

34.   On April 22, 2008, the SEC filed a complaint against Broadcom alleging that the Company violated Section 10(b) and Rule 10b-5, stemming from the same fraudulent scheme alleged herein.  Six days later, on April 26, 2008, the Company filed a consent to entry of final judgment, and agreed, *inter alia*, to pay a civil penalty in the amount of $12 million.

### C.  **The Individual Defendants**

**Henry Samueli**

35.   Defendant Samueli co-founded the Company and served as Chief Technical Officer ("CTO") from 1991 through May 14, 2008, when he took a "leave of absence" as CTO pending resolution of an SEC action charging Samueli

1  (as well as Nicholas, Ruehle and Dull) with securities fraud.  From 1991 through

2  2003, Samueli served as Co-Chairman of the Board, and served as the sole

3  Chairman from 2003 through his "resignation" on May 14, 2008.  As one of two

4  members of the Options Committee, Samueli granted and approved the issuance

5  of backdated options to the Company's non-Section 16 officers between April

6  1998 and May 2003, during which time Broadcom admittedly issued backdated

7  stock options.  Samueli signed Broadcom's false and misleading Form 10-K for

8  fiscal 2005.  As of March 2007, Samueli controlled 29.7% of the Company's

9  voting stock.  At the time Broadcom issued its annual report on Form 10-K during

10 the Class Period, Samueli fraudulently knew that it contained materially false and

11 misleading financial statements.  Samueli sold more than 1.8 million shares of

12 Broadcom stock during the Class Period, reaping gross proceeds in excess of $90

13 million.

14       36.    On May 14, 2008, the SEC filed a civil action alleging that Samueli

15 (as well as Nicholas, Ruehle and Dull) violated Section 10(b) and Rule 10b-5

16 based on the same fraudulent scheme alleged herein.  In June 2008, the USAO

17 filed an Information against Samueli, alleging that he intentionally lied to the

18 SEC regarding his role in the Company's options granting process with respect to

19 Section 16 officers, a felony offense.  On June 23, 2008, the USAO filed a Plea

20 Agreement, wherein Samueli admitted that, while testifying under oath to the

21 SEC, he "made a false statement knowingly and willfully, that is deliberately and

22 with knowledge that the statement was untrue."  Samueli also admitted in the Plea

23 Agreement that "the [false] statement . . . had the capacity to influence the SEC's

24 decisions or actions in connection with its investigation."   The USAO

25 recommended a sentence consisting of more than $12.2 million in payments and

26 fines and five years of probation.  On September 8, 2008, the court entered an

27 Order rejecting the Plea Agreement, finding, *inter alia*, that the agreed upon

28

1   sentence was "too lenient" given that "[t]he Government has publicly levied very

2   serious allegations of securities fraud against Dr. Samueli that, if true, warrant a

3   significant prison sentence."  On September 22, 2008, Samueli filed a Notice of

4   Appeal with respect to the Order rejecting the Plea Agreement, which is presently

5   pending before the Ninth Circuit.

6          **Henry Nicholas**

7          37.    Defendant Nicholas co-founded Broadcom with Samueli, and served

8   as President and CEO from the Company's inception in 1991 until his resignation

9   in January 2003, and as Co-Chairman of the Board until his term as a director

10  ended in May 2003.  As one of two members of the Options Committee, Nicholas

11  granted and approved the issuance of backdated options to the Company's non-

12  Section 16 officers between April 1998 and May 2003, when Broadcom

13  admittedly issued backdated stock options.  Since leaving Broadcom, Nicholas

14  has continued to own a significant percentage of the Company's stock and,

15  through the Nicholas Family Trust, controlled 29.3% of the Company's voting

16  stock as of March 2007.  At the time Broadcom issued its annual report on Form

17  10-K during the Class Period, Nicholas fraudulently knew that it contained

18  materially false and misleading financial statements.  Nicholas, together with the

19  Nicholas Family Trust, sold at least 36.2 million shares of Broadcom during the

20  Relevant Period, reaping at least $875 million in gross proceeds.

21         38.    On May 14, 2008, the SEC filed a civil action alleging that Nicholas

22  (as well as Samueli, Ruehle and Dull) violated Section 10(b) and Rule 10b-5

23  based on the same fraudulent scheme alleged herein.  On June 4, 2008, the USAO

24  unsealed two criminal indictments, charging Nicholas with, *inter alia*, conspiracy,

25  securities fraud, mail and wire fraud.  Nicholas's criminal trial is scheduled to

26  commence in April 2009.

27

28

---

1

**William Ruehle**

2        39.    Defendant Ruehle served as the Company's Chief Financial Officer

3 ("CFO") from 1997 until his "resignation" on September 19, 2006, two days prior

4 to his scheduled interview with the Audit Committee.  As Broadcom's CFO,

5 Ruehle signed and certified each of Broadcom's false and misleading financial

6 statements during the Class Period, including the Company's Form 10-K for

7 fiscal 2005, and the Forms 10-Q for each fiscal quarter of 2005 and the first fiscal

8 quarter of 2006.  Ruehle hand-picked many of the grant dates for the backdated

9 option grants.  At the time Broadcom issued its annual report on Form 10-K

10 during the Class Period, Ruehle fraudulently knew that it contained materially

11 false and misleading financial statements.  Ruehle received at least 850,000

12 backdated options during the Relevant Period, which were in-the-money by at

13 least $21 million.  He also exercised some of his backdated options and reaped a

14 tangible benefit of at least $102,000.  In addition, Ruehle sold 210,000 shares of

15 Broadcom stock during the Class Period, reaping gross proceeds of more than

16 $10.5 million.

17        40.    On May 14, 2008, the SEC filed a civil action alleging that Ruehle

18 (as well as Samueli, Nicholas and Dull) violated Section 10(b) and Rule 10b-5

19 based on the same fraudulent scheme alleged herein.  On June 4, 2008, the USAO

20 unsealed a criminal indictment, charging Ruehle with, *inter alia*, conspiracy,

21 securities fraud, mail and wire fraud.  Ruehle's criminal trial is scheduled to

22 commence in April 2009.

23

**David Dull**

24        41.    Defendant Dull served as Broadcom's General Counsel and

25 Corporate Secretary from April 1998 through May 14, 2008, when he took a

26 "leave of absence" as an executive officer pending the resolution of an SEC

27 action charging him (as well as Samueli, Nicholas and Ruehle) with securities

28

fraud.  Dull received the title of Senior Vice President in April 2005.  Until 1998, Dull was a partner in the law firm of Irell & Manella LLP, the Company's counsel in this Action.  At the direction of Samueli and Nicholas, Dull prepared UWCs for the Options Committee and the Compensation Committee between April 1998 and May 2003.  These UWCs memorialized the Committees' issuance of incentive stock options "as of" certain opportunistic grant dates, notwithstanding Dull's fraudulent knowledge that the actual grant dates occurred well after the dates reflected on the UWCs.

42.   Upon information and belief, and based upon Lead Plaintiff's investigation, Dull prepared and reviewed (i) Broadcom's false and misleading Forms 8-K (which, *inter alia*, attached Broadcom's earnings press releases), (ii) each of the Forms 10-Q and (iii) Forms 10-K during the Relevant Period, as specified herein.  In addition, Dull signed the false and misleading Forms 14A on behalf of the Board from 2000 through 2005, as specified herein.  At the time Broadcom issued its annual report on Form 10-K during the Class Period, Dull fraudulently knew that it contained materially false and misleading financial statements.  During the Relevant Period, Dull received at least 850,000 backdated options, which were in-the-money by at least $24 million.  He exercised some of these backdated options, receiving a tangible benefit of at least $1.8 million.  In addition, Dull sold more than 197,000 shares of Broadcom stock during the Class Period, reaping gross proceeds in excess of $9.7 million.

43.   On May 14, 2008, the SEC filed a civil action alleging that Dull (as well as Samueli, Nicholas and Ruehle) violated Section 10(b) and Rule 10b-5 based on the same fraudulent scheme alleged herein.

**Alan Ross**

44.   Defendant Alan E. Ross ("Ross") served as Broadcom's President and Chief Executive Officer from January 2003 through January 2005, and has

served as a director since November 1995.  Between 1998 and November 2002, Ross served simultaneously on the Audit and Compensation Committees. Further, from March 2004 through March 2006, Ross served as Chairman of the Equity Award Committee.  Ross signed the Company's false and misleading Form 10-K for 2005 and, as a member of the Compensation Committee, determined and approved the terms of the Company's backdated option grants to Section 16 officers between April 1998 and May 2003.  In addition, as a member of the Compensation Committee and Audit Committee, Ross either knew or recklessly disregarded that Broadcom's historical stock option practices failed to comply with GAAP and the Company's stated accounting policies.  At the time Broadcom issued its annual report on Form 10-K during the Class Period, Ross fraudulently knew that it contained materially false and misleading financial statements.  Ross sold 333,432 shares of Broadcom stock during the Class Period, reaping gross proceeds in excess of $14.3 million.

**Werner Wolfen**

45.    Defendant Werner F. Wolfen ("Wolfen") served as a director of Broadcom and its predecessor from July 1994 through May 2008, and was elected "Lead Independent Director" in May 2003.  Wolfen served as a member of Broadcom's Audit Committee from 1998 through May 2008, and simultaneously served on the Compensation and Audit Committees from November 2002 through May 2008, including acting as Chairman of the Compensation Committee from April 2003 through March 2006.  Wolfen was also a senior partner in the law firm of Irell & Manella LLP until 1998.  Wolfen signed Broadcom's false and misleading Form 10-K for 2005 and, as a member of the Compensation Committee, determined and approved the terms of Broadcom's backdated option grants to Section 16 officers between November 2002 and May 2003.  In addition, as a member of the Compensation Committee and Audit

1   Committee, Wolfen either knew or recklessly disregarded that Broadcom's
2   historical stock option practices failed to comply with GAAP and the Company's
3   stated accounting policies. At the time Broadcom issued its annual report on
4   Form 10-K during the Class Period, Wolfen fraudulently knew that it contained
5   materially false and misleading financial statements. Wolfen sold more than
6   107,000 shares of Broadcom stock during the Class Period, reaping gross
7   proceeds in excess of $4.7 million.

8   **George Farinsky**

9       46.   Defendant George L. Farinsky ("Farinsky") has served as a director
10  of Broadcom since February 2002. Farinsky, a Certified Public Accountant,
11  previously served as Chief Financial Officer of Ashton-Tate Corporation from
12  1987 to 1991. Farinsky has served on Broadcom's Audit Committee since
13  November 2002, and served concurrently on the Audit and Compensation
14  Committees from April 2003 through March 2006. Farinsky signed Broadcom's
15  false and misleading Form 10-K for 2005 and, as a member of the Compensation
16  Committee and Audit Committee, either knew or recklessly disregarded that
17  Broadcom's historical stock option practices failed to comply with GAAP and the
18  Company's stated accounting policies. At the time Broadcom issued its annual
19  report on Form 10-K during the Class Period, Farinsky fraudulently knew that it
20  contained materially false and misleading financial statements.

21      47.   Samueli, Nicholas, Ruehle, Dull, Ross, Wolfen and Farinsky are
22  collectively referred to herein as the "Individual Defendants." The Individual
23  Defendants and the Company are together referred to herein as the "Broadcom
24  Defendants."

25      48.   Samueli, Nicholas, Ruehle and Dull, by virtue of their positions as
26  Broadcom's senior executive officers, directly participated in the management of
27  Broadcom, and were directly involved in the day-to-day operations of Broadcom

28

at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.   In addition, Samueli, Nicholas, Ruehle and Dull were involved in drafting, producing, reviewing and/or causing the dissemination of the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, the fact that the false and misleading statements were being issued by the Company, and approved or ratified these statements, in violation of the federal securities laws.

49.   As officers and controlling persons of a publicly-held company whose shares are registered with the SEC and traded on NASDAQ, Samueli, Nicholas, Ruehle and Dull had a duty to disseminate promptly, accurate and truthful information with respect to Broadcom, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded Class A common stock would be based upon truthful and accurate information.   Samueli, Nicholas, Ruehle and Dull each violated these specific requirements and obligations during the Class Period.

50.   Ross, Wolfen and Farinsky participated in the drafting, preparation and/or approval of the Company's publicly filed financial statements, and were aware of, or recklessly disregarded, that those public filings were materially false and misleading.   Because of their membership on the Board, the Compensation Committee and the Audit Committee, each of these defendants had "sole and exclusive authority" to administer, review and approve the terms of Broadcom's option grants to Section 16 officers, as well as "reviewing" and "monitoring" the Company's corporate financial reporting.   Ross, Wolfen and Farinsky each had access to non-public information concerning the Company's historical stock option practices, and either knew or recklessly disregarded the fact that

1    Broadcom's issuance of backdated stock options failed to comply with GAAP
2    and the Company's stated accounting policies.

3       51.    The Individual Defendants are liable as participants in a fraudulent
4    scheme and course of business that operated as a fraud or deceit on purchasers of
5    Broadcom's Class A common stock by disseminating materially false and
6    misleading statements and/or concealing material adverse facts with respect to the
7    statements concerning Broadcom's stock option practices, as alleged herein. The
8    scheme: (i) deceived the investing public regarding Broadcom's business,
9    operations, management and the intrinsic value of Broadcom's Class A common
10    stock; (ii) permitted certain of the Individual Defendants to receive substantial
11    sums of backdated stock options; (iii) caused Broadcom to materially understate
12    its reported compensation expense and materially overstate its reported net
13    income; and (iv) caused Lead Plaintiff and other members of the Class to
14    purchase Broadcom Class A common stock at artificially inflated prices.

15       **D.**    <u>**Ernst & Young**</u>

16       52.    Defendant Ernst & Young LLP ("EY") is a Delaware limited
17    liability partnership headquartered in New York, NY. EY provided auditing
18    services to Broadcom at all relevant times, from its initial public offering in April
19    1998 through the end of the Class Period, including, without limitation,
20    conducting audits of the Company's year-end financial statements. EY played an
21    integral part in the conduct, acts and omissions alleged herein and, by no later
22    than July 2000, either knew or deliberately disregarded that Broadcom's option
23    granting practices failed to comply with GAAP and the Company's stated
24    accounting policies. Between 2000 and 2006, Broadcom paid EY $19.6 million
25    in fees, more than $17.1 million of which related to EY's auditing services.

26       53.    EY's audit efforts were led by Marc Blythe, Bruce Stump, and
27    Clifford Pike. Blythe was a member of the engagement team from at least Q2
28

1   1999 through the end of the Class Period, and was elevated to partner after

2   working on the Broadcom engagement as a Senior Manager from Q2 1999 to Q2

3   2001.  Bruce Stump was the Coordinating Partner from 1998 to 2003, and was

4   involved in EY's procedures concerning Broadcom's option grants.  Cliff Pike

5   was the technical stock option specialist at EY who advised Broadcom on option-

6   related issues.  Each of these individuals participated in the audit procedures

7   concerning Broadcom's options practices and had a significant role in the

8   execution of EY's false and misleading audit opinions.  In particular, each of

9   these individuals took part in approving Broadcom's accounting of the May 26,

10  2000 grant.

11      54.   In March 2008, the Company issued a press release announcing its

12  decision to replace EY as its longstanding auditor.  Tellingly, the Company's

13  press release stated that it decided to replace EY "as part of [Broadcom's]

14  ongoing efforts to enhance its corporate governance practices."

15      55.   EY, together with the Broadcom Defendants, are collectively

16  referred to herein as "Defendants."

17  **IV.   CLASS ACTION ALLEGATIONS**

18      56.   Lead Plaintiff brings this action as a class action pursuant to Federal

19  Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all

20  persons and entities who purchased or otherwise acquired Broadcom Class A

21  common stock between July 21, 2005 and July 13, 2006, inclusive, and who were

22  damaged thereby (the "Class").  Excluded from the Class are Defendants, the

23  officers and directors of the Company, members of their immediate families and

24  their legal representatives, heirs, successors or assigns, any entity in which the

25  Broadcom Defendants have or had a controlling interest, and any Broadcom

26  employee who acquired Broadcom's Class A common stock through their

27  exercise of incentive stock options during the Relevant Period.

28

57.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Broadcom stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of member in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Broadcom or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

58.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

59.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

60.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Broadcom;

(c)    the extent to which the prices of Broadcom's publicly traded Class A common stock was artificially inflated during the Class Period; and,

(d)    the extent to which members of the Class have sustained damages and the proper measure of damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.     Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this case as a class action.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Options Backdating – The "Ultimate Greed"

62.     Options backdating is akin to betting on a horse race after the horse has crossed the finish line.   With the benefit of hindsight, the executives or directors tasked with administering a company's option program can monitor the highs and lows of the company's stock price, and thus ensure that the options they award to themselves and their colleagues are "in-the-money" at the time of grant.

63.     As discussed below, companies that grant in-the-money options are required to record a compensation expense, and to amortize that expense over the vesting period of the option grant.   Failing to record that compensation expense results in an understatement of the company's reported compensation costs and an overstatement of the company's reported net income, not only in the year of the grant, but in each subsequent year until the options fully vest.   At Broadcom, the vesting period was four years.

64.     Commentators like former SEC Chairman Arthur Levitt have declared that backdating "represents the ultimate in greed.   It is stealing, in effect. It is ripping off shareholders in an unconscionable way."   Charles Forelle and James Bandler, *Five More Companies Show Questionable Options Pattern*, The Wall Street Journal, May 22, 2006.

65.     Similarly, in testimony before the U.S. Committee on Banking, Housing, and Urban Affairs on September 6, 2006, SEC Chairman Christopher Cox explained why options backdating schemes, such as Broadcom's, cause "real harm" to companies and their shareholders:

> There are many variations on the backdating theme. But here is a typical example…:  They granted an "in-the-money" option – that is, an option with an exercise price lower than that day's market price. They did this by misrepresenting the date of the option grant, to make it appear that the grant was made on an earlier date when the market value was lower.  That, of course, is what is meant by abusive "backdating" in today's parlance.
>
> The purpose of disguising an in-the-money option through backdating is to allow the person who gets the option grant to realize larger potential gains – without the company having to show it as compensation on the financial statements.
>
> Rather obviously, this fact pattern results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws.

(http://www.sec.gov/news/testimony/2006/ts090606cc.htm).

66.     Moreover, Harvey Pitt, former Chairman of the SEC, proclaimed that "[t]hose who backdate options grants violate federal and state law.  And those on whose watch this conduct occurs are also potentially liable:  ***If they knew about the backdating, they're participants in fraudulent and unlawful conduct.***  If they didn't know about the backdating, the question will be:  Should they have done more to discover it?"  (emphasis added).  Harvey Pitt, *The Next Big Scandal*, <u>Forbes</u>, May 26, 2006.

67.     To date, the SEC and USAO have brought six separate actions stemming from the same fraudulent conduct and/or material misrepresentations alleged herein.  Thus far, these civil and criminal actions have resulted in two plea agreements, two consents for final judgment, a $12 million civil penalty against Broadcom, recommended payments and fines exceeding $12.2 million against Samueli for lying to the SEC regarding his role in the options granting process, among others.

68.     Indeed, as demonstrated below, the Individual Defendants engaged in a long-term, fraudulent backdating scheme, which caused the Company to overstate its reported net income by more than **$2.2 billion**, and ultimately required the Company to restate its previously issued financial statements for every fiscal year from 1998 through 2005.  Tellingly, the Individual Defendants reaped significant profits from their scheme, cashing out stocks and options for over **$2 billion** during the Relevant Period.  Certain of the Individual Defendants also received a significant sum of backdated stock options during the Relevant Period.

## 1.     How Stock Options Are Intended To Work

69.     Stock options are agreements that allow an officer, employee or director to purchase shares of a public company at a specific price—known as the "exercise price" or "strike price"—on or after a predetermined date.  Employee stock options serve a dual purpose:  they yield a profit to employees when the market price of the company's common stock exceeds the strike price, and they align the interests of the company's employees with its shareholders.  As described below, a company incurs a compensation expense for its issuance of incentive options when the exercise price of those options is less than 100% of the fair market value of the company's common stock on the date of the grant.

70.     An optionee reaps a profit from his or her receipt of incentive options when the market price of the company's stock exceeds the exercise price of his or her stock options.  For example, if a company grants an employee an option to purchase 100 shares with an exercise price of $10 per share, the employee can buy 100 shares for $1,000 regardless of the actual market price of the stock on the date that the employee exercises their stock options.  In this example, if the price of the stock rises during the option term from $10 to $20 per share, the employee exercising the option at $10 will pay a total of $1,000 for 100 shares of stock that are, at the time of purchase, worth $20 per share or $2,000. This employee will immediately realize a "paper" profit of $1,000.

71.     When a company grants options to its employees or directors, it must do so under the written procedures of a stock option plan that is publicly filed with the SEC.  Given that stock option plans are publicly filed, the issuing company's officers and directors, particularly those who sign the SEC filings attaching the plan, are required to be familiar with the terms of the plan, how it is designed to operate, as well as their specific responsibilities thereunder.

## 2.     **The Company's Stock Option Plan**

72.     At all relevant times, Broadcom's options were granted pursuant to the 1998 Stock Incentive Plan (the "Stock Option Plan" or the "Plan").  The Plan was designed and prepared by Broadcom's management, adopted by the Board, and voted-on and approved by Broadcom's shareholders.  Although the Board amended and restated the Plan over the subsequent eight years, the core provisions of the Plan remained intact throughout the Relevant Period.

73.     The Stock Option Plan states that the Company uses stock options to "promote the interests of Broadcom Corporation, … by providing eligible persons with the opportunity to acquire a proprietary interest, or otherwise increase their

1   proprietary interest, in the Corporation as an incentive for them to remain in the

2   service of the Corporation." *See* the Stock Option Plan, Article One, Section 1.

3       74.    Under the Plan, the Board is required to form a "Primary

4   Committee," which has the "sole and exclusive authority" to "administer" the

5   Plan with respect to the Company's Section 16 insiders, including, *inter alia*, the

6   CEO, CFO, Controller and any vice president in charge of a principal business

7   unit, division, or function (such as human resources).  The Plan also empowers

8   the Board to form a "Secondary Committee," which, at the discretion of the

9   Board, is responsible for "administering" the Plan with respect to the Company's

10  non-Section 16 insiders.

11      75.    At all relevant times, the Board appointed the Compensation

12  Committee to serve as the "Primary Committee," and the Options Committee to

13  serve as the "Secondary Committee."  (In mid-2004, the Company changed the

14  name of the Options Committee to the Equity Award Committee.)  Between 2000

15  and 2005, the Company's annual proxy statements, filed on Forms 14A,

16  consistently represented that the Compensation Committees had "exclusive

17  authority" to grant incentive options to the Company's Section 16 officers.  Each

18  of these proxy statements were signed by Dull on behalf of the Board.

19      76.    The Stock Option Plan also provides that the per share exercise price

20  of options granted under the Plan may not be less than 100% of the fair market

21  value of Broadcom's common stock price on the date of the grant.  The Plan

22  defines "fair market value" as the closing selling price per share on the date of the

23  grant, or if there is no closing selling price for the common stock on the date of

24  the grant, then the closing selling price on the last preceding trading date.

25      77.    Throughout the Relevant Period, employees who received Broadcom

26  stock options were required to enter into a written agreement with the Company

27  with respect to each option grant, consisting of a Notice of Grant of Options

28

("Notice of Grant"), a Stock Option Agreement, and a Plan Summary and Prospectus. Each Notice of Grant plainly states the terms of the option grant on the face of the document, so that the optionee can easily review the relevant terms of his or her option grant. These terms include: (i) date of the grant; (ii) exercise price per share; (iii) number of options granted; and (iv) expiration date. Before the option is legally granted, the optionee must sign the Notice of Grant, affirming their understanding of the terms and conditions set forth therein.

78. Thus, from the face of the Notice of Grant, each recipient of Broadcom stock options could ascertain the purported grant date and strike price associated with such options. Based on this information, the Individual Defendants who received backdated options, including Nicholas, Samueli, Ruehle and Dull, either knew or recklessly disregarded that the grant date(s) and the exercise price(s) reflected on each of their Notice of Grants were not contemporaneous with the actual grant date(s), and either knew or were deliberately reckless in disregarding that this "discrepancy" failed to comport with GAAP (given the Company's failure to record the options as a compensation expense) and the Stock Option Plan.

### 3. APB 25: Accounting for Stock Options Issued Under the Plan

79. Accounting for option grants is subject to GAAP, which are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate, irrespective of footnote or other disclosure. Regulation S-X requires that interim financial statements filed quarterly must also comply with GAAP, with the exception that interim financial

1  statements need not include disclosure which would be duplicative of disclosures

2  accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

3      80.   In effect through December 31, 2005, Accounting Principles Board

4  Opinion No. 25 ("APB 25") was the relevant GAAP at issue with respect to

5  option grants.  This long-standing and well-settled GAAP clearly and simply

6  mandates that a company must record a compensation expense if it issues an

7  incentive option with an exercise price <u>lower than</u> the market price on date of the

8  grant (*i.e.*, an "in-the-money" option).  APB 25 defines the "measurement date"

9  (*i.e.*, the grant date) as the <u>first date</u> on which the following information is known:

10  (i) the number of options that an individual employee is entitled to receive; and

11  (ii) the exercise price.  If a compensation cost is required, it must be amortized

12  and recognized as an expense over the option's vesting period.

13      81.   Conversely, a company need not record a compensation expense

14  when issuing an incentive stock option with an exercise price equal to the extant

15  market price on the date of the grant (*i.e.*, an "at-the-money" option), or greater

16  than the extant market price on the date of the grant (*i.e.*, an "out-of-the-money"

17  or "underwater" option).

18      82.   The stock options that Broadcom granted to its employees typically

19  had a vesting period of four years, during which time a proportion of the option

20  shares became exercisable periodically.  Consequently, granting in-the-money

21  options to employees had a significant impact on the expense and income (loss)

22  reported to Broadcom's shareholders during the entire four-year vesting period.

23      83.   More specifically, failure to properly account for "in-the-money"

24  options results in an ***understatement*** of the issuing company's reported

25  compensation costs and an ***overstatement*** of its reported net income in the year of

26  the option grant, as well as each year thereafter, until the option fully vests.  For

27  example, if a company awards its employees with $24,000,000 in options during

28

1    2001, and such options carry a four year vesting period, the company would be

2    required to record a $6 million compensation expense in 2002, 2003, 2004 and

3    2005.

4           84.     Throughout the Relevant Period, Broadcom repeatedly assured the

5    Company's investors that its incentive stock options were accounted for in

6    accordance with APB 25.  For example, each of the Company's publicly filed

7    Form 10-Ks between 1998 and the end of the Class Period represented that "[t]he

8    Company accounts for stock-based awards to employees in accordance with

9    Accounting Principles Board ('APB') Opinion No. 25 . . .".  These Forms 10-K

10   were signed by defendants Nicholas (fiscal 1998-2002), Samueli (fiscal 1998-

11   2005), Ruehle (fiscal 1998-2005), Ross (fiscal 1998-2005), Wolfen (fiscal 1998-

12   2005) and Farinsky (fiscal 2001-2005), and, upon information and belief, and

13   based upon Lead Plaintiff's investigation and as corroborated by the SEC's

14   investigation, were prepared and reviewed by defendant Dull (fiscal 1998-2005).

15          85.     Broadcom's illegal accounting for options was also concealed, in

16   part, by Broadcom's public proxy statements between 2000 and 2005, filed on

17   Form 14As.  These Forms 14A asserted that the proper accounting treatment for

18   granting in-the-money options under APB 25 was followed by Broadcom.

19   Specifically, these Forms 14A stated that "*[o]ption grants . . . under the 1998*

20   *Plan with exercise or issue prices less than the fair market value of the shares*

21   *on the grant or issue date will result in a compensation expense to the Company*

22   *in an amount equal to the excess of such fair market value of the shares over*

23   *the exercise or issue price*.  *The expense must be amortized against the*

24   *Company's earnings over the period that the option shares or issued shares are*

25   *to vest.*"  *See, e.g.*, Broadcom's 2002 Proxy Statement at 19 (emphasis added);

26   *see also* Broadcom's 2005 Proxy Statement at 26.  Dull signed each of these

27   Form 14As on behalf of the Board.

28

86. Accordingly, given that each of the Individual Defendants either signed, prepared and/or reviewed the Company's publicly filed Form 10-Ks and 14As, they each knew, or were deliberately reckless in disregarding, that backdated options had accounting consequences under APB 25 at all relevant times.

### 4. Certain of the Individual Defendants Served Concurrently on the Compensation Committee and the Audit Committee

87. Remarkably, while the Company was admittedly issuing backdated options between April 1998 and May 2003, defendants Ross, Wolfen and Farinsky were serving *simultaneously* on both the Compensation Committee and the Audit Committee—the very committee charged with monitoring the integrity of the Company's financial reporting—during some or all of this timeframe.

88. Thus, notwithstanding their specific responsibilities as members of the Compensation Committee, Ross, Wolfen and Farinsky, as members of the Audit Committee, were concurrently responsible for "review[ing] and monitor[ing] the corporate financial reporting and the internal and external audits of the Company, including, among other things, the Company's internal audit and control functions, the results and scope of the annual audit . . . and the Company's compliance with legal matters that have a significant impact on the Company's financial reports." *See, e.g.,* Broadcom's 2001 Proxy Statement at 4.

89. According to the Company's public proxy statements, each member of the Audit Committee (*i.e.*, Ross, Wolfen and Farinsky) "meet[s] the financial literacy requirements of the NASDAQ National Market," while "at least one" member of the Committee (Farinsky) is an "'audit committee financial expert' as such term is defined in applicable SEC rules." *See, e.g.,* Broadcom 2003 Proxy Statement at A-1. Under applicable SEC rules, the "financial expert" on the Audit Committee must, *inter alia*, have "an understanding of generally accepted

accounting principles." 15 U.S.C.A. § 7265. The Company's proxy statements between 2003 and 2006 identified Farinsky as one of the Audit Committee's "financial experts" under applicable SEC rules and regulations. *See, e.g.,* Broadcom's 2004 Proxy Statement at 4.

90. To the extent that Ross, Wolfen and Farinsky were responsible for issuing, reviewing or approving backdated option grants through their service on the Compensation Committee, they either knew, or should have known, that the Company was therefore required to record a compensation expense in connection with those grants. Even if these defendants were somehow unaware of this fact when they were approving the issuance of backdated stock options (which they were not), they undoubtedly learned that granting backdated options had accounting consequences when, as discussed below, the Board secretly abandoned the backdating practice in June 2003 and implemented "rigorous processes to prevent and detect future instances of improper accounting of equity awards." *See* Broadcom's January 23, 2007 Press Release (announcing the filing of the Restatement and quoting Scott McGregor, current CEO).

91. In short, as demonstrated by the Restatement and their approval and authorization of the backdated option grants discussed below, Ross, Wolfen and Farinsky utterly failed to fulfill their duties as members of the Compensation and Audit Committees with respect to Broadcom's historical stock option practices.

### B. The Broadcom Defendants' Backdating Scheme

92. Stock options do not backdate themselves. From inception, the Individual Defendants' decision to backdate Broadcom's option grants was neither an accident nor pure chance; rather, as demonstrated by the Company's own admissions and evidence uncovered by the subsequent governmental investigations, it was an intentional, long-term practice known and endorsed by

1   Broadcom's executive officers, including Nicholas, Samueli, Ruehle and Dull for

2   accounting purposes—*i.e.*, to deflate compensation expenses and inflate earnings.

3        93.   Indeed, backdating, by its very nature, refers to intentionally

4   selecting an earlier grant date based on a favorable strike price.  Had the

5   Individual Defendants wished to award extraordinary compensation to Broadcom

6   employees, they could have simply awarded them "in-the-money" options at the

7   expense of the Company.  Importantly, while both backdated and "in-the-money"

8   grants provide employees with excess compensation, backdating alone results in

9   understated compensation expenses and fraudulently inflated earnings.

10                 **1.**   **Broadcom Admittedly Issued Backdated**

11                     **Options Between April 1998 and May 2003**

12        94.   Beginning as early as April 1998, the same month as Broadcom's

13   initial public offering, Samueli and Nicholas served as the only two members of

14   the Options Committee, and were the primary arbiters of Broadcom's incentive

15   option grants, the terms of which were indisputably manipulated.

16        95.   Specifically, from April 1998 through May 2003, the Options

17   Committee (consisting of Samueli and Nicholas) awarded options to Broadcom's

18   non-Section 16 officers.  As Broadcom admitted in the Restatement, the Options

19   Committee operated at the whim of Samueli and Nicholas, and lacked any

20   consistent process or procedures:

21         The [Options Committee] did not conduct formal meetings with

22         respect to all option grants; rather, the committee members often

23         held informal discussions, either in person or telephonically, to

24         determine whether option grants should be approved and priced as of

25         that day. … No formal, contemporaneous written records were kept.

26         Instead, ***the [Options Committee] relied upon, and option grant***

27         ***approvals were documented by, unanimous written consents, which***

28

> *were dated "as of" a specified date but were generally prepared after that date and signed at a later time.* [Emphasis added].

*See* the Restatement at 2. Subsequent to the Company's admission, the SEC uncovered that, from June 1998 through May 2003, the Options Committee approved at least eighty-eight (88) option grants, "most" of which, as the Company concedes, were backdated. Tellingly, when the SEC scrutinized the purported grant dates associated with these option grants, it determined that the Options Committee did not meet on those dates, nor did the Options Committee decide to issue options on those dates.

96. Absent formal meetings of the Options Committee, "most" of the grant dates were selected retroactively by Ruehle, who reviewed a list of closing stock prices for prior Fridays (notably, the days on which the Options Committee purportedly held its meetings) and invariably selected the Friday corresponding to the lowest closing price. Ruehle received such information in "menu" emails from Broadcom's stock administrator, which allowed Ruehle to easily "look back" and select the lowest strike price for the period.

97. For example, on December 17, 1999, the Company's stock administrator sent a "menu" email to Ruehle, stating as follows:

> REMINDER: The last option grant date you have advised us is 10/29/99.
>
> Friday FMVs are:
>
> 11/5  $149.25
>
> 11/12 $180.13
>
> 11/19 $196.50
>
> 11/26 $207.125
>
> 12/3  $207.75
>
> 12/10 $217.75

1     12/17  $225.313

2     End of month November 11/30 was $179.063. …

3     Please let us know if and when the Options Committee met to

4     approve grants.

5  Later that day, Ruehle falsely informed Broadcom's stock administrator that the

6  Options Committee met and approved grants on November 5 and November 30,

7  1999, the dates with the two lowest stock prices on the "menu" email.

8       98.    Moreover, on November 22, 2002, the Company's Treasurer sent an

9  email to Ruehle, stating: "Attached are the pending new hire grants. There are

10  660,000 that we could price at $10.63 [the closing price on October 18] that

11  would take us through 10/18, we can wait on the rest." Six minutes later, Ruehle

12  responded to the Treasurer's email, falsely stating "I do believe the Option

13  Committee did meet on 10/18 …". On November 22, 2002, the date of the

14  Treasurer's email, Broadcom's stock price had risen to $20.64, and the $10.63

15  closing price on October 18 was the lowest closing price for Broadcom's stock

16  during the interim. Accordingly, such options were already in-the-money by

17  approximately $10 per share at the time of the November 22 email.

18       99.    Furthermore, at the direction of Samueli and Nicholas, defendant

19  Dull documented at least certain of the phony grant dates using UWCs. As

20  Broadcom admitted in the Restatement, however, these UWCs "were dated 'as

21  of' a specified date but were generally prepared after that date and signed at a

22  later time." In fact, the UWCs were usually prepared "weeks or months" after the

23  "as of" date, as uncovered by the SEC. Throughout the Relevant Period,

24  Nicholas and Samueli signed "dozens" of UWCs to memorialize their incentive

25  option grants, most of which were indisputably backdated. Accordingly,

26  Nicholas and Samueli knew that the "as of" dates reflected in the UWCs were

27

28

false, and did not correspond to the actual day on which they decided to issue such options, let alone to the date of an actual Options Committee meeting.

100. The Company has admitted that certain individuals, including Nicholas and Ruehle, were "actively responsible for the lack of internal controls and the inappropriate grant practices." Specifically, after conducting an investigation into Broadcom's historical stock option practices, the Audit Committee (assisted by independent outside counsel) determined that:

- Defendant Nicholas "bears significant responsibility for the lack of adequate controls in the option granting process due to the tone and style of doing business he set. ***There is substantial evidence that Dr. Nicholas was at times involved with the selection of grant dates after the fact*** and with subsequent allocation of grants."

- Defendant Ruehle "was at the center of the flawed option granting process. . . . Mr. Ruehle bears a substantial measure of responsibility for the lack of adequate controls and appropriate documentation of the options granting process. ***There is substantial evidence he engaged in the selection of grant dates after the fact***. There is also substantial evidence he engaged in subsequent allocations of grants. Mr. Ruehle failed to provide proper advice concerning proper accounting standards or to establish proper procedures. ***He was involved with grants for which the grant date was selected after the fact, and personally received options included in some of such grants.***" In addition, the Audit Committee determined that, with the assistance of the Company's former Treasurer, Ruehle selected certain grant dates after the fact in late 2002.

(Emphasis added).

101.   In addition, the Company admitted that its former Vice President of Human Resources, Nancy M. Tullos ("Tullos"), who at all times worked at the direction of Nicholas and Samueli, "bears significant responsibility for the lack of controls and deficiencies in the options granting process.  She was heavily involved in the flawed option granting process.  While there is a lack of evidence that Ms. Tullos herself selected grant dates after the fact, there is substantial evidence she was heavily involved in that process, and was fully aware of what was occurring, and encouraged, assisted in, and enabled it.   There is also substantial evidence that Ms. Tullos was at the center of the allocations of grants to individuals after the grants were made.  She was also involved with grants for which the grant date was selected after the fact, and personally received options included in some of such grants."

102.   With respect to Ross, Wolfen and Farinsky, the Restatement acknowledged that, between April 1998 and May 2003, the Compensation Committee "relied upon, and option grant approvals were documented by, unanimous written consents, which were dated 'as of' a specified date but generally were prepared after that date and signed at a later time."

## 2.   The Broadcom Defendants Falsified the Date of Wolfen's Appointment to the Compensation Committee to Ensure that Broadcom Could Issue Backdated Options on Dates When the Compensation Committee Was Not Constituted

103.   In 2001, the Company purportedly granted options to its Section 16 officers on at least two separate occasions, October 19, 2001 (*see* ¶¶199-205) and December 24, 2001 (*see* ¶¶153-64), and attempted to issue options with a purported grant date of June 24, 2001.  Pursuant to the Stock Option Plan, the Compensation Committee had "exclusive authority" to approve these grants.

104. In July 2001, prior to signing a UWC to memorialize a purported grant of options on June 24, 2001, one of the Compensation Committee's two members passed away. In order to salvage this options grant, Dull directed an in-house lawyer to prepare draft minutes for a "special telephonic meeting" of the Compensation Committee that purportedly occurred on June 24, 2001. Although Dull received a draft copy of these minutes, he never signed them in his capacity as Corporate Secretary.

105. Beginning in September 2001, defendant Dull led the effort to resolve the vacancy issue on the Compensation Committee. He first directed an in-house attorney under his supervision to determine the quorum of the Committee, as well as who could serve. The in-house lawyer advised Dull that at least two independent members were required, thus leaving defendant Wolfen as the only eligible director to replace the deceased Committee member.

106. On November 4, 2001, Dull sent an email to Samueli, Nicholas and Ruehle, and specifically advised them that "*The Comp Ctte has exclusive jurisdiction for option grants to Section 16 officers. Accordingly, we cannot make those grants until it is in a position to act*." (emphasis added). Dull also urged them to appoint Wolfen to the Compensation Committee so that the Committee would be constituted to award options to Broadcom's Section 16 officers. Later that day, Samueli sent an email agreeing to appoint Wolfen, but Nicholas never responded.

107. On December 21, 2001 and again on December 28, 2001, Dull asked Ruehle to "get closure" so the Company could proceed with a re-grant of options to its Section 16 officers—including to himself and Ruehle—after the tender offer. (The re-grant at issue is referred to herein as the 2001 Options Exchange, and is discussed in detail below at ¶¶153-64.)

108. On January 3, 2002, Dull again urged Nicholas to approve Wolfen's selection to the Compensation Committee, reminding him that the current vacancy "affect[s] our ability to make option grants to Section 16 officers." Once again, however, Nicholas did not respond. Undeterred, Dull instructed an in-house attorney to prepare a UWC appointing Wolfen to the Compensation Committee. The in-house attorney prepared the draft UWC and sent it to Dull, asking him what date should be reflected on the UWC. Tellingly, after reviewing the draft UWC, Dull instructed the in-house attorney to ***"[l]eave the date [of Wolfen's appointment] blank."*** (Emphasis added).

109. Dull's reasoning for doing so was transparent, as he then asked the in-house attorney to prepare UWCs to memorialize a purported grant of options to Section 16 officers (including himself) during periods when he knew that the Compensation Committee was not constituted. On January 3, 2002, the in-house attorney provided Dull with draft UWCs to memorialize purported option grants by the Compensation Committee on October 19, 2001 and December 24, 2001. Dull reviewed and approved these UWCs, as reflected by the SEC's investigation.

110. On February 27, 2002, at Dull's request, the in-house attorney asked Ruehle when Wolfen was "appointed" to the Compensation Committee. Ruehle provided him with a date of October 12, 2001, which, as Ruehle and Dull both knew, was not the actual date of Wolfen's appointment. On March 1, 2002, Dull presented the Board with a UWC to memorialize Wolfen's appointment to the Compensation Committee "as of" October 12, 2001. The Board—including Samueli, Nicholas, Ross, Wolfen and Farinsky—signed and executed this UWC, notwithstanding their knowledge or reckless disregard that the UWC falsely represented the date of Wolfen's appointment.

111. At the same Board meeting, defendants Ross and Wolfen—serving as the newly comprised Compensation Committee—were presented with, and

1  signed, UWCs dated "as of" October 19, 2001 and December 24, 2001, which
2  approved option grants that the Compensation Committee purportedly made on
3  those dates.  As discussed in ¶¶153-64, below, December 24, 2001 marked the
4  lowest possible strike price for these options during a specified re-grant window.
5  Of course, each of the Individual Defendants knew or recklessly disregarded that
6  these UWCs were authorizing a grant of backdated options, as Wolfen's actual
7  appointment occurred earlier that meeting.  Further, the Individual Defendants
8  either knew or recklessly disregarded that the Compensation Committee could not
9  have "granted" options on the dates reflected on these UWCs considering that the
10 prior Committee member had passed away in July 2001.

11      112.  Dull's and Ruehle's efforts to engineer Wolfen's appointment to the
12 Compensation Committee "as of" October 12, 2001 paid off:  they each received
13 300,000 options from the December 24, 2001 re-grant.

14              **3.    The Board's Covert Reforms in June 2003**

15      113.  In May 2003, following his resignation as CEO in January 2003,
16 defendant Nicholas ended his term as Co-Chairman of the Board and did not seek
17 reelection as a director.  Thereafter, Samueli seized control of the Board as its
18 sole Chairman of the Board, and Ross ascended to the CEO position.  In June
19 2003, ***just days after*** Nicholas ended his longstanding tenure as a director and Co-
20 Chairman, the Board, led by Samueli, implemented "significant corrective
21 changes" to the Company's historical stock options practices.  This fact was not
22 publicly disclosed until Broadcom completed the Restatement in January 2007.

23      114.  In the Company's press release dated January 23, 2007, the
24 Company's current CEO (Scott McGregor) revealed to investors for the first time
25 that, "in mid-2003, [the Board] significantly strengthened [its] options granting
26 practices and put into place ***rigorous processes to prevent and detect any future***
27 ***instances of improper accounting for equity awards***."  (emphasis added).

28

1    115. Later that day, the Restatement revealed that, after May 2003, the

2    Board, under Samueli's and Ross's influence, "made **significant corrective**

3    **changes** to its options granting and documentation processes." *See* the

4    Restatement at 5. Tellingly, the Restatement noted that **all** of Broadcom's option

5    grants after May 2003 have "complied with prevailing accounting rules and [are]

6    not subject to restatement." *Id.*

7    116. There is only one set of circumstances that could explain this telling

8    chain of events: ***days after*** Nicholas completed his term as Co-Chairman and a

9    director of the Board in May 2003, the Board—including Samueli, who served as

10   its Chairman, Ross, Wolfen and Farinsky—abandoned their longstanding

11   backdating practice. That the Board recognized the need to take immediate action

12   by implementing "rigorous processes to prevent and detect future instances of

13   **improper accounting** of equity awards" reflects their implicit understanding that:

14   (i) the Company's historical stock option grants had accounting consequences;

15   (ii) the Company's previously reported financial results were, therefore, false and

16   could not be relied upon; and (iii) that a restatement may be necessary.

17   117. Further, that the Board specifically devised such reforms to "prevent

18   and detect future instances of improper accounting of equity awards"

19   demonstrates that these reforms were not spurred by the enactment of the

20   Sarbanes-Oxley Act of 2002 ("SOX"), which requires insiders to report their

21   receipt of incentive options to the SEC within two trading days of the grant date.

22   Instead, given the timing (shortly after Nicholas's departure) and the scope

23   (accounting for equity awards) of these "corrective measures," there is a strong

24   inference that the Broadcom Defendants knew, or was deliberately reckless in not

25   knowing, that there was a serious risk of misstatement with Broadcom's historical

26   accounting for equity awards before the implementation of these reforms.

27

28

1    118.   In addition, the fact that *every* option grant was correctly accounted

2  for after the Board's reforms demonstrates that, absolutely no later than June

3  2003, each of the Broadcom Defendants knew that Broadcom's historical option

4  grants between 1998 and mid-2003 were improperly accounted for under APB 25

5  and the Stock Option Plan.  This, too, raises a strong inference that the Board—

6  particularly the members of the Audit and Compensation Committees—had

7  actual knowledge by mid-2003 that the Company's previously reported financial

8  results contained material misstatements and could no longer be relied upon.

### 4.    The Broadcom Defendants' Scheme Continued
### Until the End of the Class Period

11    119.   Even though the Broadcom Defendants abandoned their backdating

12  practice in June 2003, their scheme continued through the end of the Class Period.

13  Specifically, notwithstanding the Board's covert reforms in June 2003, the

14  Broadcom Defendants ensured that the Company could maintain an artificially

15  inflated stock price through the end of the Class Period by: (i) failing to record a

16  compensation expense for options that were scheduled to vest after June 2003;

17  and (ii) continuing to overstate Broadcom's reported net income for the

18  Company's existing and prior reporting periods.

19    120.   Simply put, the Broadcom Defendants' fraudulent conduct from

20  1998 through mid-2003—and their subsequent concealment of the fraud—caused

21  the Company to materially overstate its reported net income and materially

22  understate its compensation expense in 2005 and 2006.  In fact, in 2005 alone, the

23  Company understated its stock-based compensation by over $42 million, or

24  *70 percent*, and understated its net loss per share by 13% (basic) or 11% (diluted).

25  As a result, the Company's Class A stock continued to trade at artificially inflated

26  prices until the end of the Class Period.

121.   Given the "corrective measures" implemented by the Board in June 2003, there is no question that each of the Individual Defendants either knowingly or recklessly concealed the fact that Broadcom's historical option grants were continuing to affect the integrity of the Company's reported financial results after June 2003.  This is particularly true as to Ruehle and Dull, both of whom received backdated options that continued to vest during the Class Period.

**C.   The Significance of Stock Options To Defendants' Scheme**

> **1.   Defendants' Failure to Properly Account for Broadcom's Issuance of Backdated Options Caused the Company's Stock to Trade at Artificially Inflated Prices**

122.   Defendants' failure to properly account for more than $2.2 billion in compensation costs at the time that Broadcom issued backdated options enabled the Company to materially overstate its reported net income and materially understate its reported compensation expense during the Class Period.  At all relevant times, both of these metrics were critical to Broadcom's stock price.

123.   For instance, between 2001 and 2003, Broadcom reported that its net *revenue* increased from $962 million in 2001, to $1.08 billion in 2002, and onward still to $1.61 billion in 2003.  During that same period, Broadcom reported that its "stock-based compensation" purportedly decreased from $484 million in 2001, to $360 million in 2002, before settling in at a relatively paltry $264 million in 2003.

124.   Over the same three years, Broadcom reported nothing but ever-increasing revenues and profits.  Nevertheless, as this expansion and growth was taking place, "stock-based compensation"—Broadcom's primary method for attracting and retaining top-level talent—was supposedly declining.  In reality, stock-based compensation was by far Broadcom's largest expense in 2001 and

2003.  In fact, from 2001 to 2003 alone, Broadcom underreported the cost of its stock option grants by **nearly $1.8 billion**, or **nearly 220 percent**.

125.  Had Defendants correctly accounted for Broadcom's compensation expense, the Company's true earnings would have been far below the market's expectations.  More precisely, instead of consistently meeting or beating analyst expectations from 1998 through the end of the Class Period, Broadcom would have missed its earnings targets each and every year since 1998:

| Fiscal Year or Quarter | Reported EPS (split adjusted) | Restated EPS |
|---|---|---|
| 1998 | $0.07 | $0.04 |
| 1999 | $0.21 | $0.07 |
| 2000 | $(2.08) | $(2.91) |
| 2001 | $(7.02) | $(9.60) |
| 2002 | $(5.56) | $(6.93) |
| 2003 | $(2.19) | $(2.95) |
| 2004 | $0.42 | $0.33 |
| 2005 | $0.73 | $0.66 |

**2.      Options Were Integral to Attracting and Retaining Talent**

126.  Broadcom relied heavily upon stock options to attract and retain talent.  After Broadcom went public in April 1998, it grew from approximately 300 employees in 1998 to about 3,000 employees in 2002.  To compete successfully in the highly competitive high-tech market, it was essential that Broadcom recruit and retain talented employees.  Another priority, as set forth by Nicholas and Samueli, was to preserve cash.  Nicholas and Samueli did so by capping most employees' and officers' annual salaries at $110,000, with the understanding that they would also receive stock-based compensation.

127.   Indeed, Broadcom was quite clear about the significance of equity incentives to its compensation program.  From 1998 through 2004, Broadcom's annual proxy statements stated that "[t]he Company relies significantly on equity incentives in the form of stock option grants in order to attract and retain key employees and other personnel and believes that such equity incentives are necessary for the Company to remain competitive in the marketplace for executive talent and other key employees."

128.   Failing to retain key personnel could be devastating to Broadcom's success.  As the Company repeatedly warned investors, "Broadcom is engaged in a very competitive industry, and its *success depends upon* the ability to attract and retain qualified executives through competitive compensation packages."  March 27, 2006 DEF 14A Proxy Statement ("2006 Proxy Statement").   As Ruehle explained to analysts during an April 16, 2003 earnings call, "Broadcom has always paid below market cash compensation and in the case of senior contributors and managers, we *paid very significantly below market*.  We have *offset this by paying significantly above market in equity*." (emphasis added).

129.   As explained below, the need to attract and retain talent was not lost on Samueli or Nicholas, who devised their fraudulent scheme to compensate employees, officers and recruits with backdated option grants.

### (a)     Broadcom "Granted" Backdated Stock Options to Key Recruits Prior to their Actual Start Dates

130.   In order to ensure that key recruits accepted the Company's offers of employment, Nicholas and Samueli regularly included a grant of backdated options as part of the hiring package.  Such options were approved by either the Options or Compensation Committee depending on whether the recruit qualified as a Section 16 officer.

131. For example, on July 28, 2000, the Options Committee (Nicholas and Samueli) purportedly awarded 35,000 options to the Company's newly hired Manager of Technical Marketing (Uri Elzur), even though he was not an employee on the date of that option grant. In reality, the Options Committee retroactively selected this grant date nearly *two months later* (on or about September 18, 2000). In the following months, Broadcom's share price declined 30%, rendering Elzur's options underwater, or, in other words, worthless. Accordingly, Ruehle (and others) removed Elzur from the July 28, 2000 grant. Instead, the Options Committee awarded him backdated options that were purportedly granted on December 21, 2000.

132. Elzur was not the only high-ranking employee that Broadcom recruited in this manner. In June 1999, Nicholas and Samueli enticed a senior engineer (Mehrdad Nayebi) to accept his offer of employment by awarding him 120,000 backdated options. Nicholas and Samueli played an active role in Nayebi's hiring process, and either knew or were deliberately reckless in not knowing that Broadcom was offering him stock options that were purportedly granted prior to his actual hire date. Indeed, on or about May 26, 1999, defendant Samueli emailed Tullos asking whether Broadcom should make an offer of employment to Nayebi. On or about May 27, 1999, Tullos sent an email to Samueli stating that she was going to schedule an interview between Nayebi and defendant Nicholas.

133. After interviewing Nayebi in June 1999, defendant Nicholas hired Nayebi and agreed that Nayebi would receive a grant of 120,000 options with a strike price of $88.375, equal to Broadcom's closing stock price on May 25, 1999. Nayebi did not begin his employment at Broadcom until June 28, 1999. On that day, Broadcom's stock price closed at $118. In other words, on Nayebi's

first day of employment, his 120,000 options were in-the-money by more than $3.5 million.

134. Tellingly, at the direction of Samueli and Nicholas, Tullos attempted to conceal the Options Committee's decision to grant backdated options to Nayebi. Specifically, Tullos prepared a backdated offer of employment, as well as a backdated personnel action notice, both of which reflected a phony hire date of May 25, 1999. Tullos also instructed one of her colleagues (Laura Turner) to delete an email evidencing that Nayebi's options were backdated.

135. Nayebi's receipt of backdated options was a "key factor" in whether he decided to accept Broadcom's offer of employment. In fact, in an email to Tullos dated July 15, 1999, Nayebi complained that his options were not backdated far enough, stating: "My hire date was 5/25 NOT 5/28. The option price is showing to be $95.75 instead of $88.375. I hope this is just a simple clerical error since that has been a major key deciding factor." Nayebi's email also stated that he had a "clear agreement" with Nicholas that his options would be "granted" by Broadcom on May 25, 1999 at $88.375.

136. On or around July 19, 1999, Ruehle agreed to reprice the 120,000 options awarded to Nayebi to reflect the earlier and more favorable grant date of May 25, 1999 rather than May 28, 1999. Later that day, Samueli and Nicholas executed a UWC to memorialize a purported grant of 120,000 options to Nayebi on May 25, 1999.

137. In late November 2000, Broadcom terminated Nayebi's employment, causing his options to cease to vest. Remarkably, around November 2000, Nayebi's attorney provided Nicholas and Ruehle with a draft complaint that alleged, *inter alia*, that Broadcom was artificially inflating its earnings by issuing backdated options without recording a compensation expense. On information and belief, defendant Dull, as the Company's General Counsel, also reviewed a

draft copy of Nayebi's complaint, and thus knew about the substance of the allegations therein around November 2000.

138.  On or about January 17, 2001, Nicholas met with Nayebi at a hotel in Orange County, and pleaded with him not to file the draft complaint.  In exchange for Nayebi's silence, Nicholas offered to have Broadcom vest 85 percent of Nayebi's outstanding options, an offer worth approximately $7 million at the time of their meeting.  Nayebi accepted Nicholas's settlement offer. James Adler, Dull's and Wolfen's former partner at Irell & Manella LLP, negotiated the settlement on behalf of Broadcom.  On information and belief, these settlement negotiations were conducted at Dull's direction and with his personal knowledge of the accounting consequences should Nayebi's allegations come to light.

139.  In November 2007, Tullos signed a plea agreement with the USAO, admitting that she attempted to destroy the email noted in ¶134, above, because "she was concerned that, notwithstanding [Nicholas's] statements to the contrary, [Nayebi's] true hire date was later than May 25, 1999."  Thus, as stated in the plea agreement, Tullos, who at all times worked at the direction of Nicholas and Samueli, "knew that the electronic mail she requested [to] be deleted might damage Broadcom if the United States Department of Justice or other federal agencies were to obtain it as part of any official proceeding, and she was attempting to avoid that outcome."

### (b)    Broadcom Awarded In-the-Money Options to Key Recruits Through its Acquisition Targets

140.  In 2000, Broadcom acquired numerous start-up companies, whose stock was comparatively cheap.  Rather than hire key recruits directly, the Company's senior officers required certain of Broadcom's acquisition targets to hire Broadcom's candidates on Broadcom's terms of employment.  Because the

new hires never really worked for the target company, employment and personnel records were falsified to effect the hiring and granting of options by the target. The SEC's investigation confirmed that Samueli advocated this deceptive hiring practice, and that Nicholas, Ruehle and Dull also knew about it.

141. For example, on August 9, 2000, Broadcom acquired a start-up company called Newport Communications, Inc. ("Newport"). At the same time that Broadcom's senior officers were negotiating the Newport acquisition, they were also recruiting a candidate (Kenneth Venner) to serve as Broadcom's Chief Information Officer. Nicholas and Ruehle interviewed him for the position and decided to hire him. To induce Venner into accepting the position, Ruehle (and others) offered him options that would be in-the-money by $12 million.

142. Yet, rather than hire Venner as a Broadcom officer, Ruehle created false documents to make it appears as if Venner was an executive at Newport, when, in reality, he was hired solely to work at Broadcom. In addition, Ruehle caused Newport to grant 600,000 Newport options to Venner, which Venner knew would be converted to in-the-money Broadcom options upon completion of the merger. Accordingly, by hiring Venner through Newport, Broadcom concealed the fact that a newly hired officer had received a significant sum of in-the-money options as part of his hiring package.

143. Rather than record an ordinary compensation expense, the Company recorded a one-time acquisition-related charge to account for the amount that the Newport options were in-the-money as of the close of the Newport acquisition. Unlike a hiring-related compensation expense, however, an acquisition-related expense is non-recurring, and is thus discounted by investors and analysts.

1      **(c)**    **Broadcom Awarded "Top-Up" Option Grants to**
2      **Executives at Certain Acquisition Targets**

3      144.   Following its IPO, the Company grew rapidly by acquiring other

4  companies that had developed, or were developing, technology of interest to

5  Broadcom.  It was thus important for Broadcom to retain the employees of such

6  companies.   One way it did so was by offering lucrative retention packages,

7  which typically included an award of backdated Broadcom stock options.

8      145.   The Broadcom Defendants referred to these equity awards as "top

9  up" option grants because they were intended to make the new employees' equity

10  positions comparable to existing Broadcom employees of the same seniority.  The

11  USAO's investigation confirmed that Nicholas determined the number of "top

12  up" options that were granted to the senior executives of most acquisition targets.

13      146.   For example, in May 1999, Broadcom acquired companies named

14  "Maverick," "Epigram," and "Armedia," and subsequently awarded top up

15  options to certain of their employees who then became Broadcom employees.  On

16  or around June 18, 1999, the Options Committee (Nicholas and Samueli) signed a

17  UWC to memorialize a purported grant of 3,279,428 options on June 1, 1999.  In

18  reality, however, these top up options were backdated by Nicholas, Samueli and

19  Ruehle (among others), and were already in-the-money by more than $18 per

20  share at the time they were granted.

21      147.   Similarly, in August 1999, Broadcom acquired companies named

22  "Altocom" and "Hot Haus."   On or about September 8, 1999, Ruehle told a

23  subordinate that the Options Committee met on September 2, 1999 and granted

24  top up options to former Altocom and Hot Haus employees.  Broadcom's share

25  price fell in the following weeks.  Accordingly, on or about October 6, 1999,

26  Ruehle abandoned the September 8 "grant," and told a subordinate that the

27  Options Committee "met and approved" such top up options "effective"

28

September 30, 1999, with a strike price corresponding to the lowest closing price of the third quarter of 1999.

148. On or after October 7, 1999, the Options Committee (Nicholas and Samueli) executed a UWC to memorialize a purported grant of 1,605,127 options on September 30, 1999. Once again, these top up options were backdated by Nicholas, Samueli and Ruehle (among others), and were already in-the-money by more than $15 per share at the time they were granted.

149. Moreover, with respect to the Company's acquisition of a company called "Pivotal," defendant Nicholas instructed Tullos on or about July 10, 2000 that four Pivotal executives were to be issued top up options with a grant date of May 26, 2000, which marked the Company's lowest closing price between October 1999 and October 2000. However, after a Broadcom employee realized that this option grant would pre-date Broadcom's acquisition of Pivotal, defendant Ruehle abandoned the May 26, 2000 "grant" to these executives.

150. On or about July 13, 2000, Ruehle selected an alternative grant date of June 16, 2000. Because the closing price on June 16, 2000 was inferior to the closing price on May 26, 2000, Nicholas agreed to make up the difference to the Pivotal executives by granting them additional backdated options.

151. On July 16, 2000, the Options Committee (Nicholas and Samueli) executed a UWC to memorialize a purported grant of 2,173,650 options on June 16, 2000. Based on the Company's closing stock price on June 16, 2000, these top up options were already in-the-money by more than *$106 per share* at the time they were granted.

**D. Selected Examples of Backdated Option Grants**

152. The Broadcom Defendants' fraudulent scheme was undertaken and perpetuated with culpable scienter. From inception, Broadcom's issuance of backdated options did not occur by accident or by pure chance. As detailed

1  below, scrutiny of Broadcom's option grants between 1998 and 2003 reveals a

2  deliberate, self-serving pattern whereby incentive stock options were issued using

3  the lowest possible strike price.  Indeed, as explained below, the probability that

4  these grant dates were selected by chance are less than *1 in 32,000* odds.

## 1.    Exchange of Options

### (a)    The 2001 Options Exchange

7  153.   By mid-2001, Broadcom's stock price withered as the tech bubble of

8  the late-1990s imploded.   The vast number of options held by Broadcom

9  employees, once the envy of Silicon Valley, were now underwater or worthless.

10  Thus, in an effort to retain employees, Broadcom initiated an exchange of

11  employees' underwater options covering the right to purchase nearly *19 million*

12  shares.  By participating in the exchange, option holders received an equivalent

13  number of options, except that the re-granted options would not be underwater.

14  154.   In a press release dated April 26, 2001, defendant Nicholas touted

15  the Company's decision to offer an options exchange to its employees, and

16  specifically acknowledged that equity-based compensation has had a "very

17  positive effect" on the Company's business and financial success, stating:

18     This is a significant initiative by the company intended to address the

19     recent decline in price of Broadcom's stock and the financial impact

20     of that decline on our employees.

21                    *          *          *

22     *We believe this has had a very positive effect on our business and*

23     *financial success in the past and that it will have the same effect in*

24     *the future.*   Broadcom's employees are true owners in Broadcom,

25     and they understand clearly that their work and their work ethic are

26     directly tied to the success of the company and its shareholders. With

27     the current economic slowdown and the recent drop in the market

28

1  price of many technology stocks, including Broadcom's, we believe

2  that this is the best way to continue to retain and motivate our most

3  important asset, our employees.  [emphasis added].

4  155.  Unknown to the market, however, the Broadcom Defendants

5  backdated the re-granted options to December 24, 2001, *a date when the*

6  *Compensation Committee was not even constituted* (discussed in ¶¶103-12,

7  above), thus capitalizing on the lowest possible strike price during the re-grant

8  window.  Given the magnitude of stock options covered by the company-wide

9  options exchange, this decision, alone, enabled Broadcom to avoid over

10  *$569 million* in compensation expenses.  Strikingly, had Defendants properly

11  accounted for the 2001 options exchange, stock-based compensation for 2001

12  would have been the Company's *single largest expense*.

13  **<u>Background of the 2001 Options Exchange</u>**

14  156.  According to Broadcom, the Company initiated the 2001 exchange

15  in response to the "intense and [] recent decline" of Broadcom's stock price,

16  which made it "more difficult to attract and retain such key employees, all of

17  whom have been granted stock options."  As the Company admitted in its Form

18  10-K for fiscal 2001, Broadcom's "future success *depend[ed]*" on its "ability to

19  continue to attract, retain and motivate qualified personnel."

20  157.  In an attempt to repair employee morale, Broadcom commenced an

21  options exchange (or tender offer) in May 2001.  Specifically, the Company

22  offered its employees the opportunity to voluntarily exchange their underwater

23  options priced at or above $45.00 per share for new options to purchase the same

24  number of shares.  The new options, however, would be priced based on a re-

25  grant window from December 24, 2001 to January 31, 2002.

26  158.  In total, the Company's employees exchanged options to purchase

27  *18,716,811 shares* with a weighed-average price of $128.35.  These employees

28

1   were promised that the exercise price of their re-granted options would equal the

2   closing price of Broadcom's Class A common stock on the date of the grant.

3   **The Exchanged Options Were Improperly Backdated**

4   159. The Broadcom Defendants represented to investors (and their

5   employees) that the re-granted options were granted on December 24, 2001. As

6   the Company conceded in the Restatement, however, the Broadcom Defendants

7   did not select the December 24 grant date until January 2002.

8   160. Specifically, at the end of 2001, Broadcom's senior officers,

9   including Nicholas and Samueli, deliberated on the grant date for the re-granted

10  options, as the SEC uncovered. The choice became obvious. Broadcom's closing

11  price on December 24, 2001 ($39.75 per share) marked the lowest possible price

12  during the re-grant window. Indeed, in an email dated January 4, 2002, defendant

13  Ruehle urged Nicholas, Samueli and Dull (among others) to use December 24,

14  2001 as the grant date, and thus capitalize on a *23 percent* increase in Broadcom's

15  stock price between December 24, 2001 and January 4, 2002, stating:

16      I VERY strongly recommend that these options be priced as of Dec

17      24 ($39 & change). The absolute drop dead [sic] for this decision is

18      Friday Jan 4. If there are no objections I would like to go ahead and

19      price as of that date…. Given the recent market performance, I think

20      that we should grab the Dec 24 price.

21  161. Samueli responded to Ruehle's email within five minutes, and

22  specifically agreed to backdate the re-grant to December 24, 2001, stating: "I

23  agree. We may not see the $39.75 price again before Jan. 31. It would be far too

24  risky to wait and see."

25  162. The SEC's investigation also revealed that, on the same day as

26  Ruehle's and Samueli's emails, Tullos confirmed with Nicholas, Samueli, Ruehle

27  and Dull that the Options Committee and the Compensation Committee had met

28

and "approved" the re-grant on December 24, 2001, even though all of these senior officers knew, or should have known, that this grant date was selected retroactively.  In fact, notwithstanding their authorship and receipt of the above-referenced emails, the Broadcom Defendants also knew that the Compensation Committee could not have granted options on December 24, 2001 because, as discussed in ¶¶103-12, above, the Compensation Committee was not constituted on that date because one of its two members passed away in July 2001 and had not been replaced.

163.   Ruehle and Dull personally benefited from their decision to backdate these stock options to December 24, 2001.  Indeed, the SEC uncovered that they each received 300,000 backdated options from the 2001 options exchange.

164.   Unbeknownst to class members, the 2001 options exchange caused Broadcom to incur extraordinary compensation expenses, which far surpassed the $8.9 million expense that Broadcom originally reported.  As Broadcom ultimately disclosed in the Restatement, the true compensation expense was nearly *seventy times* more than Broadcom originally reported, totaling more than *$569 million*.

### (b)   The 2003 Exchange

165.   In 2003, the Broadcom Defendants orchestrated a second options exchange, covering options to purchase over 20 million shares of Broadcom stock.  Broadcom stated in its Form 10-K for 2003 that the offering involved, among other options, "*unvested* eligible options that were previously assumed by the [Company] in connection with acquisitions that were accounted for using the purchase method of accounting."  (emphasis in original).

166.   After it completed the 2003 options exchange, Broadcom reported that it recorded a non-cash charge of approximately $55.6 million in May 2003, which purportedly reflected the stock-based compensation expense associated with the exchange.  In reality, this charge was *understated by a multiple of five*.

1  As reflected in the Restatement, Broadcom actually incurred, and should have

2  reported, a compensation charge of *$276.3 million.*

3  ## 2.   The May 26, 2000 Option Grant

4  167.  May 26, 2000 is the purported date that the Compensation and

5  Options Committee granted the single-largest block grant in Broadcom's history,

6  consisting of 7,098,811 options granted to non-Section 16 officers and 550,000

7  options granted to Section 16 officers.  Not only was this the date of Broadcom's

8  lowest stock price for the month of May 2000, it was also Broadcom's lowest

9  closing price between October 1999 and October 2000:



20  168.  As detailed below, this grant is also significant because the facts and

21  circumstances surrounding the grant establish that Broadcom's independent

22  auditor EY had knowledge that its publicly disseminated audit opinions were

23  false and misleading beginning no later than mid-July 2000.

24  169.  Like other backdated option grants, this grant enriched certain of the

25  Individual Defendants, as well as certain other senior officers.  In particular,

26  Ruehle received 100,000 options and Dull received 150,000 options.

27

28

170. As Broadcom has now admitted, the Options and Compensation Committees did not begin to allocate these options to recipients until the summer of 2000, when Broadcom's stock was trading at an all time high, exceeding over 128% of the Company's stock price on May 26, 2000. The allocations were not completed until mid-September and, between September 2000 and January 2002, the human resources department recorded numerous changes to the allocations under the guise of "administrative errors."

171. On or about July 2000, the Broadcom Defendants' delay in allocating the May 26, 2000 option grant caught the attention of EY, as Broadcom's stock price increased from $118 per share on May 26 to as high as $261 per share during the month of July. Based on emails uncovered by the SEC and USAO, the Broadcom Defendants, as well as EY, understood that the surge in Broadcom's stock price put these options in-the-money, and thus triggered a potential $700 million accounting consequence under APB 25.

172. Indeed, on July 20, 2000, the Company's Manager of Financial Reporting (Gail Patton), who served as Broadcom's primary contact with EY, informed Ruehle that:

> As expected, I am experiencing resistance from [EY] on our Focal Grant program. The basic concern is the measurement date of these grants (5/26/00). …
>
> ***[EY's] position is that we need to know how many shares are granted to each individual and to actually set the measurement date***. . . . [The auditors] could require us to record compensation expenses . . . ***[which] could be over $700 million*** based on the 5/26/00 price and the current price!

(Emphasis added).

173. The same day, Ruehle informed Nicholas that EY requested documentation of the grant—documentation that did not exist. Specifically, Ruehle reported:

> We need to give to E&Y a list of approved option grants for 5/26 focal review. They are making noise that we will have to take a compensation hit for the difference between the 5/26 price ($118) and the current price because we have not yet "completed" the grants. That would result in a charge of over $700M! Obviously we are not about to let this happen.

Despite "making noises" initially requesting documentation and knowing of the $700 million accounting implications of the May 26, 2000 grant, as detailed below at ¶¶377-91, EY capitulated to Broadcom and signed off on the grant based solely on management representations.

174. Thereafter, on July 24, 2000, during a meeting with EY's auditors, defendant Ruehle told EY that the Options Committee had (i) authorized a fixed number of options to be granted, and (ii) approved a "program" or "plan" establishing a set "Guideline Matrix" that would determine the specific number of grants to individual employees based on a formula.

175. Anticipating that EY would require the Company to provide contemporaneous documentation to support his representations, Ruehle instructed his finance staff to create minutes of a purported Options Committee meeting on May 26, 2000 and a "Guideline Matrix" for distributing the May 26, 2000 grants to Broadcom's employees. The draft minutes were then sent to Dull, although the minutes were never finalized or signed.

176. As detailed below, despite Ruehle's preparation of these documents, EY's auditors neither received nor relied upon these "supporting" documents before signing-off on the May 26 option grant. In other words, EY relied

1  exclusively on Ruehle's representations, which, as discussed below, constitutes a
2  clear violation of GAAS.

3      177.  Recognizing that EY was in fact "flexible" with respect to the May
4  26 grant, Patton sent an email to Ruehle (and others) on September 11, 2000,
5  stating that, "*[g]oing forward, we can expect much greater scrutiny by [EY] on*
6  *our option granting practices*.  I strongly recommend for next year's [company-
7  wide] grant that we have all the names and numbers ready before we select a
8  [strike] price [and grant] date.  I do not believe that [EY] will grant us any
9  flexibility on this in the future."  (emphasis added).

10     178.  Later that day, Ruehle forwarded Patton's email to the Company's
11 other senior officers, including Nicholas, Samueli and Dull.  Accordingly, by no
12 later than September 2000, defendants Nicholas, Samueli and Dull each knew, or
13 were reckless in not knowing, that granting backdated options had accounting
14 consequences.  In view of his role as CFO, it is indisputable that Ruehle knew, or
15 was deliberately reckless in not knowing, throughout the Relevant Period that
16 Broadcom's options practices had accounting consequences.

### 3.  Additional Backdated Option Grants

#### (a)  November 3, 1998

19     179.  In addition to engaging in options backdating, the Broadcom
20 Defendants also capitalized on spring-loading, which occurs when options are
21 granted just days prior to a company's disclosure of positive news.

22     180.  On November 3, 1998, the Company purportedly made its first block
23 grant under the Stock Option Plan.  The grants to non-Section 16 officers were
24 approved by Samueli and Nicholas, and the grants to Section 16 officers were
25 approved by defendant Ross.  As illustrated in the chart below, the Company's
26 stock price closed at $81.81 on November 3, the lowest price for that month:

27
28

1
2
3
4
5
6
7
8
9



10   Significantly, after November 3, 1998, the Company's stock price did not fall to

11   $80 per share (on a split-adjusted basis) until nearly three years later, in the post-

12   9/11 days of late September 2001.

13       181.   Just four business days after Broadcom purportedly issued this block

14   grant on November 3, the Company announced blockbuster news concerning a

15   key product.   Specifically, on Monday, November 8, 1998, the *Wall Street*

16   *Journal* reported that Broadcom was expected to unveil a "***major step forward***"

17   in its key technology, a single computer chip that would meld Internet pages and

18   television pictures on TV screens.   The financial press confirmed the importance

19   of the new chip that same day.   For example, Lou Dobbs reported on CNN's

20   Moneyline broadcast noting that investors would find Broadcom's innovation

21   "***irresistible***."

22       182.   The market reacted swiftly and forcefully, moving Broadcom's share

23   price up ***seven percent*** in a single day, reaching a ***52-week high***.   The Company's

24   stock price surged even higher on Tuesday, November 10, 1998, to close at

25   $96.50.   In one week following the temporary low on November 3, 1998,

26   Broadcom stock increased in value by ***nearly 20%.***

27
28

183.   As further evidence that these options were not only spring-loaded, but backdated, the Company did not disclose that it "granted" these options on November 3, 1998 until **70 days later** on February 16, 1999, which almost certainly is more representative of the actual grant date.

184.   Certain Defendants reaped a significant financial benefit from this option grant, including Ruehle (300,000 options) and Dull (100,000 options).

### (b)   October 22, 1999

185.   On or about November 4, 1999, defendant Ruehle retroactively selected October 22, 1999 as the date of an options grant due to the low closing price on that date, as the USAO uncovered.  That day, Broadcom's share price closed at $113.25.  By December 31, 1999, the Company's share price was $272.38, more than double the closing price on October 22.

186.   Because October 22, 1999 marked such a favorable closing price, Nicholas, Ruehle and Samueli continued to increased the number of options that were purportedly granted on that date.  Indeed, on or about January 10, 2000, the Options Committee (Nicholas and Samueli) executed a UWC to memorialize a purported grant of 1,362,600 options on October 22, 1999.

187.   Given that the Company's stock price closed at $295.56 on January 10, 2000, such options were already in-the-money by approximately $182.31 per share at the time they were granted.

### (c)   March 1, 2000

188.   The USAO's investigation revealed that, on or about March 16, 2000, Ruehle informed an employee responsible for documenting Broadcom's option grants that, before he selected the grant date of an options grant, he was going to wait and see whether Broadcom's closing stock price on March 17, 2000 was higher than the closing price on March 1, 2000.

189.   Broadcom's closing stock price on March 17, 2000 was $217.56, more than $11 higher than the closing price on March 1, 2000.   Accordingly, Ruehle selected March 1, 2000 as the purported grant date for this particular options grant.  On or after March 17, 2000, the Options Committee (Nicholas and Samueli) executed a UWC to memorialize a purported grant of 3,134,564 options on March 1, 2000.

190.   Based on the closing price on March 17, 2000, these options were in-the-money by approximately $11 per share at the time they were granted.

### (d)   October 1, 2001

191.   On October 1, 2001, the Company's stock price hit $18.77, which marked Broadcom's lowest stock price during all of 2001.   On November 1, 2001, a senior Broadcom executive wrote to Nicholas to complain that he had not received an options grant.  In response, Nicholas lied, claiming that the Options Committee had met on October 1, 2001, and that he would need to check his notes on whether this particular executive was awarded options.  In reality, no options were actually granted on October 1, 2001, as the USAO uncovered.

192.   On November 12, 2001, Samueli advised Nicholas and Tullos that "we are about to do some additional stock grants for key people," and requested that Tullos provide him with a spreadsheet showing a proposed grant schedule for Nicholas's direct reports.   Thereafter, on November 28, 2001, Tullos advised Ruehle that she and Samueli "spent 4.5 hours on [Samueli's] jet last night working on the option grants while flying to Delaware.  We spent another hour on the tarmac but we finished!"

193.   On November 14, 2001, Tullos advised Nicholas that she reserved 2 million options that would be granted to his direct reports using the October 1, 2001 strike price.  On November 30, 2001, however, Ruehle advised Nicholas

1  that he should add an additional 1 million shares to the October 1 grant, thus
2  bringing the options pool to 3 million.

3  194.  Throughout November and December 2001, defendants Samueli and
4  Ruehle (among others) continued to work on determining which employees
5  would be "granted" options on October 1, 2001, as well as how many options
6  each employee would receive.  Nearly two months after the purported grant date,
7  on December 27, 2001, Tullos sent an email to Nicholas, copied to Samueli and
8  Ruehle, advising him that "[Ruehle] said . . . that tomorrow (Friday, the 28th) is
9  the absolute deadline to get these options granted at the $18.77 strike price."

10  195.  Nicholas did not approve the grants detailed in Samueli's and
11  Tullos's spreadsheet until January 2002.  In an email to Tullos and Samueli dated
12  January 2, 2002, with the subject line "I found my old share grant spreadsheet
13  from before October," defendant Nicholas falsely stated, "Attached is the
14  spreadsheet that I developed at the option meeting months ago."  In fact, as
15  Nicholas and Samueli both knew, the spreadsheet that Samueli and Tullos had
16  worked on was not created "before October" as Nicholas claimed.  In his
17  revisions, Nicholas increased the options pool to slightly above 3 million and also
18  added new grantees.

19  196.  After receiving Nicholas's revisions, Samueli met with Nicholas to
20  make additional changes to the list.  On January 2, 2002, Samueli sent an email to
21  Tullos attaching the purportedly "Final option grant list" for October 1, 2001,
22  which he also copied to Ruehle and Nicholas.  Thereafter, on January 23, 2002,
23  Tullos re-circulated a further revised spreadsheet to Nicholas and Samueli,
24  stating:  "I wanted to confirm that I did find the attached option spreadsheets that
25  you sent to me a few months ago.  Bill Ruehle is aware that I found these."  Once
26  again, as Nicholas and Samueli both knew, this spreadsheet was not created or
27  sent to Tullos prior to October 1, 2001, but was, in reality, Tullos's revisions to

28

1  the spreadsheet that they had each been working on throughout December 2001
2  and January 2002.

3      197.  On or about January 23, 2002, the Options Committee (Nicholas and
4  Samueli) executed a UWC to memorialize a purported grant of 5,624,080 options
5  on October 1, 2001 with a strike price of $18.77.  Given that Broadcom's stock
6  price closed at $45.38 on January 23, 2002, these options were already in-the-
7  money by approximately $27 per share as of the actual grant date.

8      198.  Remarkably, as late as March 22, 2002, Nicholas continued to award
9  options using the October 1, 2001 strike price, as uncovered by the SEC.

10         **(e)    October 19, 2001**

11     199.  As discussed in ¶¶153-64, above, in 2001, the Company offered its
12  employees the opportunity to exchange their underwater options in the 2001
13  options exchange.  Employees who declined to participate were awarded options
14  on June 24, 2001, priced at $33.68, the closing price on June 22, 2001.

15     200.  The SEC's investigation revealed that Nicholas planned to include
16  his direct reports, including certain Section 16 officers, in the June 24 grant.  By
17  September 2001, however, the Company had not yet issued the June 24 options
18  grants to Nicholas's direct reports because Nicholas had not decided how such
19  options should be allocated.  That month, Broadcom's stock price dropped below
20  $33.68, the closing price on June 24, 2001.  In other words, the options that
21  Nicholas intended to grant to his direct reports were underwater, or worthless.

22     201.  Undeterred by the Company's slumping stock price, Nicholas,
23  instead, hand-picked October 1, 2001 as the new grant date, thus capitalizing on
24  Broadcom's *lowest closing price in 2001*.  Once again, however, Nicholas did not
25  timely decide how these options should be allocated.

26     202.  Recognizing that Broadcom's stock price dropped significantly since
27  June 24, 2001, Tullos alerted Nicholas that the rank and file employees who

28

1    received the June 24, 2001 grant (with a strike price of $33.68) would resent the

2    fact that Nicholas's direct reports were now receiving a strike price of $18.77.

3    203.   On January 3, 2002, Tullos emailed Samueli, Ruehle and Dull,

4    stating that ***Nicholas "would like to find another opportunistic date, say $25.55***

5    ***on 10/5 or $29.25 on 10/19***."   (emphasis added).   A cursory glance at

6    Broadcom's slumping stock price on October 19, 2001, and the price surge

7    thereafter, demonstrates precisely why Nicholas was focusing on these dates:



8
9
10
11
12
13
14
15
16

17   204.   Nine minutes after his receipt of Tullos's email, Samueli agreed to

18   backdate this grant to October 19, 2001, responding to the group (*i.e.*, Ruehle,

19   Dull and Tullos):   "OK, then go with the 10/19 price."   Thereafter, Tullos

20   confirmed with Dull that the Options Committee had met and "granted" options

21   to Nicholas's direct reports, including the Section 16 officers, on October 19,

22   2001.

23   205.   In addition to their receipt of Tullos's January 3 email—which

24   plainly stated that Nicholas was searching for an "opportunistic [grant] date"—

25   Samueli, Ruehle and Dull either knew, or recklessly disregarded, that these

26   options could not have been granted to Broadcom's Section 16 officers on

27   October 19, 2001, because, as discussed in ¶¶103-12, above, the Compensation

28

1  Committee was not constituted on that date because one of its two members

2  passed away in July 2001 and had not been replaced.

3          **(f)      March 1, 2002**

4          206.   On March 1, 2002, Broadcom purportedly granted 1,000,000 options

5  each to Nicholas and Samueli.   Just a day earlier, on February 28, 2002,

6  Broadcom granted 120,000 options to unnamed non-section 16 officers.   Pursuant

7  to the Stock Option Plan, the March 1, 2002 option grant was approved by the

8  Compensation Committee, which included Ross and Wolfen, and the February

9  28, 2002 option grant was approved by the Options Committee, which consisted

10  of Samueli and Nicholas.  As illustrated below, on March 1, 2002, the Company's

11  stock price closed at its lowest trading price during the month of March 2002:

12
13
14

15
16
17
18
19
20
21

22          207.   Further adding to the egregious nature of this backdated option grant,

23  on March 1, 2002, the Company announced its entrance into a burgeoning

24  segment of the networking market, in Nicholas's words, ***"a major element of our***

25  ***vision to enable ubiquitous broadband connectivity."*** (emphasis added).   As

26  would be expected, the market reacted strongly, pushing Broadcom's share price

27  up over ***44.5%*** since February 28, 2002.

28

1

### (g)    July 3, 2002

2       208.   Broadcom's purported grant of options on July 3, 2002 represents

3   yet another instance of options backdating.   The SEC's investigation revealed

4   that, on or about May 17, 2002, Samueli and Nicholas approved a grant date of

5   May 10, 2002 at an exercise price of $24.54.   Nonetheless, the Broadcom

6   Defendants decided to abandon that date for a more favorable strike price as the

7   Company's stock price continued to decline.

8       209.   In mid-June 2002, defendant Samueli suggested that Broadcom

9   should take advantage of a "favorable strike price," and grant Broadcom's

10   company-wide option grant for 2003 concurrent with its 2002 option grant.

11   Ruehle, however, "killed" that proposal in early July because of the dilutive

12   impact that a "double focal" grant would have on Broadcom's stock.   Shortly

13   thereafter, Samueli "revived" the double focal grant in mid-July.

14       210.   In late June 2002, the Company's employees grew anxious to receive

15   their share of the company-wide option grant, and sent several emails to Tullos

16   demanding an explanation for the delay.   For example, on June 26, 2002, Tullos

17   sent the following response to one employee's inquiry:

18       I really do not understand why I keep getting these questions,

19       particularly from people that have been at [Broadcom] a long time. *I*

20       *cannot respond fully in writing, but in case you haven't noticed,*

21       *the stock continues to drop.*   [Emphasis added].

22   In another email, Tullos responded to another employee: "The problem is that I

23   cannot tell you what we are doing (post-Enron, now Worldcom)."

24       211.   Ultimately, the Company purportedly granted its company-wide

25   option grant for 2002 and 2003 on July 3, 2002 at an exercise price of $15.74.

26   The July 3, 2002 date, which Ruehle hand-picked on or about July 16, 2002,

27   marked Broadcom's second lowest stock price between January 1, 2002 and

28

1  September 5, 2002. The SEC's investigation confirmed that even during the last
2  week of July, Tullos was still assembling the individual allocation
3  recommendations, and continued to make changes to those allocations through at
4  least August 7, 2002.

5  212. Once again, the fraudulent nature of this option grant did not go
6  unnoticed by Ruehle, who, at that time, knew that he would be required to certify
7  the Company's financial statements pursuant to SOX. Indeed, the SEC
8  uncovered evidence that Ruehle instructed Tullos to gather all information
9  relating to the July 2, 2002 option grant through **in person** meetings with
10 members of the business units, and to not request the information in writing. In
11 an email dated July 19, 2002, Tullos noted that Ruehle did not want her to
12 "communicate anything in writing since it would leave an email trail of
13 unfavorable dates."

14 213. Like the other backdated grants discussed herein, the July 3, 2002
15 grant yielded immediate gains. Broadcom's stock price climbed nearly 11% the
16 very next trading day, rising nearly ***42% in less than two weeks***:



**(h)**   <u>**August 5, 2002**</u>

214.   Because Nicholas missed the opportunity to allocate options to his direct reports with the July 3, 2002 grant (¶¶208-13), he continued to make modifications to the existing allocation.   On or about July 27 and 28, 2002, Nicholas completed his allocation to Section 16 officers, which required the approval of the Compensation Committee (Ross and Wolfen).

215.   On July 29, 2002, Tullos sent an email to Ross and Wolfen asking them to "confirm that the Compensation Committee of the Board of Directors has met and approved the attached Section 16 Officer Grants."   In reality, no such meeting had occurred, as Nicholas had completed the allocation just two days prior.   Nevertheless, on July 30, 2002, one of the Compensation Committee's two members (Ross or Wolfen) sent an email to Nicholas and Tullos confirming that the Committee had approved these grants.   The other member of the Committee, however, was on an Alaskan cruise and did not approve these grants at this time.

216.   In the following week, the Company's stock price declined, and on August 5, 2002, closed at $15.74, the same closing price as July 3, 2002.   This presented an opportunity for Nicholas to award his direct reports with a more favorable strike price.   As demonstrated by the chart below, an August 5 grant date—which was hand-pick by Ruehle—capitalized on a 20% decline in the four trading days leading up to August 5, 2002, as well as a 15% price surge in the following five days:

///

///

///

///

///

///



217. Neither the Options Committee nor the Compensation Committee actually approved an options grant on August 5, 2002. In fact, the Compensation Committee's members (Ross and Wolfen) did not learn of the August 5, 2002 grant until late September 2002, when they executed a UWC to memorialize a purported grant of 850,000 options on August 5, 2002 to Section 16 officers. Similarly, Nicholas and Samueli executed a UWC to memorialize a purported grant of 2,112,262 options on August 5, 2002 to non-Section 16 officers.

218. Ruehle (300,000 options) and Dull (200,000 options) both received backdated stock options in connection with the August 5, 2002 grant.

### (i) May 19, 2003

219. On May 19, 2003, Broadcom purportedly granted options with a strike price of $20.00 to certain new employees. Upon information and belief, the Options (Samueli) and Compensation Committees (Ross, Wolfen and Farinsky) did not actually approve these options grants until June 5, 2003, when the Company's stock price closed at $26.66, approximately $6 higher than Broadcom's closing price on May 19, 2003.

220. The SEC's investigation also confirmed that Dull knew or recklessly disregarded that these options were not actually granted on May 19, 2003,

1  particularly considering that he did not provide Tullos with an allocation for his

2  subordinates until after May 19, 2003.

3      **E.**     **The Statistical Probability that Broadcom Randomly Granted**

4               **Options on Opportunistic Grant Dates Establishes Scienter**

5      221.   As part of its investigation, Lead Plaintiff retained an expert in

6  finance who has authored several articles on the subject of options manipulation

7  and is a recognized expert in the field to conduct an analysis of Broadcom's

8  incentive stock option grants between April 1998 and May 2003 to Section 16

9  officers, based on information available to Lead Plaintiff. For the limited purpose

10  of this analysis, Lead Plaintiff instructed the expert to consider Broadcom's

11  option grants through May 2003 because the Company claims to have stopped

12  unlawfully backdating its options as of that date.

13      222.   The expert's analysis reveals that the near-perfect timing of the

14  Company's option grants could not have resulted from chance. In fact, as set

15  forth below, the mathematical probability that Broadcom's option grants could

16  achieve the number of historical low points that they did without manipulation

17  was at least 1 in 32,000 (or a probability of 0.00311%).

18      223.   Specifically, the expert identified 20 unique grant dates between

19  November 1998 and May 2003. Based on these 20 grants, the expert identified

20  14 grant dates that may have been susceptible to backdating, by excluding those

21  grant dates for which the required SEC forms were filed within 2 business days or

22  for which the Company's options were not granted at-the-money.

23      224.   The expert then identified 6 of the 14 grant dates that occurred on the

24  lowest closing price of the particular month. Once identified, the expert

25  employed a three step empirical simulation of the historical trading parameters to

26  estimate the probability that the Broadcom Defendants had chosen these 6 grant

27  dates at random. First, for each of the 6 grant dates, the expert identified all

28

historical closing prices for the same month. Second, the expert randomly drew a price in each of the months in which one of the six grants was made. Third, after repeating the first two steps for every one of the six grant dates, the expert counted the total number of times the lowest price of the month was drawn. The expert then repeated these three steps five million times.

225. Based on this empirical simulation, the expert estimates that the probability that the Broadcom Defendants selected six or more of the fourteen grant dates occurring at monthly lows is 1 in 32,124.

226. The expert also calculated the probability that these option grants occurred at random using a binomial distribution, which is a probability function used in problems, such as the one at hand, with a fixed number of tests or trials, when the outcomes of any trial are only success or failure. For this analysis, rather than using the actual trading data used in the empirical analysis, the expert assumed that each of the months in which the six grants occurred had 20 trading days, and therefore a 5% chance that the lowest price could be selected at random, and that each month had one unique low price. Based on this analysis, the expert determined that there was a 1 in 30,220 chance that the grant dates associated with these six grants were chosen at random.

227. This analysis is quite revealing of the Broadcom Defendants' scienter, as these six grant dates are but a small subset of the ninety-six grant dates at issue. Lead Plaintiff is confident that once discovery commences, and the specific dates for option grant made exclusively to non-Section 16 officers are discoverable, this statistical analysis will not only be confirmed, but strengthened.

## F. Broadcom's Restatement

228. On January 23, 2007, Broadcom restated its financial statements previously filed for fiscal years 1998 through 2005 and for interim quarterly periods during fiscal years 2003 to 2005 and for the first quarter of 2006. The

Restatement is Broadcom's, as well as EY's, **admission** that the Company's financial statements for these periods were materially false and misleading and omitted necessary information to render those statements truthful.  In sum, Broadcom, as did EY, admitted that its earnings had been inflated in excess of **$2.22 billon** since its inception as a public company in April 1998.  By this measure, Broadcom's backdating fraud is by far the most egregious of all other public companies implicated in such misconduct.

229.  The Restatement is Broadcom's and EY's admission of the material falsity of Broadcom's financial statements because, under GAAP, a restatement of previously filed financial statements is required, and indeed only permitted, to correct **material** accounting errors or irregularities "**that existed at the time the financial statements were prepared**."  *See* Statement of Financial Accounting Standard No. 154, *Accounting Changes and Error Corrections* ("FAS 154"), ¶¶ 25-26.

230.  The Restatement radically altered the financial picture of Broadcom. Specifically, as summarized below, the Restatement erased more than $2.2 billion in net income that the Company had previously reported since 1998 and, instead, increased compensation expense by that amount:

| | Stock- Based Compensation Expense | | |
| | As Reported | Adjustments (In thousands) | As Restated |
|---|---|---|---|
| Year ended December 31, 2005 | $ 60,004 | $ 42,011 | $102,015 |
| Year ended December 31, 2004 | 74.687 | 43.714 | 118.401 |
| Year ended December 31, 2003 | 577,487 | 333,609 | 911,096 |
| Year ended December 31, 2002 | 419.663 | 548.450 | 968.113 |
| Year ended December 31, 2001 | 511,010 | 916,879 | 1,427,889 |
| Year ended December 31, 2000 | 120.209 | 274.555 | 394.764 |
| Year ended December 31, 1999 | 4,713 | 48,241 | 52,954 |
| Year ended December 31, 1998 | 1,900 | 8,106 | 10,006 |
| | $ 1,769,673 | $ 2,215,565 | $3,985,238 |

231.  In total, Broadcom attributed $904.5 million of the Restatement to 18 instances where "the grant date for some options was selected **after** the date

1   indicating on the unanimous written consent documenting the approval of those

2   options." In other words, the Company admits that these 18 option grants were

3   intentionally backdated. The affected awards on these grants involved 6,205

4   options covering 90.3 million shares.

5        232. In addition, Broadcom attributed $1.037 billion of the Restatement to

6   68 instances where the Company could not locate contemporaneous

7   documentation (beyond the "as of" UWCs) confirming that a committee meeting

8   occurred on the indicated grant date. Accordingly, the Company "presumed" that

9   each of these grant dates did not comply with APB 25. The affected awards on

10   the grants involved 10,529 option grants covering 108.9 million shares. Among

11   the option grants that fall into this category, three of the grants occurred when the

12   closing price of Broadcom's Class A common stock was "near the lowest price

13   experienced during the applicable quarter of year." These three grants involved

14   1,128 option grants covering 12.5 million shares.

15        233. Moreover, the Company attributed approximately $678 million of

16   the Restatement to certain company-wide option grants to a substantial

17   percentage (as high as 90%) of Broadcom's employees. With respect to two of

18   these company-wide option grants, including the block option grant in May 2000

19   (discussed in ¶¶167-78, above), the Company failed to complete the allocation of

20   its options to individual employees before the grant dates selected by the Options

21   Committee or the Compensation Committee. The affected awards on these two

22   grant dates involved 4,271 option grants covering 33.7 million shares.

23      **G.**   **The Broadcom Defendants' Scheme Systematically**

24           **Violated GAAP and SEC Regulations**

25        234. Broadcom admits that, from April 1998 through May 2003, "most"

26   of its incentive stock option grants were intentionally backdated. This long-term

27   practice had a single purpose—to systematically understate compensation

28

expenses and overstate earnings by causing the Company to run afoul of GAAP and SEC regulations, both for the proper reporting of its financial condition generally, and the reporting of its compensation costs specifically.

235. According to SEC regulations, public companies, such as Broadcom, are required to prepare their financial statements in accordance with GAAP. By failing to comply with APB 25, Broadcom's financial statements are presumptively in violation of those regulations.

236. GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. They are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association. Through three successor groups AICPA has also established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB") with the permission of the SEC (Accounting Series Release 150).

237. SEC Rule 4-01(a) of SEC Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate, despite footnote [or other disclosures], unless the Commission has otherwise provided." 17 C.F.R. § 210.4-01(a)(1). Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. § 210.10-01(a).

238. As noted in AICPA auditing standard ("AU"), § 110.02, a public company's management is responsible for preparing financial statements in conformity with GAAP:

The financial statements are management's responsibility …

Management is responsible for adopting sound accounting policies

1    and for establishing and maintaining internal controls that will,
2    among other things, initiate, authorized, record, process, and report
3    transactions (as well as events and conditions) consistent with
4    management's assertions embodied in the financial statements. The
5    entity's transactions and the related assets, liabilities and equity are
6    within the direct knowledge and control of management…. Thus, the
7    fair presentation of financial statements in conformity with generally
8    accepted accounting principles is an implicit and integral part of
9    management's responsibility.

10   239. As demonstrated by the long-term, pervasive nature of their
11   backdating scheme, Defendants knowingly failed to adopt sound accounting
12   policies and to maintain internal controls designed to ensure that the Company's
13   public filings were fairly presented. Nor did Defendants ever take measures to
14   correct their knowingly improper accounting of backdated options at any point
15   through the end of the Class Period.

16   240. The SEC also regulates statements by companies "that can
17   reasonably be expected to reach investors and the trading markets, whoever the
18   intended primary audience." Public Statements by Corporate Representatives,
19   Exchange Act Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at
20   17,096, 17 C.F.R. § 241.20560, 1984 WL 126134 (Jan. 20, 1984).

21   241. Under SEC regulations, the management of a public company has a
22   duty "to make full and prompt announcements of material facts regarding the
23   company's financial condition." Timely Disclosure of Material Corporate
24   Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH)
25   23,120A, at 17,095, 17 C.F.R. § 241.8995, 1970 WL 10576 (Oct. 15, 1970).
26   Defendants violated this regulation throughout the Class Period by deliberately

27

28

1    and/or recklessly misrepresenting that Broadcom was complying with APB 25
2    and its own stated accounting policies.

3        242.   In Securities Act Release No. 6349, 23 S.E.C. Docket 962 (Sept. 28,
4    1981), the SEC stated that:

5        It is the responsibility of management to identify and address those
6        key variables and other qualitative and quantitative factors which are
7        peculiar to and necessary for an understanding and evaluation of the
8        individual company.

9        243.   Each of the Broadcom Defendants repeatedly violated this basic
10   precept by concealing from the public a complete understanding of material facts
11   relating to: (i) Broadcom's historical stock option practices and compliance with
12   GAAP and its own stated accounting policies; (ii) the true compensation costs the
13   Company would have incurred had it properly accounted for its issuance of
14   backdated stock options; and (iii) material weaknesses in the Company's internal
15   controls.

16       244.   In Accounting Series Release No. 173 (July 2, 1975), the SEC
17   reiterated the duty of management to present a true representation of a company's
18   operations:

19       [I]t is important that the overall impression created by the financial
20       statements be consistent with the business realities of the company's
21       financial position and operations.

22       245.   For the reasons stated above, the Broadcom Defendants failed to
23   present a correct impression of Broadcom's business realities.

24       246.   Item 7 of the Company's Form 10-Ks and Item 2 of its Form 10-Qs,
25   Management's Discussion and Analysis of Financial Condition and Results of
26   Operations, requires the issuer to furnish information required by Item 303 of
27   Regulation S-K, 17 C.F.R. § 229.303.

28

247. On May 18, 1989, the SEC issued an interpretive release (Securities Act Release No. 6835, 54 Fed. Reg. 22427 (May 18, 1989)), which stated, in relevant part:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

248. As discussed *infra*, the Broadcom Defendants nowhere explained in the MD&A sections of Broadcom's annual and quarterly SEC filings that, as a result of their backdating scheme, the Company failed to comply with GAAP or the terms of the Stock Option Plan.

249. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion No. 20 ("APB No. 20"),[1] restatements are required to correct material

---

[1] As of December 2005, APB No. 20 was replaced by Statement of Financial Accounting Standard No. 154, which carries forward without change the guidance contained in APB No. 20 for reporting the correction of an error in previously issued financial statements.

1    accounting errors, whether unintentional or fraudulent, that existed at the time the

2    financial statements were issued, and are permitted for the purpose of correcting

3    improper accounting only when it results in material misstatements.  By restating

4    Broadcom's financial statements, the Company and EY admitted that each

5    document publishing the original financial statements contained untrue statements

6    and/or omissions of material fact.  Similarly, by restating, the Company and EY

7    also conceded that each of the press releases disseminated to the investing public

8    and each of the annual and quarterly reports on Form 10-K and Form 10-Q that

9    were filed with the SEC during the Class Period, contained untrue statements of

10   material fact, and/or failed to disclose material facts.

11        250.  Lastly, Broadcom's accounting for backdated options violated, *inter*

12   *alia*, the following fundamental principles of GAAP:

13           •   the principle that financial reporting should provide information that

14               is useful to present and potential investors and creditors and other

15               users in making rational investment, credit and similar decisions.

16               (FASB Statement of Financial Accounting Concepts ("FASCON")

17               No. 1);

18           •   the principle that financial reporting should provide information

19               about the economic resources of an enterprise, the claims to those

20               resources, and the effects of transactions, events, and circumstances

21               that change resources and claims to those resources.  (*Id.*);

22           •   the principle that financial reporting should provide information

23               about how management of an enterprise has discharged its

24               stewardship responsibility to owners (stockholders) for the use of

25               enterprise resources entrusted to it. (*Id.*);

26           •   the principle that financial reporting should provide information

27               about an enterprise's financial performance during a certain time

28

period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (*Id.*);

- the principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (FASCON No. 2);

- the principle that information should be reliable as well as relevant. The reliability of a measure rests on the faithfulness with which it represents what it purports to represent. (*Id.*);

- the principle of completeness, that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (*Id.*);

- the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (*Id.*); and

- the principle that recognition of revenues, expenses, gains and losses and the related increments or decrements in assets and liabilities… is the essence of using accrual accounting to measure performance of entities. (FASCON No. 6).

## H. Broadcom's Lack of Internal Controls

251. Broadcom's admitted lack of internal controls is further evidence of the Broadcom Defendants' fraudulent scienter. In the Restatement, Broadcom admitted that, at all relevant times, its internal controls suffered from material weaknesses that resulted in the material falsification of the Company's 2005 financial statements. By intentionally, or at least recklessly, establishing inadequate internal controls, the Broadcom Defendants established a corporate culture that facilitated the fraudulent scheme alleged herein. The lack of adequate controls also enabled the Broadcom Defendants to carry out their fraudulent scheme while minimizing the potential for detection.

252. The Broadcom Defendants knew full-well that if investors uncovered the inadequacy of Broadcom's internal controls, the Company's share price would be devastated. Indeed, in the originally issued Form 10-K for 2005, Broadcom expressly stated that, "[i]f our internal controls over financial reporting are not considered adequate, we may experience a loss of public confidence, which could have an *adverse effect on our business and our stock price*."

253. EY contributed to Broadcom's internal control failures. Indeed, in March 2008, the Company issued a press release announcing its decision to replace EY as its longstanding auditor. Tellingly, the Company's press release stated that it decided to replace EY "as part of [its] ongoing efforts to enhance its corporate governance practices."

254. At all relevant times, under GAAP and the SEC rules promulgated pursuant to the Exchange Act, the Broadcom Defendants were required to maintain effective internal controls over the Company's financial reporting and to monitor and assess these controls based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (known as the COSO Criteria).

255.   More specifically, internal controls over financial reporting is a process designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.  A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the company are being made *only in accordance with authorizations of management and directors of the company*; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized use or disposition of the company's assets that could have a *material effect* on the financial statements.

256.   Although the Broadcom Defendants consistently informed investors that Broadcom's internal controls were adequate, in the Restatement, the Company ultimately conceded that its "internal control over financial reporting was not effective as of December 31, 2005."  In addition, in both the January 23, 2007 press release and in the Restatement itself, the Company essentially conceded that, no later than June 2003, the Broadcom Defendants knew that Broadcom's options program (including the accounting thereof) suffered from a material weakness.   This fact is plainly demonstrated by the Company's admission that, in June 2003, the Board implemented "*rigorous processes to prevent and detect any future instances of improper accounting for equity awards*" and "made *significant corrective changes* to its options granting and documentation processes."

257.  In addition, Broadcom attributed at least part of the blame for its weak controls to defendant Nicholas, noting that he "bears significant responsibility for the lack of adequate controls in the option granting process due to the tone and style of doing business he set," and to defendant Ruehle "who bears a substantial measure of responsibility for the lack of adequate controls and appropriate documentation in the option granting process."

258.  The Restatement also stated, with respect to Ruehle, that the Broadcom's "internal control over financial reporting was not effective as of December 31, 2005 because *there was a material weakness with respect to our former chief financial officer's* role in the application of accounting principles as it pertains to certain equity awards granted prior to June 2003, including the impact on the 2005 financial statements of amortizing deferred compensation related to those equity awards." *See* the Restatement at 105 (emphasis added).

259.  The Company's complete lack of internal controls is further underscored by the fact that defendants Ross, Wolfen and Farinsky served simultaneously on both the Compensation Committee and Audit Committee, and were specifically charged with evaluating the Company's controls, making sure they were appropriate, and remedying any related problems.  Had these defendants conducted any investigation into the sufficiency of Broadcom's internal controls, particularly with respect to its options granting practices, they would have necessarily discovered that "most" of the Company's option grants between April 1998 and May 2003 were improperly backdated, and were approved by themselves and the Options Committee by virtue of UWCs that were dated "as of" a specified date but were prepared after that date and signed at a later time.

260.  Between 1998 and the end of the Class Period, EY was responsible for testing and auditing the Company's internal controls.  Yet, notwithstanding its

1   actual knowledge, or at least deliberate recklessness, in July 2000 that at least the
2   May 26, 2000 block option grant was improperly backdated, EY consistently
3   issued an opinion that Broadcom's internal controls were adequate. In the
4   Restatement, however, EY was forced to concede that "[t]he Company did not
5   have appropriate internal controls in place to properly apply accounting literature
6   as it pertains to certain stock options granted prior to June 2003, including the
7   impact on the 2005 financial statements of the amortization of deferred
8   compensation related to certain stock options that were granted prior to June
9   2003." Further, in its Report of Independent Registered Public Accounting Firm,
10  dated January 19, 2007, EY issued "an adverse opinion on the effectiveness of
11  internal control over financial reporting."

12  ## VI.    SUMMARY OF THE BROADCOM DEFENDANTS' SCIENTER

13       261. The facts set forth above, examined collectively, demonstrate that
14  the Broadcom Defendants engaged in an options backdating scheme either
15  knowingly or recklessly disregarding that granting backdated options had
16  accounting consequences under APB 25 and, as a result, that Broadcom's audited
17  financial results materially understated its reported compensation expense and
18  materially overstated its reported net income (loss).

19  ### A.    Defendant Samueli

20       262. In January 2007, the Audit Committee found that Samueli, the
21  Chairman of the Board, "while involved in the flawed option granting process,
22  reasonably relied on  management and other professionals regarding the correct
23  option accounting treatment and grant approval process." This finding, however,
24  is not only belied by an objective reading of the alleged facts, but is also
25  completely unreliable in light of Samueli's guilty plea and evidence recently
26  uncovered by the SEC and the USAO. Indeed, after conducting its own

27

28

1  investigation into the backdating scheme, the SEC reached the opposite

2  conclusion as the Audit Committee, and charged Samueli with securities fraud.

3  263. Numerous particularized facts support the SEC's assessment that

4  Samueli acted with scienter. First and foremost, a strong inference of scienter is

5  raised by the fact that, between April 1998 and May 2003, Samueli served as one

6  of only two members of the Options Committee, the same timeframe when

7  "most" of the Company's option grants were admittedly backdated. As a result,

8  Samueli was deeply intertwined in the backdating scheme throughout the

9  Relevant Period, and expressly approved the issuance of backdated options to the

10 Company's non-Section 16 officers in the grants described in ¶¶152-220, above.

11 264. At all relevant times, Samueli participated in the backdating scheme

12 knowing or recklessly disregarding that granting backdated options had

13 accounting consequences. For example:

14 • **May 26, 2000 Grant**: As discussed in ¶¶167-78, above, in July

15 2000, Broadcom's senior officers (including Samueli) feared that EY

16 may require Broadcom to record a $700 million compensation

17 charge with respect to the May 26, 2000 grant. Although EY

18 ultimately afforded Broadcom *"flexibility"* with respect to this grant,

19 Ruehle warned Samueli (as well as Nicholas and Dull) in an email

20 dated September 11, 2000 that: "Going forward, we can expect

21 much greater scrutiny by E&Y on our options granting practices…. I

22 do not believe that [EY] will grant us any flexibility on this in the

23 future."

24 • **Broadcom's Covert Reforms in 2003**: As discussed in ¶¶113-18,

25 above, immediately following Nicholas's departure, the Board—led

26 by Samueli, as its Chairman—"significantly strengthened [its]

27 options granting practices and put into place *rigorous processes to*

28

*prevent and detect any future instances of improper accounting for equity awards*." Tellingly, all of the Company's option grants after May 2003 have "complied with prevailing accounting rules and [were] not subject to restatement."

- **Broadcom's Deceptive Hiring Practices**: As discussed in ¶¶129-51, above, Samueli knew that Broadcom was using backdated options to entice key recruits to accept their offers of employment, and as a means to retain key executives at companies that Broadcom acquired. Samueli, in fact, "advocated" the use of these deceptive practices, as the SEC's investigation uncovered. There is only one reason why Samueli would do so: to award extraordinary compensation to these individuals without requiring Broadcom to incur a compensation expense.

- **Samueli Signed the Company's Forms 10-K**: As discussed herein (*see, e.g.,* ¶84), throughout the Relevant Period, Samueli signed the Company's Forms 10-K, including the 2005 10-K, which falsely represented that Broadcom accounted for its option grants in accordance with APB 25 and the Stock Option Plan.

265. Samueli's scienter is also demonstrated by numerous emails uncovered by the USAO and SEC, wherein Samueli and certain of the other Individual Defendants discussed awarding backdated options and selecting "opportunistic" grant dates. In certain of these emails, Samueli affirmatively agreed to issue backdated options. *See, e.g.,* ¶¶161, 204.

266. Although the Options Committee approved 88 option grants between June 1998 and May 2003, it did not meet on the purported grant dates, nor did Samueli and Nicholas decide to issue options on those dates. Based on this fact, Samueli knew or recklessly disregarded that the purported grant dates were

1   deliberately manipulated. This is particularly true given that Samueli signed

2   "dozens" of UWCs to memorialize purported option grants on days that did not

3   correspond to actual Options Committee meetings, many of which he signed with

4   different "as of" dates on the same day.

5          267. In fact, evidence uncovered by the SEC reflects that Samueli spent

6   inordinate amounts of time between November 2001 and January 2002 preparing

7   and revising a spreadsheet to award backdated options to senior employees on

8   October 1, 2002. In an email dated November 12, 2001, Tullos informed

9   Nicholas that her and Samueli spent 5.5 hours "working on the options grants"

10  while on a flight to Delaware. Samueli continued to work on this allocation and

11  completed his work on the spreadsheet in January 2002. On or about January 23,

12  2002, Samueli (and Nicholas) executed a UWC to memorialize a purported grant

13  of more than 5.6 million on October 1, 2001, Broadcom's lowest closing price in

14  all of 2001. (Samueli's direct involvement in the October 1, 2001 grant is

15  discussed in further detail in ¶¶191-97, above.)

16         268. Samueli's scienter is also demonstrated by his knowledge that, on

17  March 1, 2002, the Board falsified the date of Wolfen's appointment to the

18  Compensation Committee so that the Compensation Committee could "award"

19  backdated options on October 19, 2001 and December 24, 2001. (Discussed in

20  further detail in ¶¶103-12, above.) Samueli knew that those grant dates were

21  improper because the Compensation Committee was not constituted on those

22  dates, as one of its two members passed away in July 2001 and had not been

23  replaced. Indeed, in an email dated November 4, 2001, Dull informed Samueli

24  (as well as Nicholas and Ruehle) that "The Comp Ctte has exclusive jurisdiction

25  for option grants to Section 16 officers. Accordingly, *we cannot make those*

26  *grants until it is in a position to act.*" (emphasis added).

27

28

1      269.   Rather than face responsibility for his actions, Samueli lied under

2  oath in his deposition before the SEC, claiming that he was "not involved" in the

3  process of granting options to Broadcom's Section 16 officers.  This statement

4  was false and Samueli knew it.  As Samueli admitted in his Plea Agreement with

5  the USAO, he "*made [this] false statement knowingly and willfully, that is*

6  *deliberately and with knowledge that the statement was untrue.*"  (emphasis

7  added).    Samueli's reason for lying was simple: he knew that "the [false]

8  statement had the capacity to influence the SEC's decisions or actions in

9  connection with its investigation."  As noted above, the SEC ultimately decided

10  to charge Samueli with securities fraud for his role in the backdating scheme.

11      270.   In sum, Samueli participated in the backdating scheme through the

12  deceptive acts set forth herein, and took steps to conceal the scheme by signing

13  Broadcom's false and misleading Forms 10-K throughout the Relevant Period, as

14  specified herein, including the 2005 10-K.

15      271.   A strong inference of Samueli's scienter is also supported by the fact

16  that he purportedly received 1,000,000 options on March 1, 2002, marking the

17  lowest closing price in March 2002.  This grant was accompanied by a Notice of

18  Grant, which stated the terms of the stock options on the face of the document,

19  including the exercise price and grant date.  For this reason, as well, Samueli

20  knew   or   were   deliberately   reckless   in   disregarding   that   his   options   were

21  improperly backdated.  In February 2006, Samueli exercised and sold 500,000 of

22  these options, reaping more than *$17.5 million* in gross proceeds.

23      272.  The fact that Samueli received options also demonstrates his

24  understanding that Broadcom's options vested evenly over a four-year period.

25  Accordingly, Samueli either knowingly or recklessly disregarded that granting

26  backdated options affected Broadcom's financial statements not only in the year

27  of the grant, but over the course of the entire vesting period.

28

273. With fraudulent scienter, Samueli enriched himself with more than *$90 million* in insider trading proceeds during the Class Period:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 7/28/2005 | 50,000.00 | 42.72 | 2,136,000.00 |
| 8/2/2005 | 5,000.00 | 43.18 | 215,900.00 |
| 8/15/2005 | 100,000.00 | 43.11 | 4,311,000.00 |
| 8/18/2005 | 50,000.00 | 41.26 | 2,063,000.00 |
| 8/24/2005 | 50,000.00 | 43.21 | 2,160,500.00 |
| 8/29/2005 | 100,000.00 | 42.56 | 4,256,000.00 |
| 8/30/2005 | 100,000.00 | 42.95 | 4,295,000.00 |
| 11/9/2005 | 100,000.00 | 45.53 | 4,553,000.00 |
| 11/15/2005 | 2,500.00 | 46.50 | 116,250.00 |
| 11/16/2005 | 50,000.00 | 46.45 | 2,322,500.00 |
| 11/16/2005 | 47,500.00 | 46.45 | 2,206,375.00 |
| 11/17/2005 | 50,000.00 | 47.01 | 2,350,500.00 |
| 11/17/2005 | 50,000.00 | 47.14 | 2,357,000.00 |
| 11/18/2005 | 50,000.00 | 48.28 | 2,414,000.00 |
| 11/22/2005 | 50,000.00 | 48.21 | 2,410,500.00 |
| 2/6/2006 | 250,000.00 | 69.70 | 17,425,000.00 |
| 2/7/2006 | 100,000.00 | 70.00 | 7,000,000.00 |
| 2/8/2006 | 100,000.00 | 70.54 | 7,054,000.00 |
| 2/9/2006 | 50,000.00 | 71.01 | 3,550,500.00 |
| 5/30/2006 | 250,000.00 | 33.50 | 8,375,000.00 |
| 5/31/2006 | 250,000.00 | 33.78 | 8,445,000.00 |
| **TOTAL** | **1,855,000.00** | | **$ 90,017,025.00** |

### B.     Defendant Nicholas

274. In January 2007, the Audit Committee found that Nicholas "bears significant responsibility for the lack of adequate controls in the option granting process due to the tone and style of doing business he set. ***There is substantial evidence that Dr. Nicholas was at times involved with the selection of grant dates after the fact*** and with subsequent allocation of grants." Broadcom also admitted in the Restatement that Nicholas was "actively responsible" for its "inappropriate grant practices." Since then, Nicholas the USAO has unsealed an

1    indictment charging Nicholas with conspiracy and securities fraud, and the SEC

2    has filed a complaint against Nicholas for securities fraud.   The evidence

3    uncovered in these pleadings further supports the Audit Committee's conclusion

4    that Nicholas was, at all relevant times, an active and knowing participant in the

5    backdating scheme, and that Nicholas's participation in the scheme continued

6    long after his departure.

7        275.   As with Samueli, a strong inference of Nicholas's scienter is raised

8    by the fact that, between April 1998 and May 2003, Nicholas served as one of

9    only two members of the Options Committee, the same timeframe when "most"

10   of the Company's option grants were admittedly backdated.   As a result, Nicholas

11   was deeply intertwined in the backdating scheme throughout the Relevant Period,

12   and expressly approved the issuance of backdated options to the Company's non-

13   Section 16 officers in the grants described in ¶¶152-220, above.

14       276.   At all relevant times, Nicholas took part in the backdating scheme

15   knowing or recklessly disregarding that granting backdated options had

16   accounting consequences.   For example:

17       •   **The May 26, 2000 Grant**:   As discussed in ¶¶167-78, above, on July

18           20, 2000, Ruehle alerted Nicholas that "[EY is] making noise that we

19           will have to take a compensation hit for the difference between the

20           5/26 price ($118) and the current price because we have not yet

21           "completed" the [May 26, 2000] grants.   That would result in a

22           charge of over $700M!" Although EY ultimately afforded Broadcom

23           "flexibility" with respect to this grant, Ruehle subsequently warned

24           Nicholas (as well as Samueli and Dull) in an email dated September

25           11, 2000 that:  "Going forward, we can expect much greater scrutiny

26           by E&Y on our options granting practices. . . .  I do not believe that

27           [EY] will grant us any flexibility on this in the future."

28

1

2

3

4

5

6

7

8

9

- **<u>Broadcom's Deceptive Hiring Practices</u>**:  As discussed in ¶¶129-51, above, Nicholas knew that Broadcom was using backdated options to entice key recruits to accept their offers of employment, and as a means to retain key executives at companies that Broadcom acquired.  Nicholas, in particular, was responsible for determining the terms of the options awarded to such executives.  There is only one reason why Nicholas would do so: to award extraordinary compensation to these recruits without requiring Broadcom to incur a compensation expense.

10

11

12

13

14

15

16

17

18

19

20

21

- **<u>Nicholas Paid Off a Whistleblower in November 2000</u>:**  As discussed in ¶¶132-38, above, Nicholas and Samueli enticed one recruit (Mehrdad Nayebi) to accept an offer of employment by awarding him 120,000 backdated options.  Remarkably, after the Company terminated his employment in November 2000, Nayebi's attorney provided Nicholas with a draft complaint alleging that Broadcom inflated its earnings by issuing backdated options without recording a compensation expense.  On January 17, 2001, Nicholas met with Nayebi at a hotel in Orange County, and pleaded with him not to file the draft complaint.  In exchange for Nayebi's silence, Nicholas agreed to vest 85 percent of his outstanding options, an offer worth approximately $7 million at the time of their meeting.

22

23

24

25

26

- **<u>Nicholas Signed the Company's Forms 10-K and 10-Q</u>**:  As discussed herein (*see, e.g.,* ¶84), from 1998 through 2003, Nicholas concealed the scheme by signing the Company's Forms 10-K and 10-Q, which falsely represented that Broadcom accounted for its option grants in accordance with APB 25 and the Stock Option Plan.

27

28

1    277.   Nicholas's scienter and concealment of the scheme is also supported

2    by his certification of Broadcom's Form 10-Q for the third quarter of 2002.  The

3    3Q02 10-Q falsely represented that Broadcom's financial statements and options

4    practices complied with GAAP and APB 25, notwithstanding Nicholas's

5    knowledge or reckless disregard that they did not.

6    278.   The SOX certification for 3Q02 also falsely represented that the

7    Company's internal controls were effective and adequate.  This, too, raises a

8    strong inference of his scienter, particularly in view of Broadcom's admission

9    that Nicholas "bears significant responsibility for the lack of adequate controls in

10   the option granting process due to the tone and style of doing business he set."

11   279.   Nicholas's scienter is also demonstrated by his receipt of numerous

12   emails uncovered by the USAO and SEC, wherein certain of the Individual

13   Defendants discussed awarding backdated options.  At least one of these emails

14   reflected Nicholas's desire to find an "opportunistic" grant date for his direct

15   reports, including Dull and Ruehle.  *See, e.g.,* ¶203.

16   280.   Although the Options Committee approved 88 option grants between

17   June 1998 and May 2003, it did not meet on the purported grant dates, nor did

18   Samueli and Nicholas decide to issue options on those dates.  Based on this fact,

19   Nicholas knew or recklessly disregarded that the purported grant dates were

20   deliberately manipulated.  This is particularly true given that Nicholas signed

21   "dozens" of UWCs to memorialize purported option grants on days that did not

22   correspond to actual meetings of the Options Committee.

23   281.   Nicholas's scienter is also demonstrated by his knowledge that, on

24   March 1, 2002, the Board falsified the date of Wolfen's appointment to the

25   Compensation Committee so that the Compensation Committee could "award"

26   backdated options on October 19, 2001 and December 24, 2001.  (Discussed in

27   further detail in ¶¶103-12, above.)  Nicholas knew that those grant dates were

28

1   improper because the Compensation Committee did not exist on those dates, as
2   one of its two members passed away in July 2001 and had not been replaced.
3   Indeed, in an email dated November 4, 2001, Dull informed Nicholas (as well as
4   Samueli and Ruehle) that "The Comp Ctte has exclusive jurisdiction for option
5   grants to Section 16 officers. Accordingly, *we cannot make those grants until it*
6   *is in a position to act.*" (emphasis added).

7       282. Further, as discussed in ¶¶113-18, above, a strong inference of
8   Nicholas's scienter is raised by the fact that the Board, led by Samueli,
9   "significantly strengthened [its] options granting practices and put into place
10  *rigorous processes to prevent and detect any future instances of improper*
11  *accounting for equity awards*" in June 2003, just *days after* Nicholas completed
12  his longstanding tenure as Co-Chairman of the Board and a member of the
13  Options Committee in May 2003.

14      283. Even though Nicholas did not make any false statements concerning
15  Broadcom after he left the Company and ended his tenure as Co-Chairman in
16  May 2003, his knowledge of, and participation in, the fraudulent backdating
17  scheme continued through the end of the Class Period. Indeed, after conducting
18  an extensive investigation, the USAO indicted Nicholas for conspiracy and
19  securities fraud (among other charges), which accused him of continuing his
20  participation in the scheme for several years after his departure from the
21  Company in 2003. The SEC also charged him with securities fraud for his role in
22  the backdating scheme after his departure from Broadcom.

23      284. In sum, Nicholas participated in the backdating scheme through the
24  deceptive acts set forth herein, and took steps to conceal the scheme by signing
25  each of Broadcom's false and misleading Forms 10-Q and Forms 10-K through
26  his resignation as CEO in January 2003, and by certifying the accuracy of the
27  Form 10-Q for the third quarter of 2002 pursuant to SOX, as specified herein.

28

285. A strong inference of Nicholas's scienter is also supported by the fact that he purportedly received 1,000,000 options on March 1, 2002, marking the lowest closing price in March 2002. This grant was accompanied by a Notice of Grant, which stated the terms of the stock options on the face of the document, including the exercise price and grant date. For this reason, as well, Nicholas knew or recklessly disregarded that his options were improperly backdated.

286. The fact that Nicholas received options also demonstrates his understanding that Broadcom's options vested evenly over a four-year period. Accordingly, Nicholas either knowingly or recklessly disregarded that granting backdated options affected Broadcom's financial statements not only in the year of the grant, but over the course of the entire vesting period.

287. With fraudulent scienter, Nicholas also enriched himself with significant sums of insider trading proceeds. Specifically, during the Relevant Period, Nicholas reaped more than *$335 million* in gross proceeds, or more than *$875 million* when combined with the Nicholas Family Trust.

## C. Defendant Ruehle

288. In January 2007, the Audit Committee found that Ruehle "was at the center of the flawed option granting process" and "bears a substantial measure of responsibility for the lack of adequate controls and appropriate documentation of the options granting process." Broadcom also admitted in the Restatement that "*[t]here is substantial evidence [Ruehle] engaged in the selection of grant dates after the fact" and that he "personally received options included in some of such grants.*" Since then, additional evidence has emerged that further corroborates the Audit Committee's conclusion that Ruehle was, at all relevant times, an active and knowing participant in the backdating scheme.

289. As discussed herein (*see, e.g.,* ¶¶96-98), although Ruehle was not a member of the Options Committee or Compensation Committee, he selected most

of the grant dates retroactively after reviewing a "menu" email from Broadcom's stock administrator listing the closing stock prices for the prior Fridays. (The Options Committee purportedly held its meetings on Fridays.) These "menu" emails allowed Ruehle to easily "look back" and pick the lowest strike price for the period. He then provided this information to Samueli, Nicholas and Dull.

290. At all relevant times, Ruehle knew or recklessly disregarded that granting backdated options had accounting consequences. For example:

- **May 26, 2000 Grant**: As discussed in ¶¶167-78, above, on July 20, 2000, Ruehle alerted Nicholas that "[EY is] making noise that we will have to take a compensation hit for the difference between the 5/26 price ($118) and the current price because we have not yet "completed" the [May 26, 2000] grants. That would result in a charge of over $700M!" EY ultimately afforded Broadcom "flexibility" with respect to this grant. Thereafter, in an email dated September 11, 2000, Ruehle warned Samueli, Nicholas and Dull that: "Going forward, we can expect much greater scrutiny by E&Y on our options granting practices. … I do not believe that [EY] will grant us any flexibility on this in the future."

- **Broadcom's Covert Reforms in 2003**: As discussed in ¶¶113-18, above, immediately following Nicholas's departure, the Board—led by Samueli, as its Chairman—"significantly strengthened [its] options granting practices and put into place *rigorous processes to prevent and detect any future instances of improper accounting for equity awards*." Tellingly, all of the Company's option grants after May 2003 "complied with prevailing accounting rules and [were] not subject to restatement."

- **Broadcom's Deceptive Hiring Practices**:  As discussed in ¶¶129-51, above, Ruehle knew that Nicholas and Samueli were using backdated options to entice key recruits to accept their offers of employment, and as a means to retain key executives at companies that Broadcom acquired.  There was only one reason why Broadcom would do so: to award extraordinary compensation to these recruits without requiring Broadcom to incur a compensation expense.

- **Ruehle was the CFO and a Certified Public Accountant**:  As the Company's principal accounting officer between 1997 and 2006, and a long-term certified public accountant, there is no question that Ruehle possessed the sophistication and experience necessary to understand the correct application of APB 25, a relatively simple accounting rule.

- **Ruehle Signed the Company's Forms 10-K and 10-Q**:  As discussed herein (*see, e.g.,* ¶84), throughout the Relevant Period, Ruehle signed Broadcom's Forms 10-K and 10-Q, including the 2005 10-K, which falsely represented that Broadcom accounted for its option grants in accordance with APB 25 and the Plan.

291.  Ruehle's scienter is also supported by his certifications of the Company's quarterly and annual financial statements pursuant to SOX, including each of the Form 10-Qs during fiscal 2005 and the 1Q06 10-Q, and the 2005 10-K.  The Forms 10-Q and the 2005 10-K falsely represented that Broadcom's financial statements and options practices complied with GAAP and APB 25, notwithstanding Ruehle's knowledge or reckless disregard that they did not.

292.  The SOX certifications also falsely represented that Broadcom's internal controls were effective and adequate throughout the Class Period.  This raises a strong inference of Ruehle's scienter in view of the Company's admission

1  that "Ruehle bears a substantial measure of responsibility for the lack of adequate
2  controls . . . in the option granting process."

3  293.  Ruehle's scienter is also demonstrated by numerous emails
4  uncovered by the USAO and SEC, wherein Ruehle and certain of the other
5  Individual Defendants discussed awarding backdated options and selecting
6  "opportunistic" grant dates.  In certain of these emails, Ruehle recommended that
7  the Options Committee select certain advantageous grant dates.  *See, e.g.,* ¶160.

8  294.  Ruehle's scienter is also evidenced by the fact that he instructed
9  Tullos to gather all information concerning the July 2, 2002 option grant through
10  in person meetings and not to request the information in writing.  Tellingly,
11  Tullos noted in an email dated July 19, 2002 that Ruehle did so because he did
12  not want her to "leave an email trail of unfavorable dates."

13  295.  A strong inference of Ruehle's scienter is also supported by the fact
14  that, after serving as CFO since 1997, Ruehle "resigned" from Broadcom
15  effective immediately in September 2006.  Tellingly, his resignation occurred just
16  ***two days*** before he was scheduled to meet with the Audit Committee as part of its
17  conduct review into the Company's historical option practices.

18  296.  Following Ruehle's "resignation," a strong inference is raised by
19  Broadcom's admission in the Restatement that its "internal control over financial
20  reporting was not effective as of December 31, 2005 because ***there was a***
21  ***material weakness with respect to our former chief financial officer's*** role in the
22  application of accounting principles as it pertains to certain equity awards granted
23  prior to June 2003, including the impact on the 2005 financial statements of
24  amortizing deferred compensation related to those equity awards."  *See* the
25  Restatement at 105 (emphasis added).

26  297.  Ruehle's scienter is also evidenced by the fact that, after conducting
27  an extensive investigation, the USAO indicted Ruehle for conspiracy and

28

1   securities fraud (among other charges).  The SEC also charged him with civil

2   securities fraud for his role in the backdating scheme.

3       298.   In sum, Ruehle participated in the backdating scheme through the

4   deceptive acts set forth herein, and took steps to conceal the scheme by signing

5   each of Broadcom's false and misleading Forms 10-Q and Forms 10-K during the

6   Relevant Period, and by certifying the accuracy of such filings pursuant to SOX

7   beginning in the third quarter of 2002, as specified herein.

8       299.   Ruehle received at least 850,000 backdated stock options, which, as

9   the SEC uncovered, were in-the-money by **$21.6 million**.  He also exercised

10   certain of these grants, receiving tangible benefits of at least $102,000.  Each of

11   these grants was accompanied by a Notice of Grant, which plainly stated the

12   terms of the stock options on the face of the document, including the exercise

13   price and grant date.  For this reason, as well, Ruehle knew or recklessly

14   disregarded that the aforementioned options were improperly backdated, and

15   were not granted in accordance with GAAP and the Stock Option Plan.

16       300.   The fact that Ruehle received options over a number of years also

17   demonstrates his understanding that Broadcom's options vested evenly over a

18   four-year period.  Accordingly, Ruehle either knowingly or recklessly disregarded

19   that granting backdated options affected Broadcom's financial statements not

20   only in the year of the grant, but over the course of the entire vesting period.

21       301.   With fraudulent scienter, Ruehle also enriched himself with insider

22   trading proceeds that exceeded **$10.5 million** during the Class Period:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 7/25/05 | 5,000.00 | 43.01 | 215,050.00 |
| 7/25/05 | 5,000.00 | 43.05 | 215,250.00 |
| 8/15/05 | 10,000.00 | 42.30 | 423,000.00 |
| 8/15/05 | 10,000.00 | 43.00 | 430,000.00 |
| 8/30/05 | 10,000.00 | 43.00 | 430,000.00 |
| 11/10/05 | 20,000.00 | 45.85 | 917,000.00 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 11/15/05 | 10,000.00 | 46.08 | 460,800.00 |
| 11/17/05 | 10,000.00 | 47.00 | 470,000.00 |
| 11/18/05 | 10,000.00 | 48.00 | 480,000.00 |
| 1/30/06 | 20,000.00 | 68.00 | 1,360,000.00 |
| 2/3/06 | 10,000.00 | 68.00 | 680,000.00 |
| 2/6/06 | 20,000.00 | 70.00 | 1,400,000.00 |
| 2/9/06 | 10,000.00 | 71.00 | 710,000.00 |
| 5/5/06 | 10,000.00 | 41.60 | 416,000.00 |
| 5/5/06 | 10,000.00 | 41.92 | 419,200.00 |
| 5/8/06 | 20,000.00 | 40.91 | 818,200.00 |
| 5/19/06 | 10,000.00 | 36.44 | 364,400.00 |
| 5/19/06 | 10,000.00 | 36.65 | 366,500.00 |
| **TOTAL** | **210,000.00** | | **$ 10,575,400.00** |

## D.   **Defendant Dull**

302.   The Audit Committee did not conclude that Dull was responsible for Broadcom's improper options granting practices or its lack of controls. Nevertheless, after conducting an extensive investigation into Broadcom's options granting practices, the SEC reached the opposite conclusion and charged Dull with securities fraud.  Numerous particularized facts underscore the SEC's assertion that Dull was an active and knowing participant in the backdating scheme.

303.   First and foremost, Dull's scienter is evidenced by the fact that, at the direction of Samueli and Nicholas, he prepared dozens of UWCs to memorialize the phony grant dates.   As the Company admitted in the Restatement, the UWCs were dated "as of" a specified date, but "were generally prepared after that date and signed at a later time."   As described herein, Dull prepared these UWCs at the direction of Nicholas and Samueli to memorialize purported option grants to himself and his colleagues.

304.   At all relevant times, Dull knew or recklessly disregarded that granting backdated options had accounting consequences.  For example:

- **May 26, 2000 Grant**:   As discussed in ¶¶167-78, above, in July 2000, Broadcom's senior officers (including Dull) feared that EY may require Broadcom to record a $700 million compensation charge with respect to the May 26, 2000 grant.   EY ultimately afforded Broadcom "flexibility" with respect to this grant. Thereafter, in an email dated September 11, 2000, Ruehle warned Dull (as well as Samueli and Nicholas) that:  "Going forward, we can expect much greater scrutiny by E&Y on our options granting practices. . . .  I do not believe that [EY] will grant us any flexibility on this in the future."

- **Dull Knew About the Whistleblower in November 2000:**   As discussed in ¶¶132-38, in November 2000, Nayebi's attorney provided Nicholas with a draft complaint alleging that Broadcom inflated its earnings by issuing backdated options without recording a compensation expense.  Upon information and belief, Dull, as the Company's General Counsel, was familiar with the draft complaint, and knew about the substance of the allegations contained therein. Knowing that Nayebi's allegations would implicate himself and reveal the backdating scheme, Dull ordered his former partner at Irell & Manella LLP (James Adler) to finalize a settlement with Nayebi.

- **Broadcom's Covert Reforms in 2003**:  As discussed in ¶¶113-18, above, immediately following Nicholas's departure, the Board "significantly strengthened [its] options granting practices and put into place *rigorous processes to prevent and detect any future instances of improper accounting for equity awards*."   Upon

information and belief, as Broadcom's General Counsel and Secretary, Dull knew that the Board had instituted these corrective actions in secret immediately following Nicholas's departure.

- **<u>Broadcom's Deceptive Hiring Practices</u>**: As discussed in ¶¶129-51, above, Dull knew that Nicholas and Samueli were using backdated options to entice key recruits to accept their offers of employment, and as a means to retain key executives at companies that Broadcom acquired. There was only one reason why Broadcom would do so: to award extraordinary compensation to these recruits without requiring Broadcom to incur a compensation expense.

- **<u>Dull Signed the False Proxy Statements:</u>** As discussed herein (*see, e.g.,* ¶¶42, 85), Dull signed each of the Company's Forms 14A for fiscal years 1998 through 2004, which plainly acknowledged the correct accounting treatment for granting backdated options under APB 25, including the fact that all options had to be amortized over the four-year vesting period.

- **<u>Dull Prepared and Reviewed the False 10-Ks</u>**: As discussed herein (*see, e.g.,* ¶¶42, 84), Dull prepared and reviewed each of the Company's Forms 10-K for fiscal years 1998 through 2005, which falsely represented that Broadcom accounted for its option grants in accordance with APB 25 and the Stock Option Plan.

305. As discussed in ¶¶103-12, above, Dull's scienter is also supported by the chronology of events between July 2001 and March 1, 2002, during which time Dull took deliberate, fraudulent steps to: (i) prepare several UWCs to document option grants when the Compensation Committee was not constituted; while (ii) leading the effort to appoint Wolfen to the Compensation Committee, in

order to replace a deceased director, so that the Company could continue to issue
backdated options to himself and other Section 16 officers:

- In order to proceed with a purported option grant on June 24, 2001
  (which preceded the deceased director's death in July 2001), an in-
  house lawyer, at the direction of Dull, prepared draft minutes for a
  "special telephonic meeting" of the Compensation Committee on
  June 24, 2001.  Although Dull received a draft copy of these
  minutes, he did not sign them in his capacity as Corporate Secretary.

- On November 4, 2001, after learning that the Compensation
  Committee could not be constituted without two independent
  directors, Dull advised Nicholas, Samueli and Ruehle that "The
  Comp Ctte has exclusive jurisdiction for option grants to Section 16
  officers.  Accordingly, we cannot make those grants until it is in a
  position to act."  Although Samueli agreed to appoint Wolfen,
  Nicholas never responded.

- On December 21, 2001 and December 28, 2001, Dull asked Ruehle
  to "get closure" on appointing Wolfen to the Compensation
  Committee so that Broadcom could proceed with a re-grant of
  options to its Section 16 officers, which included Dull and Ruehle.

- On January 3, 2002, Dull again urged Nicholas to approve Wolfen's
  selection to the Compensation Committee, reminding him that the
  vacancy "affect[s] our ability to make option grants to Section 16
  officers."  Once again, Nicholas did not respond.  Undeterred, Dull
  instructed an in-house attorney to prepare a draft UWC appointing
  Wolfen, and specifically ordered him to leave the date of Wolfen's
  appointment ***blank***.

- Dull prepared two UWCs to memorialize purported option grants by the Compensation Committee to himself, Ruehle and other Section 16 officers on October 19, 2001 and December 24, 2001.  As Dull knew, the Compensation Committee was not constituted on those dates, as the Board had not appointed Wolfen to replace the deceased director.

- On March 1, 2002, Dull presented the Board with a UWC memorializing Wolfen's appointment to the Compensation Committee "as of" October 12, 2001.  The Board (including each of the Individual Defendants except for Dull) executed that false document.

- Later that meeting, the newly constituted Compensation Committee (Wolfen and Ross) executed two UWCs that were prepared by Dull, which approved option grants to Dull and Ruehle (among other Section 16 officers) on October 19, 2001 and December 24, 2001.  Once again, Dull knew that these grants were improperly backdated, as the Compensation Committee could not take action as of those dates.

306.  Dull's scienter is also demonstrated by his receipt of numerous emails uncovered by the USAO and SEC, wherein certain of the Individual Defendants specifically discussed awarding backdated options and selecting "opportunistic" grant dates.  *See, e.g.,* ¶¶160-62, 203-05.

307.  A strong inference of Dull's scienter is also raised by the fact that, on May 14, 2008, the Company forced him to take a "leave of absence" as General Counsel pending the resolution of the SEC's action, in which it charged Dull with civil securities fraud.  In other words, ***Dull was fired***.

308. Dull's scienter is also evidenced by his repeated failure to comply with his reporting requirements under Section 307 of SOX, adopted in July 30, 2002, which requires in-house counsel, like Dull, to immediately investigate and "report up the ladder" any alleged or suspected internal criminal activity, fraud, or breach of fiduciary duty to senior management and, if necessary, to raise such matters with the Board.

309. In sum, Dull participated in the backdating scheme through the deceptive acts set forth herein, and took steps to conceal the scheme by: (i) preparing and reviewing Broadcom's false and misleading Forms 10-K and Forms 10-Q during the Relevant Period, including the 2005 10-K; (ii) signing the Company's false and misleading Forms 14A for fiscal years 2000 through 2005; and (iii) preparing and reviewing the Company's false and misleading Forms 8-K (which, *inter alia*, attached Broadcom's earnings information) during the Relevant Period, as specified herein.

310. Dull received at least 850,000 backdated stock options, which, based on the SEC's investigation, were in-the-money by ***$24.4 million***. Dull exercised certain of these backdated options, receiving a tangible benefit of at least ***$1.8 million***. Each of these grants was accompanied by a Notice of Grant, which plainly stated the terms of the stock options on the face of the document, including the exercise price and grant date. For this reason, as well, Dull knew or recklessly disregarded that these options were improperly backdated, and were not granted in accordance with GAAP and the Stock Option Plan.

311. The fact that Dull received options over a number of years also demonstrates his understanding that Broadcom's options vested evenly over a four-year period. Accordingly, Dull either knowingly or recklessly disregarded that granting backdated options affected Broadcom's financial statements not only in the year of the grant, but over the course of the entire vesting period.

312.   With fraudulent scienter, Dull also enriched himself with insider trading proceeds that exceeded *$9.7 million* during the Class Period:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 7/22/2005 | 4,000.00 | 43.82 | 175,280.00 |
| 7/22/2005 | 2,000.00 | 44.00 | 88,000.00 |
| 8/1/2005 | 1,000.00 | 42.90 | 42,900.00 |
| 8/1/2005 | 1,000.00 | 43.00 | 43,000.00 |
| 9/1/2005 | 2,000.00 | 43.40 | 86,800.00 |
| 9/6/2005 | 2,000.00 | 44.00 | 88,000.00 |
| 9/9/2005 | 6,000.00 | 46.00 | 276,000.00 |
| 9/13/2005 | 6,000.00 | 47.00 | 282,000.00 |
| 10/3/2005 | 6,000.00 | 47.32 | 283,920.00 |
| 11/1/2005 | 1,000.00 | 42.30 | 42,300.00 |
| 11/2/2005 | 1,000.00 | 43.00 | 43,000.00 |
| 11/3/2005 | 1,000.00 | 44.00 | 44,000.00 |
| 11/9/2005 | 1,500.00 | 46.00 | 69,000.00 |
| 11/15/2005 | 10,000.00 | 46.06 | 460,600.00 |
| 11/17/2005 | 1,500.00 | 47.00 | 70,500.00 |
| 11/18/2005 | 9,000.00 | 48.00 | 432,000.00 |
| 12/1/2005 | 6,000.00 | 47.44 | 284,640.00 |
| 12/2/2005 | 9,000.00 | 48.00 | 432,000.00 |
| 12/6/2005 | 10,500.00 | 49.00 | 514,500.00 |
| 12/15/2005 | 7,500.00 | 49.90 | 374,250.00 |
| 1/4/2006 | 1,500.00 | 49.00 | 73,500.00 |
| 1/5/2006 | 12,000.00 | 50.00 | 600,000.00 |
| 1/6/2006 | 7,500.00 | 51.90 | 389,250.00 |
| 1/9/2006 | 7,500.00 | 53.90 | 404,250.00 |
| 1/10/2006 | 7,500.00 | 55.90 | 419,250.00 |
| 1/11/2006 | 7,500.00 | 57.90 | 434,250.00 |
| 2/1/2006 | 14,205.00 | 67.96 | 965,371.80 |
| 3/2/2006 | 10,000.00 | 48.66 | 486,600.00 |
| 3/3/2006 | 10,000.00 | 49.45 | 494,500.00 |
| 4/3/2006 | 15,750.00 | 43.75 | 689,062.50 |
| 5/1/2006 | 15,750.00 | 41.35 | 651,262.50 |
| **TOTAL** | **197,205.00** | | **$ 9,739,986.80** |

1

### E.   Defendants Ross, Wolfen and Farinsky

2          313.   In January 2007, the Audit Committee found that the members of the

3   Compensation Committee (Ross, Wolfen and Farinsky) executed UWCs, but

4   "reasonably relied on the advice of the responsible officers and employees and

5   that management would present them with appropriate documents for execution."

6   This fact, alone, does not exonerate their exposure to liability under Section 10(b)

7   and Rule 10b-5.   As set forth below, a holistic review of the evidence raises a

8   strong inference that Ross, Wolfen and Farinsky (the "Committee Defendants")

9   acted with scienter, an inference that far outweighs any competing inference.

10         314.   A strong inference of scienter is raised by the Committee

11  Defendants' concurrent service on the Compensation and Audit Committees

12  during some or all of the period of wrongdoing.   Indeed, it is undisputed that the

13  Compensation Committee **authorized** the issuance of backdated options to

14  Section 16 officers, while they were simultaneously charged with monitoring the

15  integrity of Broadcom's financial reporting.   These facts raise a very strong

16  inference that each of the Committee Defendants either knew or recklessly

17  disregarded that the Compensation Committee's approval of backdated option

18  grants was not in accordance with APB 25 and the Stock Option Plan, and that, as

19  a result, the Company's audited financial statements were materially false and

20  misleading.

21         315.   This inference is particularly compelling as to Ross, who served on

22  the Compensation Committee during the **entire period** between April 1998 and

23  May 2003.   In other words, Ross personally approved **every** backdated option that

24  was awarded to the Company's Section 16 officers, including the grants described

25  above to Samueli, Nicholas, Ruehle and Dull.   Moreover, the governmental

26  investigations uncovered that Ross did not learn of the May 26, 2000 options

27

28

1  grant—the largest grant in Broadcom's history—until September 23, 2000, but

2  nonetheless approved it.

3      316. Further, as discussed in ¶76, the Stock Option Plan specifically

4  provides that the Compensation Committee **may not** approve a grant of in-the-

5  money options. This fact raises a strong inference that the Committee Defendants

6  knew or recklessly disregarded that they were evading this specific requirement

7  by approving the issuance of backdated stock options.

8      317. A strong inference of scienter is also raised by the fact that, under the

9  Stock Option Plan, the Committee Defendants had "exclusive authority" to

10  administer the Company's option grants to Section 16 officers. This ensured that

11  Samueli and Nicholas, as members of the Options Committee, did not have the

12  power to award stock options to themselves and other Section 16 officers (*i.e.*,

13  Ruehle). Notwithstanding these checks and balances, the Committee Defendants

14  knowingly abdicated their responsibilities under the Plan, and instead permitted

15  Samueli, Nicholas and Ruehle to select virtually **all** of Broadcom's equity awards.

16      318. In furtherance of the backdating scheme, the Committee Defendants

17  "granted" options to Section 16 officers (using the quantities and terms selected

18  by Samueli, Nicholas and Ruehle) by executing a UWC to memorialize the

19  Compensation Committee's "decision" to grant options "as of" a specific,

20  falsified date. The Committee Defendants either knowingly or recklessly

21  disregarded that the "as of" dates specified in these UWCs were not

22  contemporaneous with an actual decision to award such options.

23      319. The Committee Defendants' scienter is also evidenced by their

24  knowledge that the Board backdated Wolfen's appointment to the Compensation

25  Committee, discussed in ¶¶103-12, above. As members of the Board, each of the

26  Committee Defendants knew that one of the Compensation Committee's two

27  members (the other being Ross) passed away in July 2001. During a Board

28

1  meeting on March 1, 2002, Dull presented the Board with a UWC reflecting a

2  decision to appoint Wolfen to the Compensation Committee "as of" October 12,

3  2001. Despite their knowledge that the Board had not decided to appoint Wolfen

4  to the Compensation Committee prior to their meeting on March 1, 2002, the

5  Committee Defendants furthered the scheme by signing the UWC.

6  320. Further, during that same Board meeting, the newly constituted

7  Compensation Committee (Ross and Wolfen) executed UWCs to memorialize

8  their "decision" to award options on October 19, 2001 and December 24, 2001.

9  This fact raises yet another strong inference that Ross and Wolfen either

10  knowingly or recklessly disregarded their approval of backdated stock options.

11  This inference is particularly strong considering Ross's and Wolfen's knowledge

12  that the Compensation Committee was not constituted on the dates of those

13  option grants, and that the date of Wolfen's appointment ensured that the

14  Committee was "constituted" one week prior to the October 19, 2001 option

15  grant.

16  321. As discussed in ¶¶113-18, above, the Committee Defendants'

17  scienter is also demonstrated by the covert reforms in June 2003. Days after

18  Nicholas completed his tenure as Co-Chairman, the Board "significantly

19  strengthened [its] options granting practices and put into place ***rigorous processes***

20  ***to prevent and detect any future instances of improper accounting for equity***

21  ***awards***." (emphasis added). This fact, alone, raises a strong inference that the

22  Committee Defendants knew by no later than June 2003 that: (i) their historical

23  stock option practices had accounting consequences; (ii) the Company's

24  previously reported financial results were, therefore, false and could not be relied

25  upon; and (iii) that a restatement may be necessary.

26  322. These inferences are particularly compelling as to Wolfen and

27  Farinsky, both of whom were still members of the Compensation and Audit

28

1   Committees when these corrective actions were taken.   In other words, the

2   Committee Defendants represented the precise subset of directors who were most

3   familiar with the Company's historical stock option practices, and who should

4   have taken steps to ensure that Broadcom's previously filed financial statements

5   did not contain any material misrepresentations.

6       323.   In addition, the covert reforms raise a strong inference of scienter as

7   to Ross, who was then serving as Broadcom's CEO, and was therefore not just an

8   "outside director."   Had Ross taken steps as Broadcom's CEO to publicly disclose

9   these corrective actions in June 2003, or to assess the impact of Broadcom's

10  historical stock option practices on its previously reported financial results, the

11  Company would not have understated its reported compensation expense and

12  overstated its earnings by more than *$400 million* between 2003 and 2005.

13      324.   Rather, in order to further conceal the scheme, Ross signed and

14  certified Broadcom's quarterly and annual financial statements pursuant to SOX,

15  including each of the Forms 10-Q during fiscal 2003 and 2004, and the 2003

16  Form 10-K.   Each of these Forms 10-Q and the 2003 Form 10-K falsely

17  represented that Broadcom's financial statements and options practices complied

18  with GAAP and APB 25, notwithstanding Ross's knowledge or reckless disregard

19  that they did not.

20      325.   In sum, the Committee Defendants participated in the backdating

21  scheme through the deceptive acts set forth herein, and took steps to conceal the

22  scheme by signing Broadcom's false and misleading Forms 10-K during the

23  Relevant Period, including the 2005 10-K.   Specifically, as specified herein: (i)

24  Ross signed Broadcom's false and misleading Forms 10-K during the Relevant

25  Period, and signed and certified each of the Forms 10-Q during fiscal 2003 and

26  2004 and the 2003 Form 10-K; (ii) Wolfen signed each of Broadcom's false and

27  misleading Forms 10-K during the Relevant Period; and (iii) Farinsky signed

28

Broadcom's false and misleading Forms 10-K for fiscal 2001 through the end of the Relevant Period.

326.   With fraudulent scienter, Ross enriched himself with insider trading proceeds that exceeded **$14.3 million** during the Class Period:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 8/1/2005 | 90,000.00 | 43.00 | 3,870,000.00 |
| 8/2/2005 | 243,432.00 | 43.00 | 10,467,576.00 |
| **TOTAL** | **333,432.00** | | **$14,337,576.00** |

327.   With fraudulent scienter, Farinsky enriched himself with insider trading proceeds that exceeded **$5.3 million** during the Class Period:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 09/02/2005 | 38,334.00 | 43.12 | 1,652,962.08 |
| 11/09/2005 | 21,666.00 | 44.16 | 956,770.56 |
| 01/30/2006 | 20,000.00 | 68.33 | 1,366,600.00 |
| 02/06/2006 | 20,000.00 | 69.74 | 1,394,800.00 |
| **TOTAL** | **100,000.00** | | **$ 5,371,132.64** |

328.   With fraudulent scienter, Wolfen enriched himself with insider trading proceeds that exceeded **$4.7 million** during the Class Period:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 7/25/2005 | 3,401.00 | 42.77 | 145,460.77 |
| 7/25/2005 | 2,600.00 | 42.78 | 111,228.00 |
| 8/10/2005 | 15,000.00 | 43.00 | 645,000.00 |
| 8/10/2005 | 4,160.00 | 43.10 | 179,296.00 |
| 8/10/2005 | 3,240.00 | 43.09 | 139,611.60 |
| 8/10/2005 | 2,997.00 | 43.08 | 129,110.76 |
| 8/10/2005 | 2,357.00 | 43.09 | 101,563.13 |
| 8/10/2005 | 2,355.00 | 43.12 | 101,547.60 |
| 8/10/2005 | 1,301.00 | 43.06 | 56,021.06 |
| 8/10/2005 | 740.00 | 43.07 | 31,871.80 |
| 8/10/2005 | 150.00 | 43.10 | 6,465.00 |
| 8/10/2005 | 103.00 | 43.08 | 4,437.24 |
| 8/10/2005 | 100.00 | 43.05 | 4,305.00 |
| 8/10/2005 | 4,999.00 | 42.76 | 213,757.24 |

| Date | Shares | Price | Proceeds |
|------|-------:|------:|---------:|
| 8/24/2005 | 8,542.00 | 42.88 | 366,280.96 |
| 8/24/2005 | 3,100.00 | 42.84 | 132,804.00 |
| 8/24/2005 | 2,750.00 | 42.80 | 117,700.00 |
| 8/24/2005 | 2,506.00 | 42.83 | 107,331.98 |
| 8/24/2005 | 2,200.00 | 42.81 | 94,182.00 |
| 8/24/2005 | 1,000.00 | 42.79 | 42,790.00 |
| 8/24/2005 | 1,000.00 | 42.82 | 42,820.00 |
| 8/24/2005 | 902.00 | 42.85 | 38,650.70 |
| 11/10/2005 | 16,282.00 | 45.64 | 743,110.48 |
| 11/10/2005 | 2,518.00 | 45.61 | 114,845.98 |
| 11/10/2005 | 1,600.00 | 45.65 | 73,040.00 |
| 11/10/2005 | 1,300.00 | 45.63 | 59,319.00 |
| 11/10/2005 | 300.00 | 45.62 | 13,686.00 |
| 2/28/2006 | 3,800.00 | 46.01 | 174,838.00 |
| 2/28/2006 | 3,480.00 | 46.17 | 160,671.60 |
| 2/28/2006 | 2,659.00 | 46.13 | 122,659.67 |
| 2/28/2006 | 1,700.00 | 46.03 | 78,251.00 |
| 2/28/2006 | 1,509.00 | 46.15 | 69,640.35 |
| 2/28/2006 | 1,302.00 | 46.14 | 60,074.28 |
| 2/28/2006 | 1,300.00 | 46.10 | 59,930.00 |
| 2/28/2006 | 1,100.00 | 46.04 | 50,644.00 |
| 2/28/2006 | 880.00 | 46.06 | 40,532.80 |
| 2/28/2006 | 850.00 | 46.16 | 39,236.00 |
| 2/28/2006 | 820.00 | 46.02 | 37,736.40 |
| 2/28/2006 | 300.00 | 46.00 | 13,800.00 |
| 2/28/2006 | 200.00 | 46.18 | 9,236.00 |
| 2/28/2006 | 100.00 | 46.05 | 4,605.00 |
| **TOTAL** | **107,503.00** | | **$ 4,738,091.40** |

## VII.   THE BROADCOM DEFENDANTS' FALSE
## AND MISLEADING STATEMENTS

### The July 21, 2005 Press Release and the
### Form 10-Q for the Second Quarter of 2005

329.   On July 21, 2005, the first day of the Class Period, the Company issued a press release announcing its financial results for the second quarter of 2005, ending June 30, 2005.  The press release announced, *inter alia*, that:

> Net income computed in accordance with U.S. generally accepted accounting principles (GAAP) for the second quarter of 2005 was $15.1 million, or $.04 per share (diluted), compared with GAAP net income of $69.2 million, or $.19 per share (diluted), for the first quarter of 2005, and GAAP net income of $63.8 million, or $.18 per share (diluted), for the second quarter of 2004.

330.   The Company attached the July 21, 2005 press release as an exhibit to a Form 8-K, filed with the SEC on that same day, signed by defendant Ruehle under a statement that "[p]ursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

331.   The July 21, 2005 press release and Form 8-K were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others: (i) the Company's net income and net earnings per diluted share were materially overstated due to Defendants' improper accounting for backdated option grants; (ii) Broadcom lacked sufficient internal controls to ensure accurate financial reporting and compliance with the Stock Option Plan; and (iii) Broadcom, on a systematic and regular basis, was not adhering to GAAP.

332.   On July 29, 2005, the Company filed its Form 10-Q with the SEC for the quarter ended June 30, 2005 (the "2Q05 10-Q"), signed by defendant Ruehle. The 2Q05 10-Q reported Broadcom's financial results for the second quarter as follows:  (i) net income of $15.1 million; (ii) compensation expense of $14.548 million; and (iii) net earnings per diluted share of $0.04.  In a section of the 2Q05 10-Q entitled "Basis of Presentation," the Company represented that:

> The unaudited condensed consolidated financial statements have been prepared in accordance with principles generally accepted in the United States for interim financial information and with the instructions to Securities and Exchange Commission ("SEC") Form 10-Q and Article 10 of SEC Regulation S-X.
>
> *          *          *
>
> The condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly the Company's consolidated financial position at June 30, 2005 and December 31, 2004, the consolidated results of its operations for the three and six months ended June 30, 2005 and 2004, and the consolidated cash flows for the six months ended June 30, 2005 and 2004.

333.   The 2Q05 10-Q also described the Company's valuation of, and accounting for, its issuance of incentive stock options as follows:

> The Company accounts for stock-based awards to employees in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25") and related interpretations . . . .

In accordance with APB 25, stock based compensation expense is not recorded in connection with stock options granted with exercise prices equal to or greater than the fair market value of the Company's Class A common stock on the date of grant, unless certain modifications are subsequently made. [Emphasis added.]

334.   The statements referenced in ¶¶329-33, above, were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:  (i) Broadcom's net income and net earnings per diluted share were materially overstated, and its compensation expense was materially understated, due to the Broadcom Defendants' improper accounting for backdated option grants; (ii) Broadcom lacked sufficient internal controls to ensure accurate financial reporting and compliance with the Stock Option Plan; (iii) because of the pervasive accounting errors and fraudulent backdating of its option grants, the Company's balance sheet and income statement in the 2Q05 10-Q were materially misstated at all relevant times; and (iv) the Company, on a systematic basis, was not adhering to GAAP.

335.   Defendant Ruehle also certified the 2Q05 10-Q pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of SOX, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

336.   This certification was materially false and misleading because the information in the 2Q05 10-Q did not present, in all material respects, the financial condition and results of operation of the Company in view of its overstatement of net income, understatement of compensation expense, and overstatement of EPS due to Broadcom's material omission that it improperly accounted for its fraudulently backdated option grants.

337. In addition, defendant Ruehle certified the 2Q05 10-Q pursuant to Section 302 of SOX, stating that:

1. I have reviewed this quarterly report on Form 10-Q of Broadcom Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant *and have*:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

1       b)      Any fraud, whether or not material, that involves

2               management or other employees who have a significant role in

3               the registrant's internal control over financial reporting.

4       338.    This certification was false and misleading for the reasons set forth

5   in ¶334, and because defendant Ruehle either knew or recklessly disregarded that

6   the 2Q05 10-Q contained numerous false and misleading statements relating to,

7   or arising from, Broadcom's improper stock option practices.

8               **The October 20, 2005 Press Release and the**

9               **Form 10-Q for the Third Quarter of 2005**

10      339.    On October 20, 2005, Broadcom issued a press release announcing

11  its financial results for the third quarter of 2005, ending September 30, 2005.  The

12  press release announced, *inter alia*, that Broadcom's revenue and net income

13  reached "record levels" in the third quarter:

14          Net income computed in accordance with U.S. generally accepted

15          accounting principles (GAAP) for the third quarter of 2005 was

16          $132.7 million, or $.35 per share (diluted), compared with GAAP net

17          income of $15.1 million, or $.04 per share (diluted), for the second

18          quarter of 2005, and GAAP net income of $43.9 million, or $.13 per

19          share (diluted), for the third quarter of 2004.

20      340.    The Company attached the October 20, 2005 press release as an

21  exhibit to a Form 8-K, filed with the SEC on that same day, signed by defendant

22  Ruehle under a statement that "[p]ursuant to the requirements of the Securities

23  Exchange Act of 1934, the registrant has duly caused this report to be signed on

24  its behalf by the undersigned hereunto duly authorized."

25      341.    The October 20, 2005 press release and Form 8-K were materially

26  false and misleading when made because they failed to disclose and/or

27  misrepresented the following adverse facts, among others: (i) the Company's net

28

income and net earnings per diluted share were materially overstated due to the Broadcom Defendants' improper accounting for backdated option grants; (ii) Broadcom lacked sufficient internal controls to ensure accurate financial reporting and compliance with the Stock Option Plan; and (iii) Broadcom, on a systematic and regular basis, was not adhering to GAAP.

342.   On October 31, 2005, the Company filed its Form 10-Q with the SEC for the quarter ended September 30, 2005 (the "3Q05 10-Q"), signed by defendant Ruehle.  The 3Q05 10-Q reported Broadcom's financial results for the third quarter as follows:   (i) net income of $132.7 million; (ii) compensation expense of $16.584 million; and (iii) net earnings per diluted share of $0.35.  In a section of the 3Q05 10-Q entitled "Basis of Presentation," the Company represented that:

> The unaudited condensed consolidated financial statements have been prepared in accordance with principles generally accepted in the United States for interim financial information and with the instructions to Securities and Exchange Commission ("SEC") Form 10-Q and Article 10 of SEC Regulation S-X.
>
> *                 *                 *
>
> The condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly the Company's consolidated financial position at September 30, 2005 and December 31, 2004, the consolidated results of its operations for the three and nine months ended September 30, 2005 and 2004, and the consolidated cash flows for the nine months ended September 30, 2005 and 2004.

343.  The 3Q05 10-Q also described the Company's valuation of, and accounting for, its issuance of incentive stock options as follows:

> The Company accounts for stock-based awards to employees in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25") and related interpretations . . . .
>
> In accordance with APB 25, stock based compensation expense is not recorded in connection with stock options granted with exercise prices equal to or greater than the fair market value of the Company's Class A common stock on the date of grant, unless certain modifications are subsequently made.  [Emphasis added.]

344.  The statements referenced in ¶¶339-43, above, were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:  (i) Broadcom's net income and net earnings per diluted share were materially overstated, and its compensation expense was materially understated, due to the Broadcom Defendants' improper accounting for backdated option grants; (ii) Broadcom lacked sufficient internal controls to ensure accurate financial reporting and compliance with the Stock Option Plan; (iii) because of the pervasive accounting errors and fraudulent backdating of its option grants, the Company's balance sheet and income statement in the 3Q05 10-Q were materially misstated at all relevant times; and (iv) the Company, on a systematic basis, was not adhering to GAAP.

345.  Defendant Ruehle also certified the 3Q05 10-Q pursuant to 18 U.S.C. § 1350, as adopted by Section 906 of SOX, stating that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

346. This certification was materially false and misleading when made because the information in the 3Q05 10-Q did not present, in all material respects, the financial condition and results of operation of the Company in view of its overstatement of net income, understatement of compensation expense, and overstatement of EPS due to Broadcom's material omission that it improperly accounted for its fraudulently backdated option grants.

347. In addition, defendant Ruehle certified the 3Q05 10-Q pursuant to Section 302 of SOX, stating that:

1. I have reviewed this quarterly report on Form 10-Q of Broadcom Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant ***and have***:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed

under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

1           a)     All significant deficiencies and material weaknesses in

2           the design or operation of internal control over financial

3           reporting which are reasonably likely to adversely affect the

4           registrant's ability to record, process, summarize and report

5           financial information; and

6           b)     Any fraud, whether or not material, that involves

7           management or other employees who have a significant role in

8           the registrant's internal control over financial reporting.

9        348.   This certification was false and misleading for the reasons set forth

10 in ¶344, and because defendant Ruehle either knew or recklessly disregarded that

11 the 3Q05 10-Q contained numerous false and misleading statements relating to,

12 or arising from, Broadcom's improper stock option practices.

**The January 26, 2006 Press Release and the**

**<u>Fourth Quarter and Year-End Results for 2005</u>**

15        349.   On January 26, 2006, Broadcom issued a press release announcing

16 its financial results for the fourth quarter and year end December 31, 2005.  The

17 press release announced, *inter alia*, that:

18      Net income computed in accordance with U.S. generally accepted

19      accounting principles (GAAP) for the fourth quarter of 2005 was

20      $194.8 million, or $.50 per share (diluted), compared with GAAP net

21      income on $132.7 million, or $.35 per share (diluted), for the third

22      quarter of 2005, and GAAP net income of $71.1 million, or $.20 per

23      share (diluted), for the fourth quarter of 2004.

24      Net revenue for the year ended December 31, 2005 was $2.671

25      billion, an increase of 11.3% from the $2.401 billion reported for the

26      year ended December 31, 2004.  GAAP net income for the year

27      ended December 31, 2005 was $411.7 million, or $1.10 per share

28

(diluted).   That amount compares with a GAAP net income of $218.7 million, or $.63 per share (diluted), for the year ended December 31, 2004.

350.   The Company attached the January 26, 2006 press release as an exhibit to a Form 8-K, filed with the SEC on that same day, signed by defendant Ruehle under a statement that "[p]ursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized."

351.   The January 26, 2006 press release and Form 8-K were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others: (i) the Company's net income and net earnings per diluted share were materially overstated due to the Broadcom Defendants' improper accounting for backdated option grants; (ii) Broadcom lacked sufficient internal controls to ensure accurate financial reporting and compliance with the Stock Option Plan; and (iii) Broadcom, on a systematic and regular basis, was not adhering to GAAP.

352.   On February 14, 2006, the Company filed its Form 10-K with the SEC for the year-ended December 31, 2005 (the "2005 10-K"), signed by defendants Samueli, Ruehle, Ross, Wolfen and Farinsky.   For fiscal 2005, the Company reported: (i) total net income of $411.7 million; (ii) compensation expense of $60.004 million; and (iii) net earnings of $1.10 per diluted share.   The Company attached the Stock Option Plan as exhibit 10.9 to the 2005 10-K.

353.   In the 2005 10-K, the Company represented that "[w]e prepared the accompanying consolidated financial statements in accordance with accounting principles generally accepted in the United States of America."   With respect to Broadcom's accounting for stock options, the 2005 10-K states that Broadcom accounts for its stock option grants pursuant to APB 25:

1      The Company accounts for stock-based awards to employees in

2   accordance with Accounting Principles Board Opinion No. 25,

3   *Accounting for Stock Issued to Employees* ("APB 25") and related

4   interpretations . . . .

5   ***In accordance with APB 25, stock based compensation expense is***

6   ***not recorded in connection with stock options granted with exercise***

7   ***prices equal to or greater than the fair market value of the***

8   ***Company's Class A common stock on the date of grant,*** unless

9   certain modifications are subsequently made. [Emphasis added.]

10      354.   The statements referenced in ¶¶349-53, above, were materially false

11   and misleading when made because they failed to disclose and/or misrepresented

12   the following adverse facts, among others:  (i) Broadcom's net income and net

13   earnings per diluted share were materially overstated, and its compensation

14   expense was materially understated, due to the Broadcom Defendants' improper

15   accounting for backdated option grants; (ii) Broadcom lacked sufficient internal

16   controls to ensure accurate financial reporting and compliance with the Stock

17   Option Plan; (iii) because of the pervasive accounting errors and fraudulent

18   backdating of its option grants, the Company's balance sheet and income

19   statement in the 2005 10-K were materially misstated at all relevant times; and

20   (iv) the Company, on a systematic basis, was not adhering to GAAP.

21      355.   Defendant Ruehle also certified the 2Q05 10-Q pursuant to 18

22   U.S.C. § 1350, as adopted by Section 906 of SOX, stating that "the information

23   contained in the Report fairly presents, in all material respects, the financial

24   condition and results of operations of the Company."

25      356.   This certification was materially false and misleading because the

26   information in the 2005 10-K did not present, in all material respects, the

27   financial condition and results of operation of the Company in view of its

28

overstatement of net income, understatement of compensation expense, and overstatement of EPS due to Broadcom's material omission that it improperly accounted for its fraudulently backdated option grants.

357. In addition, defendant Ruehle certified the 2005 10-K pursuant to Section 302 of SOX, stating that:

1. I have reviewed this annual report on Form 10-K of Broadcom Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant *and have*:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those

entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the

1     registrant's ability to record, process, summarize and report

2     financial information; and

3     b)    Any fraud, whether or not material, that involves

4     management or other employees who have a significant role in

5     the registrant's internal control over financial reporting.

6     358.   This certification was false and misleading for the reasons set forth

7 in ¶354, and because defendant Ruehle either knew or recklessly disregarded that

8 the 2005 10-K contained numerous false and misleading statements relating to, or

9 arising from, Broadcom's improper stock option practices.

10     **The April 20, 2006 Press Release and the**

11     **Form 10-Q for the First Quarter of 2006**

12     359.   On April 20, 2006, Broadcom issued a press release announcing its

13 financial results for the first quarter of 2006, ending March 31, 2006.  The press

14 release announced, *inter alia*, that:

15     Net income computed in accordance with U.S.  generally accepted

16     accounting principles (GAAP) for the first quarter of 2006 was

17     $134.9 million, or $.22 per share (diluted), compared with GAAP net

18     income of $194.8 million, or $33 per share (diluted), for the fourth

19     quarter of 2005, and GAAP net income of $69.2 million, or $.13 per

20     share (diluted), for the first quarter of 2005.

21     360.   The Company attached the April 20, 2006 press release as an exhibit

22 to a Form 8-K, filed with the SEC on that same day, signed by defendant Ruehle

23 under a statement that "[p]ursuant to the requirements of the Securities Exchange

24 Act of 1934, the registrant has duly caused this report to be signed on its behalf

25 by the undersigned hereunto duly authorized."

26     361.   The April 20, 2006 press release and Form 8-K were materially false

27 and misleading when made because they failed to disclose and/or misrepresented

28

1  the following adverse facts, among others: (i) the Company's net income and net
2  earnings per diluted share were materially overstated due to the Broadcom
3  Defendants' improper accounting for backdated option grants; (ii) Broadcom
4  lacked sufficient internal controls to ensure accurate financial reporting and
5  compliance with the Stock Option Plan; and (iii) Broadcom, on a systematic and
6  regular basis, was not adhering to GAAP.

7       362.   On May 2, 2006, the Company filed its Form 10-Q with the SEC for
8  the quarter ended March 31, 2006 (the "1Q06 10-Q"), signed by defendant
9  Ruehle.   The 1Q06 10-Q reported Broadcom's financial results for the third
10 quarter as follows:  (i) net income of $134.9 million; (ii) compensation expense of
11 $93.691 million; and (iii) net earnings per diluted share of $0.22.  In a section of
12 the 1Q06 10-Q entitled "Basis of Presentation," the Company represented that:

13          The unaudited condensed consolidated financial statements have
14          been prepared in accordance with accounting principles generally
15          accepted in the United States for interim financial information and
16          with the instructions to Securities and Exchange Commission
17          ("SEC') Form 10-Q and Article 10 of SEC Regulation S-X.  They do
18          not include all of the information and footnotes required by generally
19          accepted accounting principles for complete financial statements.
20          Therefore, these financial statements should be read in conjunction
21          with the Company's audited consolidated financial statements and
22          notes thereto for the year ended December 31, 2005, included in the
23          Company's Annual Report on Form 10-K filed February 14, 2006
24          with the SEC.

25                    *          *          *

26          The condensed consolidated financial statements included herein are
27          unaudited; however, they contain all normal recurring accruals and

28

adjustments that, in the opinion of management, are necessary to present fairly the Company's consolidated financial position at March 31, 2006 and December 31, 2005, and the consolidated results of its operations and consolidated cash flows for the three months ended March 31, 2006 and 2005.

363.   This certification was materially false and misleading because the information in the 1Q06 10-Q did not present, in all material respects, the financial condition and results of operation of the Company in view of its overstatement of net income, understatement of compensation expense, and overstatement of EPS due to Broadcom's material omission that it improperly accounted for its fraudulently backdated option grants.

364.   In addition, defendant Ruehle certified the 3Q05 10-Q pursuant to Section 302 of SOX, stating that:

1.   I have reviewed this quarterly report on Form 10-Q of Broadcom Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures

(as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant **and have**:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

365.    This certification was false and misleading for the reasons set forth in ¶361, and because defendant Ruehle either knew or recklessly disregarded that the 1Q06 10-Q contained numerous false and misleading statements relating to, or arising from, Broadcom's improper stock option practices.

## VIII.  **EY FRAUDULENTLY ISSUED THE 2005 OPINION**

### A.      **Overview of EY's Relationship With Broadcom**

366.    From Broadcom's inception as a public company in 1998, EY served as its independent auditor.  This relationship lasted until Broadcom's Board of Directors abruptly terminated EY in March 2008 to further Broadcom's "efforts to enhance its corporate governance practices."  Following EY's termination, Broadcom initiated an arbitration against EY for malpractice arising from its purported auditing of Broadcom's option grants.

367.    EY's audit efforts were led by Marc Blythe, Bruce Stump, and Clifford Pike.  Blythe was a member of the engagement team from at least Q2

1999 through the end of the Class Period, and was elevated to partner after
working on the Broadcom engagement as a Senior Manager from Q2 1999 to Q2
2001.  Bruce Stump was the Coordinating Partner from 1998 to 2003, and was
involved in EY's procedures concerning Broadcom's option grants.  Cliff Pike
was the technical stock option specialist at EY who advised Broadcom on option-
related issues.  Each of these individuals participated in the audit procedures
concerning Broadcom's options practices and had a significant role in the
execution of EY's false and misleading audit opinions.  In particular, each of
these individuals took part in approving Broadcom's accounting of the May 26,
2000 grant.

368.   EY was heavily involved in and familiar with the regular accounting
practices of Broadcom, and had access to the files and key employees of the
Company at all relevant times.  As a result of the auditing and other services it
provided to Broadcom, EY personnel were frequently present at Broadcom's
facilities, including its headquarters, and had continual access to and knowledge
of Broadcom's internal corporate, financial, operating, and business information
and had an opportunity to observe and review the Company's business and
accounting practices and to test Broadcom's internal financial information, its
publicly reported financial statements and the Company's internal control
structure.

369.   With respect to Broadcom's 2005 financial statements, EY issued its
unqualified Report of Independent Registered Public Accounting Firm and the
Report of Independent Registered Public Accounting Firm on Internal Control
Over Financial Reporting as set forth in Broadcom's Form 10-K for 2005
(collectively, the "2005 Opinion" or "Opinion"), which opined that the
Company's financial statements were prepared in conformity with Generally
Accepted Auditing Standards and later PCAOB Standards (collectively,

1   "GAAS"), and that Broadcom's internal controls were effective.   The 2005

2   Opinion specifically stated that the financial statements "present[ed] fairly in all

3   material respects" the financial condition of the Company and its results of

4   operations and cash flows.   Moreover, EY's Opinion stated that it had planned

5   and performed its audits of Broadcom in accordance with GAAS to obtain

6   reasonable assurance that the Company's financial statements were free of

7   material misstatements.   As alleged herein, these assertions were materially false

8   and misleading.

9       370.   EY was highly compensated for the accounting and auditing services

10  it provided Broadcom.   During the Class Period, EY earned more than $7 million

11  in audit fees, consisting of $2,546,000 in audit and audit-related fees in 2005 and

12  $4,473,000 in audit and audit-related fees in 2006.   In total, between 2000 and

13  2006, the Company paid EY more than **$19.6 million**, of which more than

14  $17 million stemmed from audit and audit-related services.

15      **B.    EY Knowingly Issued A Materially False And**

16          **Misleading Audit Opinion In 2005**

17      371.   EY's liability arises from its 2005 Opinion, which EY knew, or was

18  deliberately reckless in not knowing, was false, in part, in that it represented that

19  EY audited Broadcom's financial statements in compliance with GAAS.   The

20  2005 Opinion stated that EY purportedly conducted its audits in compliance with

21  GAAS.   On this basis, EY "believe[d] that [its] audits provide a reasonable basis

22  for [its] opinion."

23      **The 2005 Opinion Relates To 2003, 2004, and 2005**

24      372.   In particular, the opinion expressly related to three years of financial

25  statements—2003, 2004, **and** 2005—and stated, in part:

26      In our opinion, the financial statements referred to above present

27      fairly, in all material respects, the consolidated financial position of

28

1    Broadcom Corporation at December 31, 2005 and 2004, and the

2    consolidated results of its operations and its cash flows for each of

3    the three years in the period ended December 31, 2005, in

4    conformity with U.S. generally accepted accounting principles.

5    Furthermore, in 2004 and 2005, to comply with standards imposed by SOX, EY

6    opined that Broadcom maintained effective internal controls.

7        373.   As stated above, the 2005 Opinion opined on Broadcom's financial

8    statements for 2003, 2004, **and** 2005, thereby expressly relying on those prior

9    audits to support its Opinion.   While Broadcom claims to have stopped

10   backdating options in 2003, Broadcom's options typically had a four-year vesting

11   period, which caused the improperly backdated options to impact all three years

12   of financial statements that are the subject of the 2005 Opinion.   For instance,

13   Broadcom incurred increased *after-tax* expenses of $334 million, $46 million, and

14   $45 million in the three years ended December 31, 2003, 2004, and 2005,

15   respectively.   These amounts caused Broadcom to understate its net loss per share

16   (basic and diluted) by 26 percent for 2003, and to overstate its net income per

17   share by 28 percent (basic) and 27 percent (diluted) for 2004, and 13 percent

18   (basic) or 11 percent (diluted) for 2005.   Indeed, of the $2.2 billion of overstated

19   earnings from 1998-2005, nearly half a billion dollars or **20 percent**, was

20   attributed to the 2003-2005 period financial statements.   ¶¶228-33.

21       **EY Claimed To Audit In Compliance With GAAS**

22       374.   In rendering its Opinion, EY stated it "conducted [its] audits in

23   accordance with the standards of the Public Company Accounting Oversight

24   Board (United States) [*i.e.*, GAAS]."   EY further stated in its 2005 Opinion that it

25   "plan[ned] and perform[ed] the audit to obtain reasonable assurance about

26   whether the financial statements are free of material misstatement."   In order for

27   EY to make this statement, GAAS required, among other things, that the auditors

28

1   test Broadcom's accounts and management's representations.    In particular

2   GAAS required that "[s]ufficient competent evidential matter… be obtained

3   through inspection, observation, inquiries and confirmations to afford a

4   reasonable basis for an opinion regarding the financial statements under audit."

5   AU § 326.01.  Audit by inquiry alone is not sufficient.

6          375.   Moreover, GAAS required EY's auditors to obtain "direct personal

7   knowledge, obtained through physical examination, observation, computation,

8   and inspection."  AU § 326.21.  Significantly, GAAS required EY to consider

9   evidential matter that "consists of the underlying accounting data and ***all***

10  ***corroborating information*** available to the auditor."   AU § 326.15   (Emphasis

11  added).

12         376.  To this end, EY could not simply rely on management's

13  representations.   As detailed below, oral and written representations from

14  management "are not a substitute for the application of those auditing procedures

15  necessary to afford a reasonable basis for an opinion regarding the financial

16  statements under audit."  AU § 333.02, referencing SAS 85.

17         **1.      EY Knew It Did Not Audit The May 26, 2000 Grant**

18                 **Pursuant to GAAS, And Instead Gave Broadcom**

19                 **"Flexibility" to Backdate The Largest Options**

20                 **Grant In The Company's History**

21         377.  The May 26, 2000 Grant—the largest in Broadcom's history—is

22  central to EY's fraudulent scienter and its liability.   As the government

23  investigations uncovered, EY was intensely concerned about the propriety of this

24  grant.  Its concern was well placed in view of the Company's admission that its

25  "success depends" upon maximizing compensation for key employees using

26  options.  Despite its concern, EY nonetheless provided the Broadcom Defendants

27  "***flexibility***" to backdate this grant.  As detailed below, EY turned the other way

28

1  with knowing, or at least reckless disregard of, the fact that the grant was

2  backdated and should have resulted in a $700 million charge to Broadcom's

3  earnings.

### EY Initially Demanded Documentation to Support The Grant

378.  In July 2000, EY expressed concern to Broadcom that the May 26, 2000 grant was not properly accounted for.  As EY would soon discover, its concerns were well founded.  Specifically, the delay in allocating the purported May 26 grant caught EY's attention, ***leading EY to engage in an "intense discussion"*** with Broadcom's management concerning the timing of this grant, and to request documentation of the number of shares granted to each individual identified by name as of May 26, 2000.  This information was critical to EY's audit because APB 25 required that the measurement date for the grant could be determined ***only*** when ***both*** (i) the number of options that an individual employee is entitled to receive, and (ii) the exercise price are determined and definite.

### EY Knew That Broadcom Faced a $700 Million Charge

379.  On or about July 20, 2000, Gail Patton, Broadcom's director of financial reporting and principal contact for the auditors, emailed defendant Ruehle to inform him that EY was raising serious accounting issues concerning the May 26, 2000 grant.

380.  In fact, EY identified the core accounting issue:  the determination of the measurement date.  Due to the difference in Broadcom's share price between May 26 and mid-July 2000, EY, led by Blythe, Stump, and Pike, was going to and, in fact, should have required Broadcom to record a compensation charge in excess of $700 million, confirming that EY knew the precise accounting consequence of applying the simple requirements of APB 25 to this grant. Specifically, Patton wrote:

1   As expected, I am experiencing resistance from [the auditors] on our

2   Focal Grant program.  The basic concern is the measurement date of

3   these grants (5/26/00)….  [The auditors'] position is that we need to

4   know how many shares are granted to each individual to actually set

5   the measurement date…. ***[Auditors] could require us to record***

6   ***compensation expenses…[which] could be over $700 million*** based

7   on the 5/26/00 price and the current price.

8   381.  In turn, the same day, now nearly two months after the purported

9   grant date, Ruehle informed Nicholas that EY requested documentation of the

10  grant—documentation that did not exist.  This documentation would have been

11  essential to any conclusion reached by EY that a $700 million charge was not

12  required.  Specifically, Ruehle reported:

13  We need to give to E&Y a list of approved option grants for 5/26

14  focal review.  They are ***making noise*** that we will have to take a

15  compensation hit for the difference between the 5/26 price ($118)

16  and the current price because we have not yet "completed" the

17  grants.  That would result in a charge of over $700M!  Obviously we

18  are not about to let this happen.

19  382.  Accordingly, no later than July 20, 2000, ***EY knew of the material***

20  ***accounting consequences*** of Broadcom's improper option grants, as did Ruehle

21  and Nicholas.

22  **<u>EY Relies Solely on Management Representations</u>**

23  383.  Rather than obtaining the documentation it initially requested, EY

24  approved the accounting for this grant with nothing more than a single

25  conversation with management, in knowing violation of GAAS.  Specifically, on

26  or about July 24, 2000, Ruehle ***told the auditors*** that on May 26, 2000,

27  Broadcom's Options Committee (Nicholas and Samueli) had:  (a) authorized a

28

1    fixed number of options to be granted and (b) approved a "program" or "plan"

2    establishing a set "Guideline Matrix" by which employees were subsequently

3    granted specific numbers of these available options based on a formula.  As an

4    initial matter, EY knew that this representation on its face did not even comply

5    with APB 25, which required specificity as to the identity of the recipient and the

6    number of shares granted.

7        384.   Further, EY did nothing to test these management representations in

8    testing the May 26, 2000 grant.   Specifically, knowing that the Options

9    Committee had purportedly approved over 7 million options and the

10   Compensation Committee had purportedly approved over half a million options

11   on May 26, 2000, *EY never actually received or relied on any documents*,

12   including any purportedly false documents, to support its approval.  For instance,

13   EY could have demanded to obtain signed copies of the dated Option Committee

14   or Compensation Committee minutes; confirm with employees that the option

15   grants had been communicated on or near the purported grant date; or review the

16   option grant agreements to verify that the grants had been communicated.

17       385.   Despite "making noises" to resolve the $700 million accounting

18   implications of the May 26, 2000 grant, EY knowingly violated GAAS by

19   capitulating without performing appropriate auditing procedures and gathering

20   competent evidential matter on the grant.   Instead EY relied solely on

21   management's representations.   This was a knowing, or at least reckless,

22   departure from GAAS relating to an accounting issue that had a known material

23   impact on Broadcom's financial statements.

24       **EY Did Not Receive Any Contemporaneous Documents—**

25       **False or Otherwise—Before Signing Off**

26       386.   In late July 2000, Ruehle directed subordinates to prepare draft

27   minutes for a purported Options Committee meeting on May 26, 2000, at which

28

1  the Options Committee (Nicholas and Samueli) supposedly set up an option pool

2  of seven million shares for the grant.  These draft minutes, however, were never

3  finalized or signed and were never shared with anyone other than defendant Dull.

4      387.  Similarly, EY did not receive or rely upon the so-called Guideline

5  Matrix.  In fact, EY knew that Fred Whittlesey, Broadcom's Director of

6  Compensation who oversaw the grants and developed the guidelines spreadsheet,

7  was not even hired until mid-June 2000, meaning that grant allocations, and

8  therefore the measurement date, could not have been set on May 26, 2000.

9      388.  Though these events transpired during the course of EY's interim

10 review procedures, GAAS is nonetheless clear that EY had a duty to respond and

11 seek sufficient evidential matter.   AU § 722.20-21.   ("The accountant may

12 become aware of matters that cause him or her to believe that interim financial

13 information, filed or to be filed with a specified regulatory agency, is probably

14 materially misstated as a result of a departure from generally accepted accounting

15 principles.  In such circumstances, the accountant should discuss the matters with

16 the appropriate level of management as soon as practicable.   If, in the

17 accountant's judgment, management does not respond appropriately to the

18 accountant's communication within a reasonable period of time, the accountant

19 should inform the audit committee, or others with equivalent authority and

20 responsibility.").

21      **EY's "Flexibility" Is Confirmed By Documentary Evidence**

22      389.  In short, EY inappropriately granted Broadcom "flexibility"

23 concerning the May 26, 2000 grant.  In view of the $700 million expense EY

24 knew was associated with this grant, it allowed Broadcom to improperly account

25 for it despite its "***making noise***" about serious concerns, "intense" discussions,

26 and lack of ***any*** documentation to support its conclusion.  In other words, EY

27

28

1   looked the other way while knowing, or at least recklessly disregarding, that the

2   grant was improperly accounted for.

3       390.  Once EY signed-off on the grant, Broadcom did not take for granted

4   EY's "flexibility". On September 11, 2000, after EY agreed to the improper

5   accounting for the May 26 grant, Gail Patton, Broadcom's manager of financial

6   reporting, emailed Ruehle, warning that while EY was "flexible," such

7   capitulation could not be counted on time and again. Specifically, she wrote:

8           Going forward, we can expect much greater scrutiny by [the

9           auditors] on our option granting process…. I do not believe that [the

10          auditors] will grant us any *flexibility* on this in the future."

11  In reality, however, EY did not cease its flexibility until the fraud came to light at

12  the end of the Class Period.

13          **2.     EY Had Actual Knowledge Of Unauthorized**

14                  **Grants Following The Death of One of**

15                  **<u>Two Members of the Compensation Committee</u>**

16      391.  As detailed above, Broadcom's Compensation Committee issued

17  backdated options on June 24, October 19, and December 24, 2001 using "as of"

18  UWCs to approve these grants. However, the Compensation Committee did

19  not—and could not—authorize these grants because the Committee was not

20  constituted due to the death of one of its two members, a fact EY knew.

21  Nevertheless EY accepted these grants as if they had been fully authorized.

22      **EY Knew The Evidence Supporting The June 24 2001 Grant**

23      **<u>Revealed There Was No Committee Authorization</u>**

24      392.  With respect to the June 24, 2001 grant, EY accepted as audit

25  evidence documentation that established that the grant was not properly

26  authorized. Specifically, one of the two Compensation Committee members died

27  in July 2001, *before* the UWC for the June 24, 2001 grant was signed. In order to

28

salvage this grant, Dull directed an in-house lawyer to prepare draft minutes for a "special telephonic meeting" of the Compensation Committee that purportedly occurred on June 24, 2001. However, while Dull received a draft copy of these minutes, he never signed them in his capacity as Corporate Secretary. Without Dull's signature, there was no evidence of the Compensation Committee's approval of the June 24, 2001 grant, contrary to APB 25.

393. EY knew the documentation contradicted the assertion that the grant was authorized. The June 24, 2001 grant was one of the grants on which Broadcom specifically consulted with EY to determine whether a compensation charge was necessary. Nevertheless, EY accepted the unsigned draft minutes as the sole support for its audit testing, incorporating the document into its workpapers.

394. Similarly, EY accepted the timing of the October 19, 2001 grants despite knowing that the Compensation Committee was not constituted on that date, and while knowing there was no authorization for the June 24 grant.

### EY Accepted The Improbability of the Christmas Eve 2001 Grant

395. The December 24, 2001 grant was also highly suspect for an additional reason. As explained above at ¶¶153-64, December 24 was the first date during a five-week window that Broadcom could have granted options following a six-month tender period. In hindsight, it also ended up marking the lowest trading price during the entire the window.

396. Beyond the fact that EY knew that the Compensation Committee was not constituted on that date, EY also knew, or should have known, the risks associated with the improbability that Broadcom chose the very first day of the window, which happened to also be Christmas Eve and the single lowest price within the window, to formalize the grant.

1    **EY Deliberately Disregarded Managements'**

2    **Override of Compensation Committee Approval**

3    397.  Quite obviously, what EY knowingly ignored was that management

4    did not choose December 24 out of good fortune, but in fact backdated the grant.

5    EY also knew that the Compensation Committee was not constituted, therefore

6    management faced no limits on its ability to choose the date.

7    398.  In view of these facts, EY knowingly, or at least recklessly, failed to

8    appropriately consider the risk of management override or the implications

9    caused by the discrepancies in the accounting records.  AU § 316.26,

10   AU § 316.27 ("[T]his consideration [of a lack of controls in place to address

11   identified fraud risk factors] would need to include an added sensitivity to

12   management's ability to override such controls.")  *See also* AU § 316.25

13   ("Discrepancies in the accounting records, including – Transactions not recorded

14   in a complete or timely manner or improperly recorded as to amount, accounting

15   period, classification, or entity policy.").

16   **3.    Separately, EY Knew There Was**

17   **Insufficient Evidential Matter For**

18   **Nearly Half of the Backdated Grants**

19   399.  EY's failure to audit Broadcom's grants, in accordance with GAAS,

20   was not limited to the May 26, 2000 grant, or those grants that could not be

21   authorized by the Compensation Committee.  As both EY and Broadcom

22   admitted, ***nearly half*** of the Restatement's $2.2 billion reduction in earnings is

23   attributed to backdated options that were unsupported by any contemporaneous

24   documents.  Specifically, ***$1.037 billion of the Restatement is attributed to***

25   ***option awards for which there was no contemporaneous documentation***.  These

26   awards involved 10,529 options grants covering 108.9 million shares.  Of these

27   awards, as EY and Broadcom admitted in the Restatement, three grants covering

28

12.5 million shares occurred when the closing price of Broadcom's stock was "near the lowest price experienced during the applicable quarter [or] year." (quoting the Restatement). In view of the massive number of grants and shares involved, let alone the material impact to earnings, if EY had audited any of these 10,529 option grants, it would have expected to find some documentary evidence.

### UWCs Revealed They Were Executed Long After Grant Date

400. The only documentation that existed for these grants was the UWCs. By their very nature, these UWCs were not contemporaneous—a fact exposed on the face of the documents. As EY and Broadcom admitted in the Restatement, the UWCs were executed weeks, if not months, after the "as of" date of the purported grant. Significantly, to the extent EY ever looked at these UWCs, it knew that the documents were executed weeks or months after the "as of" date because the **execution dates were never altered**. As EY and Broadcom admitted in the Restatement:

> the Audit Committee found no evidence of any attempt to falsify execution dates of the "as of" unanimous written consents, or of any effort to assert that the date of actual execution of the "as of" unanimous written consents was on the grant date or measurement date.

Moreover, EY knew that "a number of the 'as of' unanimous written consents were presented for signature at the same time," calling into question why the only documents supporting several grants were **executed on the same date** long after the grant purportedly occurred.

### UWCs Were Merely Management Representations

401. In addition to the significant questions raised by the information on the face of these UWCs, they did not amount to audit evidence for an additional and dispositive reason: the UWCs executed by the Option Committee, signed by

1   Samueli and Nicholas, were nothing more than management representations

2   because Broadcom could not support them on a timely basis with relevant audit

3   evidence, such as the underlying employee stock option grant agreements

4   themselves, the minutes for the committee meeting purported to have occurred on

5   the as of dates, or for that matter any other evidence that the "measurement date"

6   was correct.   Accordingly, under GAAS, these UWCs, assuming that EY ever

7   saw them, were insufficient (and incompetent) audit evidence upon which to base

8   its audit opinion.   AU § 326.25 ("The auditor should be thorough in his or her

9   search for evidential matter and unbiased in its evaluation….   To the extent the

10  auditor remains in substantial doubt about any assertion of material significance,

11  he or she must refrain from forming an opinion until he or she has obtained

12  sufficient competent evidential matter to remove such substantial doubt, or the

13  auditor must express a qualified opinion or a disclaimer of opinion.").

14      402.   In view of the lack of contemporaneous documentation, EY was

15  required under GAAS to expand the scope of its audit procedures to corroborate

16  the management representations.   AU § 319.69 (***"Inquiry alone generally will***

17  ***not provide sufficient evidential matter*** to support a conclusion about the

18  effectiveness of design or operation of a specific control."); AU § 333.02

19  (management representations "are not a substitute for the application of those

20  auditing procedures necessary to afford a reasonable basis for an opinion

21  regarding the financial statements under audit.").   Instead, EY looked no further

22  and issued its audit opinion knowing, or at least in reckless disregard of, the fact

23  that it had not conducted an audit in compliance with GAAS.

24      403.   In fact, it appears that EY received or requested little, if any, false

25  documentation that purported to be contemporaneous.   The government's only

26  specific allegation of apparently false documentation being provided to EY

27  concerns the August 5, 2002 grant, two years after EY knew that Broadcom had

28

1 improperly accounted for over $700 million of backdated options. Importantly,
2 while the government alleges that EY requested certain documents, there is no
3 indication that these documents, like the UWCs, were designed to conceal
4 Broadcom's backdating practice.

### 4. EY Presided Over Corrective Reforms, Confirming the Material Weakness

7 404. EY presided over "corrective" reforms of Broadcom's internal
8 controls in June 2003, confirming that the earlier controls were wholly
9 inadequate. As discussed above, upon Nicholas's departure from Broadcom, the
10 Board "put into place rigorous processes to prevent and detect any future
11 instances of improper accounting for equity awards." *See* Broadcom's Jan. 23,
12 2007 Press Release. In the Restatement, Broadcom further admitted that in 2003
13 it implemented "significant corrective changes" to ensure that future option grants
14 "complied with prevailing accounting rules" after May 2003.

15 405. That these corrective changes were required reflects EY's implicit
16 understanding that: (i) the Company's historical stock option grants had
17 accounting consequences; (ii) the Company's previously reported financial results
18 were, therefore, false and could not be relied upon; and (iii) that a restatement
19 may be necessary.

### EY Knew That The Material Weakness That Existed Prior To 2003 Rendered the 2005 Opinion Fraudulent

22 406. EY, based upon its previous experience with Broadcom, knew, or at
23 least recklessly disregarded, that these internal control weaknesses continued
24 through the end of the Class Period. As a fundamental matter, an auditor's
25 knowledge is carried forward based on its experience with the client and the
26 procedures it has performed. AU § 319.58 ("This knowledge is ordinarily
27 obtained through previous experience with the entity and procedures such as

28

1    inquiries of appropriate management, supervisory, and staff personnel; inspection

2    of entity documents and records; and observation of entity activities and

3    operations.").

4         407.   As detailed herein, through the procedures EY performed, it knew,

5    or recklessly disregarded, the fact that it should have conducted its audits—

6    specifically its 2003, 2004, and 2005 audits on which it expressly relied in issuing

7    the 2005 Opinion—with a heightened degree of skepticism.   AU § 316.27

8    ("…increased recognition of the need to corroborate management explanations or

9    representations concerning material matters...").   However, EY did not exercise

10   increased scrutiny.  Instead, it granted *flexibility*.

11        408.   Further, that these corrective reforms were implemented specifically

12   to "prevent and detect future instances of improper accounting of equity awards"

13   demonstrates that these reforms were not spurred by SOX, which requires

14   insiders to report their receipt of incentive options to the SEC within two trading

15   days of the grant date.   Instead, given the timing (shortly after Nicholas's

16   departure) and the scope (accounting for equity awards) of these "corrective

17   measures," there is a strong inference that EY knew, or recklessly disregarded,

18   that there was a serious risk of misstatement with the Company's historical

19   accounting for equity awards before the implementation of these reforms.

20        **EY Knew That The Historic Option Grants Were False**

21        409.   Given the "corrective measures" implemented by the Board in June

22   2003, there is no question that EY either knowingly, or recklessly, disregarded the

23   fact that Broadcom's historical option grants were continuing to affect the

24   integrity of the Company's reported financial results after June 2003, including

25   the financial statements expressly opined upon in the 2005 Opinion.   (AS

26   2) ("[T]o the extent that the auditor has *previous knowledge of control

27   weaknesses*, his or her audit strategy should, of course, reflect that knowledge.

28

1    For example, a pattern of mistakes in prior periods is usually a good indicator of

2    the areas in which misstatements are likely to occur. However, the absence of

3    fraud in prior periods is not a reasonable indicator of the likelihood of

4    misstatement due to fraud.").

5        410. Ultimately, in the Restatement Opinion, EY admitted that these

6    material weaknesses, which it knew *existed before June 2003*, rendered its 2005

7    Opinion false and misleading. In particular, as EY admitted, because the

8    "Company did not have appropriate controls in place to properly apply

9    accounting literature as it pertains to certain stock options granted prior to June

10   2003, *including the impact on the 2005 financial statements* of the amortization

11   of deferred compensation related to certain stock options that were granted prior

12   to June 2003," the 2005 Opinion and Broadcom's 2005 financial statements were

13   materially false and misleading. (emphasis added).

14       411. Moreover, in the Restatement Opinion, EY admitted that Broadcom

15   did not maintain effective internal controls as of December 31, 2005, despite

16   EY's 2005 Opinion statements to the contrary.

17       **5.     No Later Than July 2000, EY Knew That**

18             **Broadcom's Internal Controls Suffered From**

19             **A Material Weakness**

20       **Overview of Internal Controls**

21       412. Internal controls are those systems and processes that are essential to

22   maintaining the integrity of publicly reported financial statements. Specifically,

23   internal controls are defined by the Committee of Sponsoring Organizations

24   ("COSO") as "a process, effected by an entity's board of directors, management

25   and other personnel. This process is designed to provide reasonable assurance

26   regarding the achievement of objectives in effectiveness and efficiency of

27

28

1    operations, reliability of financial reporting, and compliance with applicable laws

2    and regulations."

3       413. From at least July 2000 through the end of the Class Period, EY

4    knew that Broadcom's internal controls suffered from a "material weakness," if

5    not several. This gave rise to a "reportable condition," which EY was required to

6    report to Broadcom's Audit Committee. AU § 325.02 ("Matters coming to the

7    auditor's attention that, in his judgment, should be communicated to the audit

8    committee because they represent significant deficiencies in the design or

9    operation of the internal control structure, which could adversely affect the

10    organization's ability to record, process, summarize, and report financial data

11    consistent with the assertions of management in the financial statements.").

12       **EY Knew of Internal Control Weaknesses**

13       414. Specifically, EY knew that Broadcom did not, and could not, provide

14    required contemporaneous documentation to support its option grants. Strikingly,

15    EY also knew that the value of a potential misstatement exceeded $700 million, a

16    clearly material amount, particularly in light of the qualitative factors such as

17    management's clear intent behind the selection of this opportunistic grant timing.

18    In view of this failure, EY could not rely upon the integrity of Broadcom's

19    internal controls. EY knew that under GAAS, these reportable conditions should

20    have been communicated to Broadcom's Audit Committee. AU § 325.02. The

21    need to report these conditions was even greater because it should have been clear

22    that their severity rose to the level of a material weaknesses. AU § 325.15 ("A

23    material weakness in the internal control structure is a reportable condition in

24    which the design or operation of the specific internal control structure elements

25    do not reduce to a relatively low level the risk that errors or irregularities in

26    amounts that would be material in relation to the financial statements being

27

28

1   audited may occur and not be detected within a timely period by employees in the

2   normal course of performing their assigned functions.").

3   ### Under GAAS, EY Knew It Had To Expand Its Scope

4   415. EY's capitulation of its initial demands for corroborating evidential

5   matter to support the May 26, 2000 grant evidences its knowledge that the

6   Company's internal controls were ineffective. In other words, EY capitulated

7   because Broadcom could not, and did not, provide contemporaneous documents

8   to support a material accounting decision. Under such circumstances, GAAS

9   required the auditors to increase their audit testing procedures, since it could not

10  accept uncorroborated management representations as true. AU § 312.33.

11  416. EY, however, did not expand the scope of its audit procedures in

12  connection with the fraud risk factors related to the May 26, 2000 grant, or the

13  host of other grants which it purportedly tested as a component of its audit. For

14  instance, had EY demanded to see the committee minutes for the meetings at

15  which the grants were alleged to have been approved on May 26, 2000, it would

16  have seen that they were in draft form and unsigned, if they existed at all. If EY

17  had taken the next logical step and asked the members of the Audit Committee to

18  corroborate the meeting, they could not have done so. The May 26, 2000 grant

19  was approved only by UWCs from the Option Committee and the Compensation

20  Committee, dated "as of" May 26, 2000. And, as uncovered by the government

21  investigations, the Compensation Committee members did not learn of the grant

22  until September 23, 2000, nearly two months after EY consented to Broadcom's

23  filing of the materially misstated Form 10-Q for the quarter ended June 30, 2000.

24  417. In addition to the May 26, 2000 grant, as detailed above, EY knew

25  that the June 24, October 19, and December 24, 2001 grants were made without

26  Compensation Committee authorization, as the auditors knew that the committee

27  was not constituted on those dates. Furthermore, EY accepted the unsigned

28

1  committee minutes for the June 24, 2001 grant, knowing that the document did
2  not evidence authorization of any sort.

3  **EY Admitted That These Internal Control Weaknesses**
4  **Rendered the 2005 Opinion False**

5  418.   Ultimately, in connection with the Restatement, EY was forced to
6  admit that the internal control weaknesses that the auditors knew of, or recklessly
7  disregarded, in connection with the May 26, 2000 grant resulted in the
8  falsification of Broadcom's 2005 financial statements and EY's 2005 Opinion.
9  Specifically, in connection with the Restatement, EY issued an opinion dated
10 January 19, 2007 ("Restatement Opinion") which stated:

11      The Company did not have appropriate controls in place to properly
12      apply accounting literature as it pertains to certain stock options
13      granted prior to June 2003, ***including the impact on the 2005***
14      ***financial statements*** of the amortization of deferred compensation
15      related to certain stock options that were granted prior to June 2003.

16 (emphasis added).   Moreover, in the Restatement Opinion, EY admitted that
17 Broadcom did not maintain effective internal controls as of December 31, 2005,
18 despite EY's 2005 Opinion statements to the contrary.

19 **EY Was Fired**

20 419.   EY contributed to Broadcom's internal control failures.  Indeed, in
21 March 2008, the Company issued a press release announcing its decision to
22 replace EY as its longstanding auditor.  Tellingly, the Company's press release
23 stated that it decided to replace EY "as part of [its] ongoing efforts to enhance its
24 corporate governance practices."

25
26
27
28

6.      **False Management Representations Letters Are
Basis of Government Charges**

420.   While Nicholas and Ruehle have been indicted for lying to the accountants, these charges actually implicate EY for its own fraudulent conduct. Consistent with EY's reliance on management's oral representations to conduct its "audit," the indictment's allegation points to only Nicholas's and Ruehle's lies contained in the so-called "management representation" letters in connection with the 2000, 2001, and 2002 audits.  EY, however, knew these statements were false.

421.   Management representation letters, as a matter of standard practice, were ***prepared by EY*** for Ruehle's and Nicholas's signatures, and simply state in the most general terms that the Company's financial statements are free of material error or fraud.  As is typical in these types of letters, the false portion of the letter EY received in connection with the 2003 audit stated Broadcom had:

> no material transactions that have not been properly recorded in the accounting records underlying the financial statements…no material weakness in internal control…[and] no fraud involving management of employees who have significant roles in internal control.

Obviously, the letters were not particular to EY's option grant processes.  The letter also stated that Broadcom's financial statements were in compliance with GAAP.  As detailed herein, beginning in mid-2000 through the end of the Class Period, EY knew, or least recklessly disregarded, that these management representations were false and misleading.

422.   Moreover, in view of the facts described above, GAAS required that EY "appl[y] auditing procedures specifically designed to obtain audit evidence concerning matters that are also the subject of written representations." AU § 333.03.  Accordingly, the fact that the management representation letters

were false does not provide a defense to EY for its knowing or reckless violations of GAAS and its fraudulent 2005 Opinion.

### 7. Additional Evidence of EY's Scienter

#### (a) EY's Knowledge, or Reckless Disregard, Of Risk Factors Further Support Allegations of Scienter

423. In addition to the specific allegations herein, EY knew of numerous other facts which it ignored, further supporting a strong inference of scienter. These facts predictably conform to fraud risk factors EY was to be attentive to under GAAS:

- "A significant portion of ***management's compensation*** was constituted by bonuses, stock options, or other incentives, the value of which is contingent upon the entity achieving ***unduly aggressive targets*** for operating results, financial position, or cash flow.";

- "***Domination of management*** by a single person or ***small group*** without compensating controls such as ***effective oversight*** by the board of directors or audit committee.";

- "Inadequate monitoring of significant controls.";

- "Management ***failing to correct known reportable conditions*** on a timely basis.";

- "***Domineering management*** behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work." This factor was particularly relevant when Broadcom was unable to produce objective evidence to support the timing of its option grants;

- "***Inadequate recordkeeping*** with respect to assets susceptible to misappropriation.";

- "Lack of appropriate segregation of duties or independent checks.";

- "Lack of appropriate system of authorization and approval of transactions."; and

- "*Lack of timely and appropriate documentation for transactions*."

AU § 316. *See also* SAS 99.

424. Moreover, EY failed to observe other fraud indicators, including Broadcom's patterns of:

- entering into *aggressive accounting transactions* related to stock options including two rounds of tender offers to exchange granted options;

- leveraging *below-market cash compensation*, but managing to retain employees by providing non-cash compensation that rarely failed to prove significantly more lucrative for its employees; and

- selecting *improbably "fortunate" option grant dates*, including May 26, 2000, the lowest price with a one-year span and Christmas Eve 2001, the lowest possible date in a range of dates, for establishing the strike price of the 2001 tender offer exchange options.

### (b) EY was Deliberately Reckless in Ignoring Numerous "Red Flags"

425. GAAS identifies numerous "red flags" that the auditors need to consider in determining audit risk relating to misstatements arising from fraudulent financial reporting. AU § 316. Statement of Auditing Standards ("SAS") 82 provided auditors with a laundry list of management characteristics, industry conditions, and operating characteristics, which, if present, were red flags indicating that a higher degree of risk exists that financial statements may be misstated. AU § 316.16. In its role as an auditor, and throughout the Relevant Period, EY knew of or recklessly disregarded these red flags.

426. There were numerous red flags that should have alerted EY to the potential material misstatements related to stock-based compensation in Broadcom's financial statements. As described in part above, these red flags at Broadcom included:

(a) throughout the Relevant Period, stock options were granted on dates when the market price, and thus the exercise price, was at or ***near the low price for the quarter in which the options were granted***;

(b) the Company's "***success depends upon*** the ability to attract and retain qualified executives through competitive compensation packages." And below market salaries were "***offset [] by paying significantly above market in equity***." (emphasis added).

(c) knowledge that grants were purportedly authorized during the period in which the ***Compensation Committee was not constituted*** due to the death of one of its two members;

(d) the Options Committee rarely, if ever, held formal meetings between 2000 and 2002, and ***did not maintain any contemporaneous records*** to document its discussions or meetings;

(e) in-the-money options were ***prohibited*** under Broadcom's Stock Option Plan.

(f) grant dates were ***generally sporadic***, *i.e.*, not defined to one or two months of the calendar year or the third Thursday of the month, etc.;

(g) there were ***suspiciously long delays*** between the awarding of stock options and the execution of unanimous written consents approving such grants. For example, as detailed in ¶¶167-78, above, the Broadcom Defendants did not decide how to allocate the block options purportedly granted on May 26, 2000 until July 2000, during

which time the ***Company's stock price surged from $118 per share
on May 26 to well over $200 per share in July 2000***;

(h)   the market price of ***Broadcom's common stock typically surged
soon after the dates of the option awards***, and certain option awards
were granted just days prior to key Broadcom-specific
announcements (such as the option grants on November 3, 1998 and
March 1, 2002, discussed in ¶¶179-84; 206-07, above), which
inevitably spiked the Company's stock price; and

(i)   Broadcom's options ***granting practices were dominated by a select
group of individuals***, *e.g.*, Nicholas and Samueli served as the only
two members of the Options Committee from April 1998 through
2003 and Ross served as one of two members of the Compensation
Committee from 1998 through November 2002.

427.   Despite the lack of an effective internal control environment, EY
knowingly, if not recklessly, failed to adequately address the risk of material
misstatement of the financial statements due to error or fraud when it planned and
performed its audits of Broadcom during the Class Period as detailed above.

C.   **EY's False and Misleading Statements**

1.   **Overview of False Statements**

428.   Throughout the Relevant Period, EY stated in its audit opinions that
it had conducted its audits of Broadcom in accordance with auditing standards
generally accepted in the United States or GAAS.

429.   EY knew, or except for its deliberate recklessness should have
known, that, since at least July 2000: (i) it had not performed its audits of
Broadcom's financial statements in accordance with GAAS; (ii) it should not
have issued "unqualified" opinions on Broadcom's financial statements; and
(iii) its Opinion falsely expressed that Broadcom's financial statements were in

1  conformity with GAAP and that the financial statements were presented fairly in
2  all material respects. This conclusion may be expressed only when the auditor
3  has formed such an opinion on the basis of an audit performed in accordance with
4  GAAS. AU § 508.07. EY failed to do so.

5  430. As set forth above, Broadcom repeatedly violated GAAP with
6  respect to its accounting for "in-the-money" stock options. Yet, despite the
7  ***frequency, variety and magnitude of these violations***, EY fraudulently failed to
8  cause Broadcom to correct the errors and frauds when they occurred. In fact, the
9  fraud was so pervasive that compensation to essentially all levels of employees
10 had been affected since Broadcom's inception as a public company in 1998,
11 totaling more than $2.2 billion in required compensation costs that Broadcom
12 failed to account for properly.

13 431. As described herein, since at least July 2000, EY fraudulently
14 violated GAAS in each of its audits of Broadcom, failed to plan or to perform its
15 audits to obtain reasonable assurance that Broadcom's financial statements were
16 free from material misstatement, and, therefore, was deliberately reckless in
17 stating that it had conducted its audits in accordance with GAAS. EY's annual
18 audit failures and omissions were essential to perpetuating the fraud, which
19 resulted in restatement adjustments leading to a material increase of
20 compensation expense on Broadcom's income statements.

21                    **2.    The 2005 Opinion**

22 432. Broadcom's Form 10-K for 2005 contained the following Report of
23 Independent Registered Public Accounting Firm executed by EY on February 9,
24 2006:

25     We have audited the accompanying consolidated balance sheets of
26     Broadcom Corporation as of December 31, 2005 and 2004, and the
27     related consolidated statements of operations [*i.e.*, income

28

statement], shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2005.   These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Broadcom Corporation at December 31, 2005 and 2004, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2005, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Broadcom Corporation's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway

1  Commission and our report dated February 9, 2006 expressed an
2  unqualified opinion thereon.

3  433. In addition, EY consented to inclusion in the Company's Form 10-K
4  for 2005 its Report of Independent Registered Public Accounting Firm on Internal
5  Control Over Financial Reporting, which stated that Broadcom maintained
6  effective internal controls for financial reporting:

7  We have audited management's assessment, included in the
8  accompanying Management's Report on Internal Control over
9  Financial Reporting appearing above, that Broadcom Corporation
10  maintained effective internal control over financial reporting as of
11  December 31, 2005, based on criteria established in *Internal*
12  *Control — Integrated Framework* issued by the Committee of
13  Sponsoring Organizations of the Treadway Commission (the COSO
14  criteria). Broadcom Corporation's management is responsible for
15  maintaining effective internal control over financial reporting and for
16  its assessment of the effectiveness of internal control over financial
17  reporting. Our responsibility is to express an opinion on
18  management's assessment and an opinion on the effectiveness of the
19  company's internal control over financial reporting based on our
20  audit.

21  We conducted our audit in accordance with the standards of the
22  Public Company Accounting Oversight Board (United States).
23  Those standards require that we plan and perform the audit to obtain
24  reasonable assurance about whether effective internal control over
25  financial reporting was maintained in all material respects. Our audit
26  included obtaining an understanding of internal control over
27  financial reporting, evaluating management's assessment, testing and

28

evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that Broadcom Corporation maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, Broadcom Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the accompanying consolidated balance sheets of Broadcom Corporation as of December 31, 2005 and 2004, and the related consolidated statements of operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2005 of Broadcom Corporation and our report dated February 9, 2006 expressed an unqualified opinion thereon.

For the reasons stated herein, these statements were materially false and misleading.

## IX.   LOSS CAUSATION

### A.   Overview of Loss Causation

434.   The first corrective disclosure concerning Broadcom's improper accounting of stock options, calling into question the veracity of its audited financial statements and EY's audits and opinions concerning those financial statements, occurred on May 22, 2006.  That day, before the market opened, Merrill Lynch issued a report entitled "*Options Pricing – Hindsight is 20/20*," which identified Broadcom as a "standout" for options backdating and warned that investors need to be "aware of the possibility of regulatory activity" probing

1  improper accounting of backdated options, as detailed below (the "Merrill Lynch

2  Report").

3      435.   The next day, *The New York Times* (the "*NY Times*") published an

4  article reporting that Merrill Lynch identified Broadcom as a new arrival to the

5  list of companies associated with option backdating (the "*NY Times* Article").

6  Following publication of the *NY Times* Article, Bloomberg carried an article

7  entitled *BRCM:  U.S. expands its scrutiny of stock grants*, again attributing the

8  revelation of Broadcom's association with improper accounting for stock options

9  to the Merrill Lynch Report (the "Bloomberg Article").   Also on May 23,

10  *BusinessWeek* Online, citing Broadcom, reported extensively on the accounting,

11  tax, criminal, and civil consequences of options backdating (the "*BusinessWeek*

12  Article").

13      436.   Then, on May 25, 2006, Deutsche Bank reported that Broadcom had

14  launched an internal investigation in response to these revelations ("Deutsche

15  Bank Report").   As detailed below, in reaction to this news, at the market's close

16  on May 25, 2006, Broadcom's share price had dropped over ***10 percent***, or $3.85,

17  from the closing price on Friday, May 19, 2006, wiping out $2.37 billion in

18  market capitalization.

**B.      The Market's Understanding of the Accounting
Implications of Backdating Options**

21      437.   The market's reaction to these revelations concerning Broadcom's

22  stock option practices is consistent with investors' understanding of the financial

23  accounting implications of backdating.   By May 2006, investors were well

24  informed that options backdating implicated the audited financial statements of

25  public companies, as well as their auditor's opinions and procedures.   Beginning

26  in March 2006, headlines frequently reported that a number of companies were

27  facing restatement of financial statements, criminal and SEC probes for improper

accounting, and tax consequences due to options backdating.  On March 18, 2006, *The Wall Street Journal* (the "*WSJ*"), in an article entitled *Perfect Pay Day*, addressed the accounting implications of options backdating:

> [Companies] could face accounting issues.  Options priced below the stock's fair market value when they're awarded bring the recipient an instant paper gain.  Under accounting rules, that's equivalent to extra pay and thus is a cost to the company.  A company that failed to include such a cost on its books may have overstated its profits, and might need to restate past financial targets.

438.   The *Perfect Payday* article did ***not*** mention Broadcom, although it highlighted evidence of backdating at several companies including UnitedHealth, Comverse, and Vitesse.  Each of these companies soon faced restatements of their audited financial statements, criminal probes, regulatory investigations, and high-level executive departures.

439.   In the months leading up to May 2006, investors also understood that there was ***one fundamental difference*** between backdating options and simply granting in-the-money options.  As discussed above, and as the *Perfect Payday* article explained, backdating refers to the intentional practice of hand-picking a favorable stock price on an earlier date.  In contrast, an "in-the-money" option is simply a way to award extraordinary compensation to employees at the expense of the company.  While both backdated and "in-the-money" grants provide employees with excess compensation, backdating alone results in reduced expenses, thus fraudulently inflating earnings for the employer.

## C. **Background Disclosures**

### 1. **May 16, 2006—The CFRA Report**

440.   On May 16, 2006, the Center for Financial Research and Analysis ("CFRA"), an independent research and analysis firm, issued an "Educational

1   Report" to its paying subscribers concerning options backdating (the "CFRA

2   Report"). The CFRA Report was not a corrective disclosure of improper

3   accounting of stock options at Broadcom because it was not publicly

4   disseminated.

5       441. To this date, the report is not publicly available. Instead, the CFRA

6   Report was made available to CFRA's subscribers, and potentially only a tiny

7   subset of that subscriber base. According to a former CFRA Senior Sales

8   Executive who worked at CFRA from 2006 to 2008, including during May 2006,

9   the company had no more than 270 to 300 subscribers in total, as corroborated by

10   CFRA's current marketing information.

11       442. Moreover, only a fraction of this subscriber base actually accessed

12   any given report. According to the former executive, subscribers were not sent

13   reports directly, but instead received an email that would indicate which reports

14   were made available on a daily basis. Accordingly, if a subscriber was interested

15   in reviewing a report, the only way it could have obtained it is by logging into

16   CFRA's database using a secure password to download the report. This

17   description of the procedure for obtaining CFRA's reports was also corroborated

18   by a former subscriber to the service. According to the former executive,

19   subscribers also had a choice of which reports they would be notified of. With

20   respect to Educational Reports, like the one issued on May 16, 2006, as few as 30

21   clients subscribed to receive alerts.

22       443. A thorough review of publicly available sources confirms that the

23   existence, let alone the content, of the CFRA Report was not disseminated to

24   investors on May 16, 2006. There is simply an absence of any reporting, whether

25   by journalists, analysts, or any other source concerning the CFRA Report on that

26   date.

27

28

444.   Indeed, the analyst coverage concerning Broadcom on May 16, 2006 made no mention of CFRA or options backdating.   Instead, the coverage concerned positive news about the Company's business prospects.   For instance, Needham Company ("Needham") issued an independent analyst report, entitled "*BRCM:  Too Broad, too Good not to Own, Upgrading to Buy*," upgrading shares of Broadcom stock from a Hold to a Buy based on the Company's business potential.

445.   Similarly, that day, the investment bank UBS positively adjusted its outlook on Broadcom following meetings with various companies, as reported on the daily newswire.

446.   On May 16, 2006, Broadcom's stock price increased $0.03, from the prior day's close of $36.35 to $36.38 per share, or approximately .08 percent.

## 2.    May 17, 2006—Broadcom's Patent Victory

447.   The following day, on May 17, 2006, there was once again no news concerning the CFRA Report or options backdating concerning Broadcom, either generally or reflected by the analysts who regularly covered Broadcom and who presumably would be most sensitive to such news.   Instead, on May 17, 2006, investors learned that the International Trade Commission's (the "ITC") staff issued findings on Monday, May 15, 2006, that Qualcomm Inc., Broadcom's chief rival, infringed on two of Broadcom's patents.   Analysts reported the positive impact this development would have on Broadcom's outlook.

448.   Significantly, UBS increased its outlook for a second consecutive day, raising its price target for Broadcom shares from $55 to $60 based on its opinion that "the findings are more significant in the positive leverage afforded BRCM towards entering the market."   Similarly, Credit Suisse issued a report that proclaimed the "positive impact" of the ITC's report on Broadcom.   Also that day, Deutsche Bank issued an alert entitled *Favorable Preliminary Findings at*

1  *the ITC* (*i.e.*, the Deutsche Bank Report), which concluded that "the ITC

2  development is a positive for BRCM."

3      449.  On May 17, 2006, Broadcom's share price increased $1.08 from the

4  prior day's close of $36.38 to $37.46 per share, or 2.97 percent.

5      **3.**      **May 18, 2006—*Wall Street Journal* Articles**

6      450.  On May 18, 2006, the *WSJ's* article, entitled *Criminal Probe Of*

7  *UnitedHealth's Options Begins*, contained the first publicly disseminated

8  disclosure of the CRFA Report.   Based on a conversation with Marc Siegel,

9  director of research at CFRA, the *WSJ* reported the "accounting research firm …

10  identified 17 companies it termed as having the highest risk of having backdated

11  options … based [on] analysis on regulatory records and trading patterns."

12      451.  Without quoting any portion of the CFRA Report—or indicating that

13  it had received or reviewed a copy of it—the *WSJ* reported that Broadcom was

14  included in CFRA's analysis simply because it met the minimum threshold of

15  three grants that occurred on or close to stock price lows.   Significantly, the

16  article set Broadcom against the likes of UnitedHealth, Comverse, and Vitesse,

17  which were the subject of criminal probes, and reported that the CFRA Report

18  concluded that the grants at Broadcom were "***unremarkable***."

19      452.  Specifically, the *WSJ* contrasted Broadcom from all, but one, of the

20  other companies in CFRA's report:

21        ***Not all the grants issued by the companies were considered to be***

22        ***unusual***.   And many of the at-risk companies had options grants that

23        ***didn't raise red flags based on CFRA's analysis***.   The majority of

24        grants issued by ***Broadcom*** and CNET, for example, ***were***

25        ***considered unremarkable by CFRA.***

26

27

28

(Emphasis added) Thus, investors had no reason to doubt the veracity of Broadcom's audited financial statements or EY's audits and opinions, as the findings were consistent with Defendants' prior conduct and statements.

453. Also in the May 18, 2006 newspaper, the *WSJ* reported an article entitled "*ITC Opinion Says Qualcomm Infringed on Broadcom Patents*," repeating the news concerning Broadcom's patent victory.

454. There was no other news that day concerning the CFRA Report or Broadcom's options practices. Although Broadcom's inclusion in the CFRA Report was now public, in view of the CFRA Report's conclusion that Broadcom's options practices were "unremarkable," there was no disclosure of Defendants' fraudulent conduct. On May 18, 2006 Broadcom's share price declined $0.99 from the prior day's close of $37.46 to $36.47, or 2.64 percent.

**D.** **Corrective Disclosures**

**1.** **May 22, 2006—Merrill Lynch Report**

455. Before the market opened on Monday, May 22, 2006, Merrill Lynch issued a "Industry Overview" report entitled "*Options Pricing – Hindsight is 20/20*," publicly disclosing **for the first time** that Broadcom was specifically suspected of improper accounting of stock options. Merrill Lynch's report was the product of an independent proprietary analysis, unlike CFRA, into the timing of option grants issued by certain companies between 1997 and 2002. The authors of the report were "interested in understanding [] the extent to which stock price performance subsequent to options pricing diverges from stock price performance over a long period of time." The article explained its proprietary methodology:

> We've conducted a detailed look at the history of options pricing for
> the components of the SOX [*i.e.*, the Philadelphia Semiconductor
> Index].... [W]e've looked at annualized stock price returns for the

20-day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted. Theoretically, if the timing of options grants is an arm's length process, and companies haven't systematically taken advantage of their ability to backdate options within the 20-day windows that the law provided prior to the implementation of Sarbanes-Oxley in 2002, ***there shouldn't be any difference between the two measures.***

(Emphasis added.) The difference between the two measures was termed the "excess return," or the amount to which the performance of the share price within 20 days of an option grant exceeded the performance of the share price over the entire year.

456. In contrast to this proprietary statistical analysis, CFRA merely "identified [companies] that, on three or more occasions, granted options at exercise prices that matched, or were close to, lows of company stock price between 1997 and 2002, followed by a bounce of at least 10 percent in share price," as reported in the *WSJ* on May 18, 2006.

457. For the first time ever, the May 22 Report publicly disclosed that Broadcom was a "***standout***" for options backdating. Far from concluding that Broadcom was "unremarkable," as CFRA did, Merrill Lynch warned that "investors need to be aware of the possibility of regulatory activity at" Broadcom. In this regard, the report concluded that Broadcom "consistently generated excess returns" within 20 days after its option grants, a strong sign that it had been the subject of backdating. The report also explained that while Broadcom shares returned a 65 percent increase on average from 1998-2002, the share price increase, on average, was 312 percent, ***nearly five times better***, within the 20 days following the suspect option grants. As Merrill Lynch put it, "***[i]t is difficult to avoid concluding that the timing of options pricing for the period we studie[d]***

1    *has been very advantageous for executives that received options*."   (Emphasis

2    added)

3        458.   Unlike CFRA, the Merrill Lynch Report associated Broadcom with

4    Vitesse, which was already the subject of a government probe.  Merrill Lynch ran

5    its proprietary analysis on Vitesse, and the "results place [Vitesse] right at the top

6    of the table, which tells us that we're capturing something meaningful with our

7    analysis."

8        459.   Adding to the impact of the revelations of Broadcom's accounting of

9    options, also that day, former SEC Chairman Arthur Levitt was reported as saying

10   that backdating "represents the ultimate greed.  It is stealing, in effect.  It is

11   ripping off shareholders in an unconscionable way."

12       460.   In reaction to disclosures in the Merrill Lynch Report, Broadcom's

13   share price declined $2.86 from the prior trading-day's close of $37.20 to $34.34

14   per share, or 7.69 percent, on volume of 26,837,954, nearly double the daily

15   average during the Class Period, wiping out more than $1.76 billion in market

16   capitalization.   The foregoing allegations provide Defendants with additional

17   indications that the drop in Broadcom's stock price on May 22, 2006 was causally

18   related to the Defendants' fraudulent conduct alleged herein as revealed in the

19   Merrill Lynch Report.  Furthermore, as detailed below, as a matter of generally-

20   accepted statistical methodologies, the drop in Broadcom's share price may be

21   attributed specifically to the Merrill Lynch Report with a confidence level of

22   99 percent.

23            **2.    May 23, 2006—Criminal Probes Expanded**

24       461.  Before the market's opening on May 23, 2006, the *NY Times*

25   published an article entitled *U.S. Expands Its Scrutiny Of Stock Grants*.   The

26   article identified Broadcom as a new arrival to the list of companies associated

27

28

1    with options backdating, citing the Merrill Lynch Report as the source of this

2    revelation.

3        462. Following the publication of the *NY Times* Article, Bloomberg

4    carried an article entitled *BRCM: U.S. Expands its scrutiny of stock grants — NY*

5    *Times*, indicating that Broadcom was now the focus of a criminal probe. This

6    article again pointed to the Merrill Lynch Report as associating Broadcom with

7    improper accounting for stock options, while making no mention of CFRA.

8        463. That same day, *BusinessWeek* Online published an article entitled

9    *Backdated Options, Future Rules?* The article provided more detail on the

10   options backdating scandal and associated Broadcom among other companies that

11   had been targeted by law enforcement. The article also highlighted the

12   accounting, tax, law enforcement, and regulatory implications of options

13   backdating, as well as the impact that such revelations have on a company's stock

14   price. In particular, the article warned that the "latest accounting investigations

15   could…undermine investor confidence…[and] could have serious cash

16   consequences. Ten executives or directors at four companies are already out of

17   their jobs." The article also warned that "[b]ackdating is seen as a ***symptom of***

18   ***poor financial controls***, as some companies have acknowledged, and possible

19   poor governance by directors."

20       464. Significantly, *BusinessWeek* set the CFRA Report against the Merrill

21   Lynch Report, reporting that while CFRA was inconclusive, providing "***no***

22   ***proof***" as to whether there was any evidence of backdating, the Merrill Lynch

23   Report's implications had "far reaching consequences" for firms like Broadcom,

24   for whom the backdating "***suspicion is measurable***." As the article observed,

25   once "suspected of cheating," one of the "far reaching consequences" is that the

26   suggestion of accounting improprieties "***undermines the market***" for the

27   Company's shares.

28

465.   In reaction to disclosures in the *NY Times,* Bloomberg*,* and *BusinessWeek* Articles, Broadcom's shares price declined $0.90 from the prior day's close of $34.34 to $33.44 per share, or 2.62 percent, after the nearly 8 percent drop the prior day, on volume of 19,518,516 shares.   The foregoing allegations provide Defendants with additional indications that the drop in Broadcom's stock price on May 23, 2006 was causally related to the Defendants' fraudulent conduct alleged herein as revealed in the *NY Times,* Bloomberg*,* and *BusinessWeek* Articles.   Furthermore, as detailed below, as a matter of generally-accepted statistical methodologies, the cumulative decline in Broadcom's share price of nearly 10 percent on May 22 and May 23, 2006 may be attributed specifically to the dissemination of information disclosed in the Merrill Lynch Report and the May 23, 2006 *NY Times,* Bloomberg*,* and *BusinessWeek* Articles with a confidence level of 99 percent.

### 3.   May 25, 2006—Internal Investigation

466.   On May 25, 2006, for the first time, it was published that Broadcom had launched an internal investigation of its options practices.   Specifically, Deutsche Bank issued a report, entitled "*Mgmt Meeting Take-aways*," disclosing this news (*i.e.* the Deutsche Bank Report).

467.   In reaction to disclosures in the Deutsche Bank Report, Broadcom's share price declined $0.45 from the prior day's close of $33.80 to $33.35 per share, or 1.33 percent, on volume of nearly 18,985,497 million shares.   The foregoing allegations provide Defendants with additional indications that the drop in Broadcom's stock price on May 25, 2006 was causally related to the Defendants' fraudulent conduct alleged herein as revealed in the Deutsche Bank Report.   Furthermore, as detailed below, as a matter of generally-accepted statistical methodologies, Broadcom's May 25, 2006 stock price decline may be

attributed specifically to the Deutsche Bank Report's disclosures with a confidence level of 90 percent.

468.   All told, in reaction to disclosures in the Merrill Lynch Report, the *NY Times* Article, the Bloomberg Article, the *BusinessWeek* Article and the Deutsche Bank Report (collectively, the "May 2006 Disclosures"), Broadcom's share price dropped over ***10 percent***, or $3.85, from the closing price on Friday, May 19, 2006, wiping out 2.37 billion in market capitalization.

**E.   Additional Support For Lead Plaintiff's Allegations of Loss Causation**

**1.   The July 14, 2006 Announcement of the Restatement Was "Well Anticipated," So The Stock Did Not Decline**

469.   On July 14, 2006, Broadcom issued a press release announcing that the Company would have to restate its historic audited financial statements as a result of its improper backdating of options.   As indicated by the market's reaction and corroborated by commentators and analysts, investors anticipated that Broadcom would have to restate and that EY would withdraw its audit opinions, therefore Broadcom's share price did not decline significantly.

470.   Specifically, on that day, Broadcom's share price increased $0.24 from the prior day's close of $27.89 to $28.13 per share, or 0.86 percent.   More significantly, however, this marked a ***24.4 percent drop*** from the closing price on May 19, 2006, the trading day preceding the publication of the Merrill Lynch Report.

471.   Commentators and analysts commented on the "***well anticipated***" restatement news.   For instance, Jefferies & Company, Inc., issued a note concerning Broadcom, entitled *Provides Update on Stock Option Review; Does Have Issues but Well Anticipated*, concluding that "***this outcome has been well anticipated and largely priced in***."   (Emphasis added)

472.   Similarly, Credit Suisse issued an analyst report entitled "*Smog Clearing In Irvine*," noting that the Company's announcement of the forthcoming restatement of its historic financial statements "***clears up a major investor concern***" surrounding the Company's accounting for options.  (Emphasis added)

473.   Also that day, Kaufman Bros. Equity issued a note on Broadcom concerning the announcement, concluding that "most investors believe (and have believed for some time) that ***BRCM had exposure here and probably did engage in such backdating***."  (Emphasis added)  Furthermore Kaufman Bros. concluded that the "disclosure of the news [on July 14, 2006] removes a negative overhang as the company gets closer to a resolution [of] the matter."

474.   Similarly, on September 19, 2006, Broadcom announced that defendant Ruehle would "retire" as Broadcom's Chief Financial Officer.  Again, this news was not unexpected and had been factored into Broadcom's share price, which in reaction dropped only $0.46.  Commentators confirmed the market's expectations.  For example, a Deutsche Bank alert, entitled *CFO retires due to ongoing ESO investigation*, reported that while the "departure of the CFO is rarely a positive and may have a [short term] negative impact on the stock, [] *in this instance we believe it was not totally unexpected*."  (Emphasis added)

## 2.     Broadcom's Filing of The Restatement "Removes A Significant Overhang," So the Stock Increases Slightly

475.   When Broadcom released the Restatement after the market's close on January 23, 2007, nearly seven months after the May 2006 Disclosures, investors expectations were confirmed once again, and further uncertainty was removed from the market place.  On January 24, 2007, the first trading day following the announcement of the Restatement, Broadcom's share price increased $1.23 from the prior day's close of $29.46 to $30.69 per share, revealing that investors' expectations had been confirmed.

476.   In fact, analysts and commentators further confirmed that investors believed that the market had already "weathered" the options news and the expectation of the Restatement based on the earlier disclosures.  For instance, that day, Deutsche Bank issued an alert stating "No change to our view," and further explaining "[w]e remain positive on BRCM as *we believe the company has already weathered the fallout from past stock option grants*," meaning that the stock price already reflected the impact of this news.  (Emphasis added).

477.   Also on January 24, CIBC World Markets issued an update entitled *Broadcom Completes Restatement—Option Overhang Over*.  CIBC concluded that this "will likely come as *little surprise to investors* as Broadcom has been making progress on its accounting issues *over the past few quarters*… This news *removes a significant overhang* from BRCM shares."  (Emphasis added)

478.   D.A. Davidson & Co. agreed, stating that "[w]hile we expect the SEC to continue its formal review and additional lawsuits are likely, *we believe the issue for the most part is behind the company*," raising Broadcom to "Buy" from "Neutral."  (Emphasis added)  Also that day, NASDAQ confirmed that in light of the filing of the Restatement, Broadcom was in compliance with the listing requirements and was no longer at risk of delisting.

### 3.    Statistical Economic Analysis Further Supports Lead Plaintiff's Loss Causation Allegations

479.   To further support the allegations of loss causation at the pleading stage, Lead Plaintiff retained a well-regarded firm in the field of economics and finance to assess the market's reaction to publicly-available information concerning Broadcom's options-related practices and to determine, using a generally accepted methodology, the level of statistical confidence in the assumption that particular events impacted the Company's share price.  The firm has frequently been called upon to prepare reports and to testify as securities

valuation experts in class actions under Federal and State securities laws on matters including market efficiency, the materiality of information and loss and damage causation.

480. The firm performed analyses under what is known as the "event study" methodology in order to determine the statistical likelihood that certain movements in the price of Broadcom common stock during May of 2006 were caused by dissemination of information regarding options backdating and the Company.

481. An event study ultimately involves estimation of expected ("normal") and residual ("abnormal") returns within an event window, where the abnormal return is defined as the difference between the actual and normal returns. Creation of "market models" such as the ones that the firm employed in this matter is a generally accepted, widely used method to obtain estimates of abnormal returns. The approach of the market model methodology is to use the statistical method of linear regression to extract market-wide and industry effects from overall Company-specific effects of events. Standard statistical tests are then performed to determine the level of confidence one has in concluding that an abnormal return was greater than what would be expected based on the stock's normal random price changes, for example, that a price change may have been caused by the dissemination of new, material Company-specific information.

482. In this regard, application of the above-described models result in levels of high statistical confidence that:

> (1) Broadcom's stock price decline on May 22, 2006, nearly 8 percent, was outside normal bounds and was caused by information contained in the Merrill Lynch Report (as high as 99 percent levels of confidence);

(2) Broadcom's cumulative stock price decline over the course of May 22 and May 23, 2006, nearly 10 percent, was outside normal bounds and resulted from the dissemination of information disclosed in the Merrill Lynch Report and the May 23, 2006 *NY Times*, Bloomberg, and *BusinessWeek* Articles described above concerning improper accounting of options backdating (as high as 99 percent levels of confidence); and

(3) Broadcom's May 25, 2006 stock price decline was outside normal bounds and was caused by Deutsche Bank's disclosure that Broadcom had launched an investigation concerning its options practices (as high as 90 percent levels of confidence).

## X.   LEAD PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

483.   Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

484.   In the alternative, Lead Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine on Defendants' material misrepresentations and omissions for the following reasons:

(a)   Broadcom's Class A common stock was actively traded in an efficient market on NASDAQ during the Class Period;

(b)   As a regulated issuer, Broadcom filed periodic public reports with the SEC;

(c)   Broadcom regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire

services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(d)     The market reacted to public information disseminated by Broadcom;

(e)     Broadcom was covered by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(f)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Broadcom's Class A common stock; and,

(g)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased Broadcom Class A Common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

485.    In addition to the foregoing, Lead Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Broadcom's stock option practices and financial performance throughout the Class Period.

## XI.  THE SAFE HARBOR PROVISION IS INAPPLICABLE

486.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of

the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Broadcom who knew that those statements were false when made.

## XII.   CAUSES OF ACTION

### FIRST CLAIM

**Violation of Section 10(b) of the**

**Exchange Act and Rule 10b-5(a), (b) and (c) Promulgated**

**Thereunder Against the Broadcom Defendants**

487.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

488.   During the Relevant Period, the Broadcom Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Broadcom Class A common stock; and (iii) cause Lead Plaintiff and other Class members to purchase Broadcom Class A common stock at artificially inflated prices.

489.   In furtherance of this unlawful scheme, plan and course of conduct, the Broadcom Defendants, jointly and individually, took the actions set forth herein.  The Broadcom Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for Broadcom's Class A common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  All of the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

490.   In addition to the duties of full disclosure imposed on the Broadcom Defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. §§ 210.01 et seq.) and S-K (17 C.F.R. §§ 229.01 et seq.) and other SEC regulations, including truthful, complete and accurate information with respect to the Company's operations and performance so that the market prices of the Company's Class A common stock would be based on truthful, complete and accurate information.

491.   The Broadcom Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's historical stock option practices, and Broadcom's improper reporting and accounting thereof.

492.   The Broadcom Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Broadcom's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Broadcom and its stock option practices in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Broadcom Class A common stock during the Class Period.

493.   Defendants Samueli, Nicholas, Ruehle, Dull and Ross's primary liability, and controlling person liability, arises from the following facts, among others, as detailed herein: (i) they were each high-level executives and/or directors during the Relevant Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a high-level executive and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's stock option practices, finances and operations at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

494. Defendants Ross, Wolfen and Farinsky's primary liability, and controlling person liability, arises from the following facts, among others, as detailed herein: (i) each of these defendants served concurrently on the Compensation Committee and the Audit Committee during the Relevant Period; (ii) as members of the Compensation Committee, these defendants "administered" the Stock Option Plan with respect to Broadcom's Section 16 officers, and were personally responsible for selecting, reviewing and approving the terms of each option grant, including the exercise price and grant date, which were indisputably manipulated; (iii) as members of the Audit Committee, these defendants were responsible for "reviewing" and "monitoring" the Company's corporate financial reporting; (iv) each of these defendants, by virtue of his responsibilities and activities as a director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (v) each of these defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's stock option practices, finances and operations at all relevant times; and (vi) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

495. The Broadcom Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Broadcom Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Broadcom's true financial condition

1  from the investing public, hiring and retaining key personnel, and supporting the

2  artificially inflated price of its Class A common stock.  As demonstrated by the

3  Broadcom Defendants' overstatements and misstatements of the Company's

4  reported net income and compensation expense throughout the Relevant Period,

5  the Broadcom Defendants, if they did not have actual knowledge of the

6  misrepresentations and omissions alleged, were reckless in failing to obtain such

7  knowledge by deliberately refraining from taking those steps necessary to

8  discover whether those statements were false or misleading.

9       496.  As a result of the dissemination of the materially false and

10  misleading information and failure to disclose material facts, as set forth above,

11  the market price of Broadcom's Class A common stock was artificially inflated

12  during the Class Period.  Unaware that the market prices of Broadcom's publicly-

13  traded Class A common stock was artificially inflated, and relying directly or

14  indirectly on the false and misleading statements made by the Broadcom

15  Defendants, or upon the integrity of the market in which the Class A common

16  stock trades, and/or on the absence of material adverse information that was

17  known to or recklessly disregarded by the Broadcom Defendants but not

18  disclosed in public statements by the Broadcom Defendants during the Class

19  Period, Lead Plaintiff and the other members of the Class purchased or otherwise

20  acquired Broadcom Class A common stock during the Class Period at artificially

21  high prices and were damaged thereby.

22       497.  At the time of said misrepresentations and omissions, Lead Plaintiff

23  and other members of the Class were unaware of their falsity, and believed them

24  to be true.  Had Lead Plaintiff and the other members of the Class and the

25  marketplace known the truth regarding Broadcom's stock option practices and

26  financial performance, Lead Plaintiff and other members of the Class would not

27  have purchased or otherwise acquired their Broadcom Class A common stock, or,

28

1   if they had acquired such stock during the Class Period, they would not have done

2   so at the artificially inflated prices which they paid.

3   498.   By virtue of the foregoing, the Broadcom Defendants have violated

4   Section 10(b) of the Exchange Act, and Rule 10b-5(a), (b) and (c) promulgated

5   thereunder.

6   499.   As a direct and proximate result of the Broadcom Defendants'

7   wrongful conduct, Lead Plaintiff and the other members of the Class suffered

8   damages in connection with their respective purchases and sales of the

9   Company's Class A common stock during the Class Period.

10   ## SECOND CLAIM

11   ### Violation of Section 20(a) of the Exchange Act

12   ### Against the Individual Defendants

13   500.   Lead Plaintiff repeats and realleges each and every allegation

14   contained above as if fully set forth herein.

15   501.   Defendants Samueli, Nicholas, Ruehle and Dull acted as controlling

16   persons of Broadcom within the meaning of Section 20(a) of the Exchange Act as

17   alleged herein.   By virtue of their high-level positions, and their ownership and

18   contractual rights, substantial participation in and/or awareness of the Company's

19   operations and/or intimate knowledge of the false financial statements filed by the

20   Company with the SEC and disseminated to the investing public, these

21   defendants had the power to influence and control and did influence and control,

22   directly or indirectly, the decision-making of the Company, including the content

23   and dissemination of the various statements which Plaintiffs contend are false and

24   misleading. These defendants were provided with or had unlimited access to

25   copies of the Company's reports, press releases, public filings and other

26   statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after

27

28

1    these statements were issued and had the ability to prevent the issuance of the

2    statements or cause the statements to be corrected.

3         502.   In particular, Samueli, Nicholas, Ruehle and Dull each had direct

4    and supervisory involvement in the day-to-day operations of the Company,

5    particularly with respect to its stock option practices, and, therefore, are presumed

6    to have had the power to control or influence the particular transactions giving

7    rise to the securities violations alleged herein, and exercised the same.

8         503.   Moreover, as of December 31, 2006, Samueli and Nicholas held

9    59.4% of the total voting power held by Broadcom's shareholders.  Accordingly,

10   Broadcom acknowledged in the Restatement that "[b]ecause of [Nicholas's and

11   Samueli's] significant stock ownership, [the Company] will not be able to engage

12   in certain transactions, and [its] shareholders will not be able to effect certain

13   actions or transactions, without the approval of one or both of these

14   shareholders."   For example, the Company cannot proceed with certain

15   significant corporate actions, such as changing the composition of the Board,

16   without obtaining the approval of Samueli and Nicholas.

17        504.   Defendants Ross, Wolfen and Farinsky acted as controlling persons

18   of Broadcom within the meaning of Section 20(a) of the Exchange Act as alleged

19   herein.   By virtue of their ownership and contractual rights, substantial

20   participation in and/or awareness of the Company's operations and/or intimate

21   knowledge of the false financial statements filed by the Company with the SEC

22   and disseminated to the investing public, these defendants had the power to

23   influence and control and did influence and control, directly or indirectly, the

24   decision-making of the Company, including the content and dissemination of the

25   various statements which Plaintiffs contend are false and misleading.  They were

26   each provided with or had unlimited access to copies of the Company's reports,

27   press releases, public filings and other statements alleged by Plaintiffs to be

28

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

505. As set forth above, Broadcom and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Broadcom Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period.

### THIRD CLAIM

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against EY

506. During the Relevant Period, defendant EY carried out a plan, scheme and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Broadcom's Class A common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Broadcom Class A common stock at artificially inflated prices.

507. In furtherance of this unlawful scheme, plan and course of conduct, defendant EY took the actions set forth herein. EY: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for

1  Broadcom's Class A common stock in violation of Section 10(b) of the Exchange

2  Act and Rule 10b-5 promulgated thereunder.

3      508.   In addition to the duties of full disclosure imposed upon EY as a

4  result of its making affirmative statements and reports, or participation in the

5  making of affirmative statements or reports to the investing public, EY had a duty

6  to promptly disseminate truthful information that would be material to investors,

7  in compliance with GAAP and the integrated disclosure provisions of the SEC as

8  embodied in SEC Regulations S-X (17 C.F.R. §§ 210.01 et seq.) and S-K (17

9  C.F.R. §§ 229.01 et seq.) and other SEC regulations, including truthful, complete

10  and accurate information with respect to the Company's stock option practices,

11  business and operations so that the market prices of the Company's Class A

12  common stock would be based on truthful, complete and accurate information.

13      509.   EY, directly and indirectly, by the use, means or instrumentalities of

14  interstate commerce and/or of the mails, engaged and participated in a continuous

15  course of conduct to conceal adverse material information about the stock option

16  practices, business and operations of the Company as specified herein.

17      510.   EY employed devices, schemes and artifices to defraud, while in

18  possession of material adverse non-public information and engaged in acts,

19  practices, and a course of conduct as alleged herein in an effort to assure investors

20  of the Company's financial performance and compliance with GAAP, which

21  included the making of, or the participation in the making of untrue statements of

22  material facts and omitting to state material facts necessary in order to make the

23  statements made about Broadcom and its stock option practices, business and

24  operations in light of the circumstances in which they were made, not misleading,

25  as set forth more particularly herein, and engaged in transactions, practices and a

26  course of business which operated as a fraud and deceit upon the purchasers of

27  Broadcom's Class A common stock during the Class Period.

28

511. EY's primary liability arises from the following facts, among others, as detailed herein: (i) EY was the Company's auditor throughout the Class Period; (ii) EY fraudulently conducted its audit that EY was aware that Broadcom's stock options were improperly backdated by no later than July 2000, and that the Company's internal controls were so ineffective as to be non-existent, but failed to adequately plan or conduct its audit in violation of GAAS; (iii) EY was aware that it lacked a reasonable basis for its certification that the Company's financial statements were prepared in accordance with GAAP; and (iv) EY was aware of the Company's dissemination of information to the investing public which it knew or recklessly disregarded was materially false and misleading.

512. EY had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to them, and it was required by GAAS to ascertain them. EY's material misrepresentations and/or omissions were done with knowledge or deliberate recklessness and for the purpose and effect of concealing Broadcom's stock option practices, business and operations from the investing public and supporting the artificially inflated price of its Class A common stock. As demonstrated by EY's misstatements throughout the Relevant Period, EY, if it did not have actual knowledge of the misrepresentations and omissions alleged, was deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

513. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Broadcom's Class A common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of

Broadcom's Class A common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by EY, or upon the integrity of the market in which the Class A common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by EY but not disclosed in public statements by EY during the Relevant Period, Lead Plaintiff and the other members of the Class acquired Broadcom's Class A common stock during the Class Period at artificially high prices and were damaged as alleged herein.

514.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the market known the truth regarding Broadcom's stock option practices and financial results, which were not disclosed by EY, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Broadcom Class A common stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

515.   By virtue of the foregoing, EY has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

516.   As a direct and proximate result of the wrongful conduct alleged herein, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Class A common stock during the Class Period.

## XIII.  <u>**PRAYER FOR RELIEF**</u>

517.   WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)  Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(c)  Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

## XIV. JURY TRIAL DEMAND

518. Lead Plaintiff hereby demands a trial by jury.

DATED: October 27, 2008

Respectfully submitted,

Thomas A. Dubbs (admitted *pro hac vice*)
Joseph A. Fonti (admitted *pro hac vice*)
Stephen W. Tountas (admitted *pro hac vice*)
Michael H. Rogers (admitted *pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway, 34th Floor
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Lead Counsel for Lead Plaintiff and the Class*

Joseph J. Tabacco, Jr. #75484
Nicole Lavallee #165755
Lesley Hale #237726
**BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

*Liaison Counsel for Lead Plaintiff and the Class*

Of Counsel:

WILLIAM H. CARPENTER
Carpenter, Stout & Ransom, Ltd.
1600 University Boulevard, N.E.
Albuquerque, NM 87102-1724
Telephone: (505) 243-1336
Facsimile: (505) 243-1339

# EXHIBIT A

## CERTIFICATION

I, Patricia A. Madrid, Attorney General of the State of New Mexico, hereby
certify as follows:

      1.     I am statutorily authorized to represent and execute this Certification on
behalf of the the New Mexico State Investment Council ("SIC"). I have reviewed the class
action complaint filed against Broadcom Corporation ("Broadcom") alleging violations of the
federal securities laws and have authorized participation in this litigation. Through my office,
SIC will remain fully informed at all times concerning the status and progress of this Action, the
strengths and weaknesses of this Action, and the prospects for settlement.

      2.     SIC did not purchase the securities at the direction of counsel or in order
to participate in any private action under the federal securities laws.

      3.     SIC is willing to serve as a lead plaintiff in this matter, including
providing testimony at deposition and trial, if necessary. As Lead Plaintiff in this Action, SIC
understands that it owes a fiduciary duty to all members of the proposed class to provide fair and
adequate representation and to work diligently with class counsel to maximize the recovery for
the Class. As Lead Plaintiff, SIC will consult with class counsel in advance with respect to each
major litigation event, such as important motions, settlement discussions, trial and trial
preparation, and shall have the authority and responsibility to direct counsel with respect to each
of these events after receiving the benefit of counsel's advice.

      4.     The transactions of SIC in Broadcom common stock are reflected in
Exhibit A attached hereto.

      5.     SIC has sought to serve as a lead plaintiff in the following class actions
filed under the federal securities laws during the last three years:

EXHIBIT A
PAGE 190

*In re BISYS Group Securities Litigation* (appointed)
*In re Royal Dutch/Shell Transport Securities Litigation* (withdrawn)
*In re Cardinal Health Securities Litigation* (appointed)
*In re St. Paul Travelers Companies Securities Litigation* (appointed, settled)
*In re HealthSouth Corp. Securities Litigation* (appointed)

6.    Beyond their pro rata share of any recovery, SIC will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court. SIC will ensure that, if appointed, the attorneys' fees to be paid out of the recovery will be fair and reasonable under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct this 14 day of September, 2006.

Patricia A. Madrid
*Attorney General of the State of New Mexico*

2

EXHIBIT A
PAGE 191

**New Mexico State Investment Council**
Class Period: 05/21/2005 to 07/13/2006

BROADCOM CORP Cl. A COM

| Transaction | Trade Date | Settle Date | Shares (split adjusted)* | Price (split adjusted)* | Cost/Proceeds |
|---|---|---|---|---|---|
| OPEN: | | | 63,450.00 | | |
| Sale | 09/22/05 | 09/27/05 | -14,550.00 | $29.174 | $424,481.70 |
| Purchase | 10/14/05 | 10/19/05 | 152,655.00 | $29.161 | -$4,451,623.34 |
| Purchase | 12/01/05 | 12/06/05 | 121,500.00 | $31.569 | -$3,835,674.00 |
| Sale | 01/30/06 | 02/02/06 | -88,500.00 | $45.231 | $4,003,026.10 |
| Sale | 02/09/06 | 02/14/06 | -1,237.50 | $46.747 | $57,850.49 |
| Sale | 02/10/06 | 02/15/06 | -3,712.50 | $45.757 | $169,873.85 |
| Purchase | 03/22/06 | 03/27/06 | 200,000.00 | $44.038 | -$8,807,740.00 |
| Purchase | 03/24/06 | 03/29/06 | 40,000.00 | $44.177 | -$1,767,096.00 |
| Purchase | 03/31/06 | 04/05/06 | 60,000.00 | $42.948 | -$2,576,898.00 |
| Purchase | 04/11/06 | 04/17/06 | 5,775.00 | $43.249 | -$249,765.86 |
| Purchase | 04/17/06 | 04/20/06 | 70,600.00 | $42.500 | -$3,000,500.00 |
| Purchase | 04/28/06 | 05/03/06 | 73,000.00 | $41.089 | -$2,999,555.40 |
| Purchase | 05/09/06 | 05/12/06 | 100,000.00 | $40.263 | -$4,026,300.00 |
| Purchase | 05/10/06 | 05/15/06 | 100,000.00 | $39.458 | -$3,945,880.00 |
| Sale | 07/05/06 | 07/05/06 | -1.00 | $30.770 | $30.77 |

*Shares & prices have been adjusted for the 3-for-2 split on 2/22/06.

EXHIBIT A
PAGE 192